IN THE SUPREME COURT OF NORTH CAROLINA

No. 272A14

Filed 1 September 2023

STATE OF NORTH CAROLINA

v.

JONATHAN DOUGLAS RICHARDSON

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Thomas H. Lock on 3 April 2014 in Superior Court, Johnston County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court on 8 February 2023.

*Joshua H. Stein, Attorney General, by Teresa M. Postell and Kimberly N. Callahan, Special Deputy Attorneys General, for the State-appellee.*

*Glenn Gerding, Appellate Defender, by Kathryn L. VandenBerg and James R. Grant, Assistant Appellate Defenders, for defendant-appellant.*

*David S. Rudolf and Brandon L. Garrett for The Innocence Project, Inc. and the Wilson Center for Science and Justice, amici curiae.*

Justice MORGAN delivered the opinion of the Court.

Justice BERGER delivered the supplemental opinion of the Court as to Issue F.

Justice EARLS concurred in part and dissented in part.

MORGAN, Justice.

While this appeal arising from the abuse and murder of a young child presents this Court with a disturbing series of facts and circumstances, its resolution largely

requires the application of well-established legal principles to the issues raised by defendant. We have carefully considered each issue and, being mindful of both the extremity of the crimes committed by defendant and the resulting sentence imposed upon him, we conclude that defendant's trial was free from prejudicial error and that his sentence of death must be upheld.

## I. Factual and Procedural Background

### A. Factual events leading up to and including Taylor's death

This case involves profoundly significant abuses which were committed against "Taylor,"[1] ultimately leading to the youngster's death at the hands of defendant. The evidence in the record before this Court is extensive, and in this introductory segment of the Court's opinion, we present an overview of the matters which culminated in Taylor's death. Additional facts will be incorporated into various portions of our analysis as they become relevant to each legal issue addressed.

The evidence in the record shows that Taylor was born on 6 July 2006 to Helen Reyes and Jerry Skiba. Reyes and Skiba first met one another at work. Although they never married, Reyes and Skiba lived together at the home of Skiba's parents beginning near the start of their relationship in 2003 and ending sometime in 2007. Reyes described her relationship with Skiba as having "ups and downs," including incidents of physical, emotional, and verbal abuse committed by Skiba against Reyes.

---

[1] The parties have stipulated pursuant to Rule 42 of the North Carolina Rules of Appellate Procedure that the minor victim in this case will be identified as "Taylor," a pseudonym.

Upon learning in 2005 that Reyes was pregnant, the couple attempted to improve their relationship and remained together through the birth of Taylor on 6 July 2006.[2] However, difficulties continued for Reyes and Skiba in their relationship. When Taylor was about one year old, Reyes took the child and moved back into her mother's home in Raleigh where two of Reyes's sisters also resided. Although Skiba's contact with Taylor was intermittent thereafter, Skiba's parents had "a good relationship" with their grandchild and Reyes took Taylor to the paternal grandparents' home for visits.

In September 2008, Reyes enlisted in the United States Army Reserve. Reyes was required to establish a family care plan for Taylor. The family care plan established that Reyes's mother would provide care for Taylor during periods when Reyes was involved in training or deployment obligations. Following an extended period of basic training, Reyes's Army Reserve commitments generally were to consist of one weekend per month and, beginning in July 2010, an additional two-week session each year. Although the official family care plan for Taylor called for Reyes's mother to care for Taylor, Reyes testified that on some occasions, Reyes's sisters or Skiba's parents would keep Taylor. Other than her Army Reserve role, Reyes was not working at this time, and Taylor was not enrolled in any preschool or childcare programs, so Reyes spent the greater part of each day with her daughter.

---

[2] At several places in the trial transcript, the year of Taylor's birth is misstated, but the testimony of Taylor's mother, Reyes, confirmed 6 July 2006 as the correct date of the child's birth.

In December 2009, Reyes went to a bar and nightclub in Smithfield with a female friend when she noticed defendant whom Reyes described as "a tall, handsome, southern guy, respectful." Reyes and defendant talked and danced with one another at the club that night, leaving separately. Both returned to the establishment on the following night, where they conversed again and exchanged telephone numbers. Thereafter, Reyes began a romantic relationship with defendant. The tie between the twenty-seven-year-old Reyes and the twenty-year-old defendant progressed quickly, becoming sexual and involving multiple dates with one another each week by February 2010.

After Reyes and defendant had been dating for about two months, Reyes felt that their relationship was proceeding sufficiently well for Reyes to introduce defendant to Taylor. Reyes felt very positive about the rapport that developed between Taylor and defendant, and the couple began to include the child in some of their activities, including several trips to the beach. Reyes began to hope that she, Taylor, and defendant could form a family, despite the fact that one of Reyes's sisters had told Reyes that the sister saw defendant physically shake Taylor "early on" in the relationship between Reyes and defendant; Reyes did not believe her sister's report and never asked defendant about it.

When defendant and Reyes were dating, defendant was living with his grandparents. Reyes often spent time at the home of defendant's grandparents and sometimes brought Taylor. Reyes described a "little house" located behind the home

of defendant's grandparents where Reyes and defendant would "hang out" and where Reyes sometimes spent the night with defendant. The backyard outbuilding[3] had air-conditioning and electricity, but it did not have a refrigerator, bathroom, or running water, although there was running water available "outside near the outbuilding."

At some point in March or April of 2010, Reyes began to be concerned about her relationship with defendant, noticing that defendant did not want to see Reyes as often and "appeared to want to break off the relationship." Around the same time, Reyes and her mother were not getting along as well as they had been, due in large measure to the issue of Reyes's contributions to the financial needs of their shared household. In addition, there was also conflict among Reyes, her mother, and Reyes's sisters about Reyes's relationship with defendant. By late May or early June of 2010, Reyes's mother announced that she did not want defendant at their home, which led Reyes to consider taking Taylor and moving out of the residence. Ultimately, by 12 June 2010, Reyes and Taylor moved into defendant's residence to live with him.

Reyes made the decision that she and Taylor would reside with defendant despite her awareness of "incidents of . . . injuries or harm . . . to [Taylor]" when the child was alone with defendant, including Taylor suffering a one-half inch cut to the top of her head which defendant claimed had occurred when Taylor was jumping on the bed in the outbuilding and struck her head on the corner of a stationary bicycle.

---

[3] The building is described by various terms in the transcript and record of this case. For consistency and ease of reading, we shall refer to it as "the outbuilding."

Although Reyes had wanted to take Taylor to the hospital on this occasion, nonetheless defendant dissuaded Reyes from doing so. Reyes also knew of another incident which occurred while Reyes, Taylor, and defendant were at the beach. While Reyes remained on the beach, defendant took Taylor "surfing" in the ocean. When Taylor and defendant came back onto the beach, Taylor had an eyelid injury which resulted in a black eye. Defendant explained that Taylor's injury occurred when a large wave caused the "small surfboard" to strike Taylor. Before moving in with defendant, Reyes had also witnessed the physical results of defendant's discipline of Taylor at least once, when Reyes returned from shopping to find Taylor with three or four welts on her back which defendant said resulted when defendant whipped Taylor. Reyes had actually seen defendant whip Taylor with his belt on multiple occasions without leaving marks on the child.[4] At trial, Reyes was also asked about photographs taken of Taylor which showed the child with an unlit cigarette in her mouth and other photographs which showed Taylor holding a beer bottle as if she were drinking it. While Reyes admitted her awareness of defendant's creation of the situations shown in the photographs, Reyes stated that she had not approved of them.

Although defendant had been living in his grandparents' home, once Reyes and three-year-old Taylor moved in with defendant, the three resided solely in the outbuilding. They shared a bed which consisted of an air mattress with a hole which

---

[4] It is not entirely clear from the record whether these whippings occurred before or after Reyes and Taylor resided with defendant, or both.

had been repaired with duct tape. During the three or four weeks that Reyes and Taylor resided with defendant in the outbuilding, Reyes saw defendant slap Taylor in the face with enough force to cause Taylor to fall to the floor; the blow did not leave a mark. Defendant slapped Taylor because the child refused to eat certain food that defendant had given to her. Reyes testified that she had witnessed defendant physically discipline Taylor four times.[5]

Defendant was working in a construction job during the time period when Reyes and Taylor lived in the outbuilding with him. While defendant was at work during the day, Reyes and Taylor remained in the outbuilding, watching television, reading, and playing. They used the woods behind the outbuilding for toilet purposes and bathed at a nearby outdoor water source. They kept perishable foodstuffs in a cooler. Reyes and Taylor had little contact with defendant's grandparents, although "[t]here were times that [they] had gone in the house and showered[ ] and were able to use the bathroom as well" late at night after defendant's grandparents had gone to bed or during the day when the grandparents were away from the home, and once when defendant's grandmother invited Reyes and Taylor inside. Reyes testified that while defendant's grandmother did not make her feel unwelcome, nonetheless Reyes did not ask to use the bathroom inside the home of defendant's grandparents on other occasions.

---

[5] Reyes's testimony was inconclusive with regard to the residential circumstances of Reyes, Taylor, and defendant when these "disciplinary" incidents transpired.

On 2 July 2010,[6] Reyes took Taylor to the home of Reyes's mother to celebrate the birthday of Reyes's mother with family members. This was the first time that Reyes and Taylor had seen Reyes's family since moving out of the residence of Reyes's mother. Reyes knew that her two-week Army Reserve training obligation in New Mexico was approaching, although the exact dates were still being determined. In contemplating arrangements to be made for Taylor's care during Reyes's upcoming military training, Reyes knew that she could leave Taylor with Reyes's mother but did not want to do so in light of the "strained relationship" between Reyes and Reyes's mother. Reyes also knew that Taylor's paternal grandparents would be happy to care for the child, but Reyes did not want to leave Taylor with them because Reyes believed that the paternal grandparents were trying to obtain custody of the child.

Defendant offered to keep Taylor while Reyes was away for Reyes's two weeks of training, stating that his grandmother would take care of Taylor while defendant was at work. Reyes did not talk to defendant's grandmother about this plan, trusting defendant's statements. On 5 July 2010—the day before Reyes was to depart for New Mexico—defendant drove to the home of Reyes's mother with Reyes and Taylor. No one was at the residence, and defendant left Reyes there at about 8:00 p.m. and then departed with Taylor. Reyes testified that, at that point, Taylor had no injuries or marks on her body other than those resulting from "her normal kid activities,

---

[6] Reyes's testimony indicates slightly different dates for this event, but the testimony is consistent that it occurred on a Friday; therefore, it appears that this event occurred on 2 July 2010.

scratches on her legs and arms" and "mild" eczema, which even when inflamed only appeared as dry patches of skin around Taylor's arms. Reyes also confirmed that Taylor had not experienced bloody stools or any blood coming from her vaginal area. When one of Reyes's sisters returned to their mother's house later that evening, the sister was surprised to learn that Taylor was not going to be staying at the home of Reyes's mother during Reyes's Army Reserve trip to New Mexico. Reyes traveled to New Mexico on 6 July 2010. While she was in New Mexico, Reyes texted defendant and tried to call by telephone regularly, sometimes being able to speak briefly with Taylor.

Evidence tended to show the circumstances which existed for Taylor while she was in the care of defendant after he dropped off Reyes at the home of Reyes's mother on the evening of 5 July 2010. At 8:28 p.m. on 5 July 2010, shortly after leaving Reyes at her mother's home, defendant purchased a hasp, padlock, and related items from a home improvement store in Garner. At trial, Reyes viewed photographs which were taken of the door to the outbuilding and testified that the photographs depicted a hasp and padlock on the exterior of the door which had not been present when Reyes departed the outbuilding for her Army Reserve training on 5 July 2010. The hasp and padlock would have made it possible for someone to be sealed inside of the outbuilding, as opposed to the deadlock which had been the sole lock on the door and which could be opened from the inside of the outbuilding when Reyes exited the outbuilding earlier that day.

Defendant's purchase of these items and the installation of the hasp and padlock occurred in the face of defendant's failure to discuss with his grandmother—or anyone else—his need for help to care for Taylor while Reyes was out of town at her Army Reserve training, despite defendant's representation to Reyes that the grandmother would provide care for Taylor while defendant was at work. Defendant's grandmother did not learn that Taylor was staying alone with defendant in the outbuilding until Saturday, 10 July 2010. Investigation into defendant's financial transactions revealed that in the days following Reyes's departure for New Mexico to satisfy her Army Reserve training obligation, defendant was frequently away from the outbuilding during periods of time and that he was apparently without Taylor because the child was not seen by store clerks or on video surveillance footage during any of defendant's outings, errands, or work shifts during the succeeding ten days.

A video recording made at 2:31 a.m. on 10 July 2010 was recovered from defendant's cellular telephone; it showed Taylor inside the outbuilding, facing a wall and a window with her arms held straight to her sides, repeatedly reciting, "If I have to pee, I promise I will tell someone." Reyes identified a voice that can be heard in the video recording requiring Taylor to repeat the phrase and to speak more loudly as defendant's voice. Reyes testified that Taylor was fully potty-trained at the point when Reyes and her daughter began to reside with defendant, although Reyes recalled one "accident" when Taylor urinated in the bed in the outbuilding, which lacked any toilet facilities.

On the following day of 11 July 2010, defendant's grandmother went to the outbuilding to invite defendant and Taylor to have a meal with the grandmother and defendant's grandfather after church. As she approached the outbuilding, defendant's grandmother saw "poop on the doorsteps [of the outbuilding] like somebody had diarrhea," so she knocked on the side of the outbuilding, rather than on the door, and called out to defendant. She heard defendant say "[Taylor], don't go to that [expletive] door" and also heard a "whine" or "whinnying" as if from "a child that . . . couldn't get her way." Defendant did not respond to his grandmother's knock, and the grandmother returned to her house. Defendant subsequently entered his grandparents' house alone, claimed that the diarrhea had been his, and claimed that he had removed it. Defendant then told his grandmother that Taylor was fine, and from that point on the afternoon of Sunday, 11 July 2010, defendant's grandmother never went back to the outbuilding or asked defendant about Taylor. A psychiatrist who testified at trial on defendant's behalf stated that defendant had told the psychiatrist that defendant's grandfather had offered "to help" once the grandfather learned that defendant alone was caring for Taylor, but the date of this offer does not appear in the record, and the record does not show that defendant ever enlisted anyone's assistance in caring for Taylor during Reyes's two-week training period in New Mexico.

On Thursday, 15 July 2010 at 2:53 a.m., defendant purchased gauze pads, bandages, Neosporin, and Flintstones vitamins from a Walmart store in Smithfield.

Reyes testified that she was not able to speak to defendant by telephone on that day,[7] but defendant and Reyes apparently exchanged a number of text messages later that evening, including several in which defendant stated, and Reyes acknowledged, that defendant "was high" and "high as hell" from smoking marijuana. Also on 15 July 2010, defendant ran several errands with no one accompanying him, including a 3:00 p.m. trip to an auto parts store to exchange truck brake pads that he had previously purchased and another trip to the Walmart store in Smithfield to buy, among other items, a queen-size air mattress.

On Friday, 16 July 2010, Reyes spoke to defendant by telephone at about 8:15 a.m.,[8] and during the telephone call, defendant told Reyes that Taylor was fine and asleep. Later that day around noon, however, Reyes's telephone indicated that she had missed three telephone calls from defendant. Reyes texted defendant that she was in a training session and could not respond, and defendant texted the reply, "It's [Taylor]. Call me ASAP."[9] When Reyes called defendant via telephone, defendant told Reyes "that something was wrong with [Taylor], and that he needed to take her to the doctor." Reyes agreed with defendant's assessment. Reyes received an update on

---

[7] Later in the direct examination of Reyes, she noted a "very brief" telephone conversation with Taylor on 15 July 2010 but could not recall anything troubling about the conversation. Testimony regarding the specific timing of some of the exchanges between Reyes and defendant are inconsistent in the trial transcripts.

[8] There was a time zone difference between Reyes and defendant due to their respective locations. The times noted in the transcript appear to reflect Eastern Daylight Time and we employ those times in this opinion.

[9] An acronym meaning "as soon as possible."

Taylor's condition through a telephone call from someone informing Reyes that "something's really wrong with [Taylor] and they had to airlift her to UNC-Chapel Hill, and that [Reyes] needed to make [her] way back home."

Also at about noon on 16 July 2010, defendant's grandmother noticed defendant outside of the outbuilding, speaking on his cellular telephone. Shortly thereafter, defendant came inside his grandparents' house and without any conversation with his grandparents who were both present at the residence, "went to his room . . . long enough maybe to change shirts" before departing. Defendant's boxer shorts, later found on the floor in his bedroom in his grandparents' home, were subsequently tested and found to contain a mixture of DNA[10]. The mixture contained a sperm fraction which predominantly matched defendant's DNA and a non-sperm fraction which matched Taylor's DNA.

Shortly after defendant left his grandparents' house on 16 July 2010, defendant telephoned his grandmother to say that he was taking Taylor to the hospital emergency room because "[s]he fell off the bed last night and when she got up this morning she was dizzy." At approximately 12:45 p.m., defendant carried Taylor into the emergency room (ER) of Johnston Memorial Hospital[11] in Smithfield,

---

[10] Deoxyribonucleic acid.

[11] This medical facility in Smithfield is currently known as UNC Health Johnston, but we refer to it in this opinion as "Johnston Memorial Hospital" as that is the designation given by certain witnesses. *See* UNC Health Johnston, *Find a Location*, https://www.johnstonhealth.org/locations/ (last visited Aug. 17, 2023).

"hollering, '[h]elp me, help me' " and "she fell off the bed." Nurse Mary Butler noted that Taylor was limp, barely breathing, and cold to the touch, and was not sure "if [Taylor] was even alive at all." Butler called for help. Eventually, at least seven medical professionals were working on Taylor, cutting off her bloody and stained clothing, preparing her to be put on a ventilator, and struggling to find a place on Taylor's body to insert an intravenous line due to the large number of injuries that the child appeared to have sustained. Defendant told the medical personnel that Taylor "fell yesterday and hit [her] head, was fine this morning and playing" and claimed that "[f]ifteen minutes" prior to arrival at the hospital, Taylor was "conscious, alert[,] . . . complaining of dizziness and on [the] way to the ER [her] eyes rolled back in [her] head."

Upon the removal of Taylor's clothing, the hospital staff observed that Taylor had suffered injuries "[t]oo numerous to count," including lesions, abrasions, bruises, scabs, deep avulsions where her "skin ha[d] been . . . ripped off" and "chunk[s]" were missing, and obvious bite marks. The medical team could see multiple—maybe "fifty or a hundred"—"whip injuries" and "overlapping, criss-crossing" marks which they estimated to range in age from some that were "ten days, two weeks" old to others that were "fresher." Taylor's treating physician documented "multiple bruises, linear abrasions, bite marks and injuries" on all of the child's extremities. While attempting to insert a catheter into Taylor's urethra, the medical professionals noted "obvious signs of trauma" to Taylor's labia and hymen; when they attempted to take Taylor's

temperature rectally, they saw signs of rectal injury, including bruising.

When asked about Taylor's injuries while he was at the hospital, defendant claimed that "those wounds were on her when he got her, when she was dropped off with him," represented that he needed to move his truck, and then ran toward an exit of the hospital. Nurse Butler followed defendant, grabbed him from behind, pushed him into a room, cursed at him, and told defendant that he could not leave. Defendant did not struggle with or attempt to get past Butler, and instead he simply sat down on a chair in the room. Eventually, law enforcement officers arrived at the hospital in response to a 911 emergency telephone call from a member of the hospital medical team that was working on Taylor, reporting suspected child abuse. After the officers saw the child's injuries, they went to speak with defendant. Defendant gave the officers some basic information: his birthdate, Taylor's birthdate, and the explanation that Taylor's mother Reyes had left Taylor with defendant while Reyes was away for Army Reserve training. Defendant then stated that Taylor had fallen off of the bed on the previous night and had hurt her head, that defendant had put an ice pack on Taylor's head "boo-boo" that night, and that when Taylor "woke up [that] morning saying her head was hurting and dizzy . . . [defendant] fed her a granola bar and Gatorade . . . [and] she rested most of the morning, until he brought her here."

Defendant also acknowledged that "[the] past Wednesday, [Taylor] peed and pooped on him while they were sleeping, and that he lost it and whipped her with a drop cord"; the "marks on the butt and around the privates come from the cord"; "the

power cord was brown"; and "when he found out how bad the marks it left [were], he ripped [the cord] up and put it in a trash bag" inside the outbuilding. Defendant also said that Taylor's mother "does not know about the power cord incident." Defendant told the officers that he did "not know where the other whips c[a]me from . . . [and that] the bite marks c[a]me from a [child] cousin." Defendant also represented that he had "never sexually assaulted" Taylor. One of the law enforcement officers drafted a statement recounting defendant's explanations. Defendant reviewed the statement and after having the officers make corrections to it which did not alter the substance of defendant's representations, signed the document.

Meanwhile, it was determined that Taylor would be transferred to the University of North Carolina Medical Center (UNCMC) in Chapel Hill.[12] In addition to her aforementioned injuries, Taylor had a head injury which resulted in severe brain trauma. Taylor was also diagnosed as hypothermic and determined to have suffered severe blood loss. Upon Taylor's arrival at UNCMC, one of the doctors treating the child examined her in an effort to diagnose the cause of Taylor's extremely low red blood cell count. After preliminarily assuming that Taylor was suffering from uncontrolled bleeding but ultimately determining that there was no such bleeding underway, the treating physician then ascertained that Taylor "clearly had been suffering for some time" and that her "blood count was extremely low

---

[12] This medical center is variously referred to in witness testimony and record documents as "UNC Hospital," UNC Hospitals," "UNC Children's Hospital," and other similar terms, all plainly referring to the facility located on Manning Drive in Chapel Hill.

because she had this pattern of injury to occur over a period of time and had lost blood acutely over a period of time." In addition to attempting to treat Taylor's extensive injuries, the medical team at UNCMC examined the child for signs of sexual abuse and discovered "multiple scars at various stages of healing" on the outside of her vaginal area on her mons pubis and her labia majora, along with "multiple scars" on both of her buttocks that "extended . . . down into the vaginal area" "and the rectal area." All of the injuries appeared likely to have been inflicted in the previous twenty-four to seventy-two hours. Taylor also had sustained an injury to her rectum that was still bleeding and showed evidence of trauma—bruising, tears, and lacerations—as well as cuts or tears to her hymen, all resulting from the penetration of her vagina. The treating professionals noted that these types of rectal and vaginal injuries would generally heal in twenty-four to forty-eight hours.

Despite treatment from a variety of medical experts, Taylor died on 19 July 2010. Taylor's body indicated injuries to her scalp, cheeks, nose, lips, chin, ear, chest, abdomen, arms, legs, wrists, hands, buttocks, vaginal area, feet, and toes, and there were tiny pieces of copper embedded in her arms, legs, vaginal area, and buttocks.

An autopsy conducted on Taylor determined that her cause of death was "[b]lunt force trauma of the head." The autopsy noted many other physical harms, including "multiple blunt force head injuries"; areas on the child's "chest, back, thigh, lower legs, arm and finger" where tissue had been torn from her body; deep lacerations in multiple areas of Taylor's body that had pieces of copper wire embedded

in them; multiple injuries to her anus and vaginal area; and so many "healing shallow lacerations and abrasions" that the medical examiner "couldn't count them."

When investigators entered the outbuilding after Taylor had been taken to the hospital, it smelled of urine and feces, and the following items were discovered in it: a wooden board with blood and Taylor's DNA on it, propped behind the air mattress where defendant and Taylor slept; a brown belt with blood and Taylor's DNA on it; pieces of a brown extension cord with exposed wire ends, with blood and Taylor's DNA on it; pieces of gray duct tape and white tape with Taylor's hair and some of Taylor's hair roots stuck to the tape; and two pillow cases with defendant's sperm on them, one of which also had blood on it with a predominate DNA profile consistent with Taylor's DNA. Reyes testified at trial that photographs taken of the inside of the outbuilding after Taylor was taken to the hospital on 16 July 2010 depicted conditions which were very different from those conditions which were present when Reyes last saw the outbuilding. The pictures showed trash, toys, and duct tape on the floor; a rifle leaning in the corner; a different bed; and a shirt that belonged to Reyes, although Reyes stated that the shirt was not in the same condition as it had been when Reyes left for New Mexico. The photographs of the outbuilding's entrance door which featured a hasp and padlock which were not present on the door when Reyes left for her military training on 5 July 2010 were pictures which were taken after Taylor had been transported to the hospital on 16 July 2010.

**B. Legal proceedings**

On 2 August 2010, defendant was indicted on charges related to Taylor's death, including first-degree murder, felony child abuse inflicting serious injury, first-degree kidnapping, and the commission of a sex offense against a child under the age of thirteen years. On 9 September 2013, a superseding indictment was returned on the charge of the commission of a sex offense against a child under the age of thirteen years. On 20 September 2010, the trial court entered an order noting that the State intended to proceed capitally in defendant's case. As a result, the trial court ultimately determined that the trial would be conducted in, and jurors would be drawn from, neighboring Harnett County.

Defendant filed numerous other pretrial motions, including requests to prohibit the imposition of the death penalty as a potential sentence, to exclude certain photographs from admission at trial, "to Restrict the Use of the Term 'Torture' by Medical Professionals," to suppress defendant's statements which he made when he was interviewed at Johnston Memorial Hospital, and to disqualify the superior court judge who was assigned to preside over defendant's trial, the Honorable Thomas H. Lock. More specific details about the most pivotal motions and the trial court's rulings on them are discussed in the "Analysis" portion of this opinion as they become pertinent to defendant's appellate arguments.

Just before opening statements in defendant's trial, defense counsel informed the trial court outside of the presence of the jury:

> I will say that during opening statements we will be saying
> that [defendant] caused the injury that led to the death of

[Taylor] . . . .

> We are denying that he is—we'll specifically deny that he is guilty of first[-]degree murder, kidnapping, sex offense. We are not going to concede that he's guilty of any crime specifically or any lesser form of homicide at this point.
>
> We are going to acknowledge that there was abuse that took place before Helen Reyes left and afterwards and that it was horrible.

During opening statements, the State told the jury that its theory of the case was "about . . . defendant for ten days tormenting, torturing, and terrorizing" Taylor.

Defendant's theory of the case, in keeping with the concessions that were forecast by his trial counsel to be offered during the trial's opening statement phase, was that defendant

> had been damaged by years of abuse, uncontrolled anger, and untreated mental problems. And when he tried to take care of [Taylor] over a ten-day period, the result was unbelievably tragic.
>
> [Defendant] never intended to kill [Taylor] and he never sexually assaulted her, but out of anger he caused injury that killed her. When [defendant] realized that [Taylor] had been seriously injured, he rushed her to the hospital. He was desperately trying to save her. Although [defendant] inflicted the wound upon [Taylor]'s head that eventually killed her, it was never his intent to kill her.

Defense counsel went on to suggest that defendant's acts and omissions with regard to Taylor were due, in significant part, to defendant's difficult childhood during which defendant's father narrowly survived being shot three times by a stranger when defendant was about one year old, with defendant's mother subsequently being

criminally charged with hiring the shooter. She was acquitted of the alleged offense. Defense counsel stated that defendant's father, who obtained primary custody of defendant, largely ignored defendant and also physically abused defendant. Meanwhile, defendant's mother neglected defendant during the periods that defendant spent with her, as a result of her mental health struggles. Counsel for defendant also conceded that defendant had left Taylor locked in the outbuilding alone while he went shopping. Defendant's trial attorney emphasized, however, that Taylor's fatal head injury was not intentional and was separate and distinct from the child's other injuries. Finally, counsel for defendant acknowledged during opening statements that defendant had lied about what happened to Taylor but stated that once defendant took "[Taylor] to the hospital, he made no effort to cover up or hide anything that he had done to [Taylor]."

During the guilt–innocence phase of the trial proceedings, the State presented evidence which was consistent with the aforementioned factual background. This evidence included descriptions of Taylor's injuries and death from fourteen medical and law enforcement witnesses: medical doctors Edward Clark, Michael Evans, Keith Kocis, Jefferson Williams, Kenya McNeal-Trice, Sharon Cooper, and Jonathan Privette; dentist Richard Barbaro; registered nurses Kenneth Gooch and Mary Butler; Johnston County Sheriff's Department detectives Jamey Snipes and Don Pate; Johnston County Sheriff's Department deputy Matt DeSilva; State Bureau of Investigation Special Agent Mike Smith; and Crime Scene Investigator Charlotte

Yeargin Fournier. Defendant did not testify, but he introduced evidence relevant to his intent, state of mind, and mental condition, including testimony about the shooting of his father and the subsequent trial and acquittal of his mother; a report of physical abuse of defendant by his father when defendant was six years old; defendant's mother's unsanitary living conditions at some times when defendant was staying with her every other weekend; defendant's drug and alcohol use, beginning in his junior year of high school; defendant's aggressive and irritable temperament during his junior year of high school; an incident recounted by a friend of defendant in which defendant was found with a gun and talking about suicide; and defendant being put out of his parents' homes at nineteen years of age after defendant was charged with driving under the influence.

Defendant's argument at this stage of the trial proceedings was that he mistreated Taylor as a result of his traumatic life experiences, his mental health and substance abuse issues, and his frustration in attempting to care for a preschool-aged child without any help and in a difficult living situation; however, defendant's actions which caused Taylor's ultimately fatal head injury were not intended to cause her death and he tried to save the child's life once he realized that her condition was serious. Defendant asserted that there was a break in the chain of abusive acts which he committed against Taylor when he traveled to the Walmart store on Thursday, 15 July 2010 at 2:53 a.m. to purchase first-aid supplies to treat Taylor's wounds, which he contended would sever any proximate causal link between the head trauma that

caused Taylor's death and the infliction of any other previous injuries. Defendant's complementary legal argument represented that such an interruption in the transaction of events would prevent this succession of acts from qualifying defendant's conviction for the offenses of first-degree kidnapping, sex offense against a child under the age of thirteen, and felony child abuse inflicting serious injury to invoke the felony murder rule, or to support the charge of murder by torture.

The jury returned verdicts in which it found defendant to be guilty of all charges. The jury specifically determined that the State had established beyond a reasonable doubt that defendant had murdered Taylor in the first degree expressly premised upon the theories of murder by torture and the felony murder rule based upon the felonies of first-degree kidnapping, sexual offense with a child, and felony child abuse inflicting serious bodily injury. The jury also found defendant guilty of the remaining charges of first-degree kidnapping, sexual offense with a child, and felony child abuse inflicting serious bodily injury.

The matter then moved to the sentencing phase, during which defendant offered considerable evidence about his chaotic family background. It included accounts of the attempted killing of his father, which included the suggestion that defendant's mother had hired the shooter, even though she was acquitted of any wrongdoing; childhood physical abuse of defendant by defendant's father; substance abuse and suicide attempts by defendant; unsanitary conditions in the home of defendant's mother, with whom defendant spent time during his youth; a history of

mental health issues throughout defendant's family, including abuse and depression; and defendant's statements which he made to a clinical psychologist while incarcerated in which he alleged that Reyes had imposed severe physical discipline on Taylor before Reyes left for Army Reserve training which had caused a lot of the child's injuries which were still evident on 16 July 2010. However, the same psychologist also testified that defendant had acknowledged leaving Taylor locked in the outbuilding while defendant worked. The clinical psychologist also testified that defendant admitted that defendant had shaken Taylor for picking at scabs on her body and had hit Taylor's head on "the metal door a couple of times" and then "la[id] her down on the bed" without getting medical attention for her, which apparently transpired on 15 July 2010. Only "a little after lunch" on the following day of 16 July 2010, after Taylor "wouldn't wake up," did defendant undertake any efforts to seek help for the child. Defendant's psychologist also recognized the extensive injuries to Taylor and concluded that defendant "anticipates the consequences of his own actions, he thinks logically and coherently" and "there is no obvious basis for inferring [defendant] was unable to recognize the criminality of his alleged offense or to appreciate the wrongfulness of his conduct at that time."

On 3 April 2014, the jury found the existence of all three aggravating factors which were submitted to it for consideration: (1) that defendant's murder of Taylor was committed in the commission of a sexual offense, (2) that defendant's murder of Taylor was committed in the commission of a kidnapping, and (3) that Taylor's

murder was "especially heinous, atrocious, or cruel." The jury found the existence of three of the forty-six mitigating factors submitted to it: (1) that defendant "never intended to kill [Taylor]," (2) that "Reyes was aware that [defendant] abused [Taylor] and still left [Taylor] with him," and (3) that "Reyes chose to leave [Taylor] with [defendant] although he was only 21 years old and lived in a shed with no running water." The jury then unanimously found beyond a reasonable doubt that the mitigating circumstances were "insufficient to outweigh the aggravating circumstance[s]" and recommended a sentence of death as the appropriate punishment for defendant. On the same date of 3 April 2014, the trial court entered a judgment and commitment including the imposition of a death sentence.

Defendant gave notice of appeal in open court. On 22 October 2014, defendant filed a "Motion for Stay of Appellate Proceedings in Light of Pending Racial Justice Act Motion," which this Court allowed on 18 December 2014. On 12 February 2021, defendant moved to bypass the Court of Appeals for review of his non-capital appellate issues, and the Court allowed this motion on 24 February 2021. The stay was dissolved by order of the Court entered on 4 May 2022. Oral argument took place in this Court on 8 February 2023.

## II.   Analysis

### A.  Denial of defendant's motion to disqualify Judge Lock

Defendant's first two appellate arguments concern the denial of defendant's motion to disqualify the Honorable Thomas H. Lock, the superior court judge who

was assigned to preside at defendant's trial, from involvement in this case. Defendant advances two bases for his contention that Judge Lock should have been removed. First, defendant asserts that Judge Lock was a potential witness for the defense at defendant's trial as a result of Judge Lock's involvement as the district attorney in the trial of defendant's mother which occurred in 1992 on charges related to the aforementioned allegations that she hired someone to shoot and kill defendant's father. Second, defendant contends that Judge Lock's role as the prosecutor of defendant's mother two decades before created an appearance and risk of bias in defendant's own murder trial. We conclude that defendant has failed to show any error in the trial court's denial of the motion to disqualify Judge Lock.

In 1992, when defendant was three years old, defendant's mother Sandra Richardson was tried and acquitted in the Superior Court, Johnston County on charges of (1) conspiracy to commit murder and (2) assault with a deadly weapon inflicting serious injury with intent to kill. The alleged victim was defendant's father Doug Richardson in January 1991, when defendant was approximately one year old.[13] At the time of Sandra Richardson's trial, Judge Lock was the elected district attorney

---

[13] In the motion to disqualify, defendant's counsel asserted that in the attempted contract killing, defendant's father was shot three times by a man but survived, and that after Sandra Richardson's trial, defendant's parents divorced and defendant's father was given primary custody of defendant, although defendant's mother had visitation every other weekend and at other specified times. In a hearing on defendant's motion to disqualify Judge Lock from presiding over defendant's criminal trial for the abuse and murder of Taylor, defense counsel noted that in a child custody matter, the trial court made a finding that Sandra Richardson had sought to have someone hurt Doug Richardson.

in District 11,[14] which is composed of Johnston, Harnett, and Lee Counties. He tried the case against Sandra Richardson.

In May 2012, defendant's trial counsel sent a letter to Judge Lock, notifying the judge of the mother-son relationship between Sandra Richardson and defendant. Defendant's counsel requested that defendant's trial team, the State's trial team, and Judge Lock have a meeting in order for defendant to have the opportunity to question Judge Lock about his recall of Sandra Richardson's case and his knowledge of any dynamics in defendant's family which the defense team could utilize in either the guilt–innocence phase of defendant's trial and/or potentially in mitigation arguments at sentencing. On 6 August 2012, Judge Lock addressed defense counsel's request in open court, producing an email communication from the North Carolina Judicial Standards Commission which was generated in response to an inquiry directed to the Commission by Judge Lock about whether Judge Lock should disqualify himself from defendant's criminal trial. In the email, counsel for the North Carolina Judicial Standards Commission opined that, based upon Judge Lock's statement that Judge Lock remembered Sandra Richardson's case but had no recall from it that would be pertinent to defendant's case, Judge Lock did not need to recuse himself, based upon the information which he provided to the Commission, from serving as the presiding judge in defendant's trial. Judge Lock did note, however, that he would comply with

---

[14] The former District 11 has since been divided into two districts: 11A and 11B.

the recommendation of the Judicial Standards Commission to refer to another superior court judge any motions related to his participation in defendant's trial.

On 1 October 2012, defendant filed a motion to disqualify Judge Lock from presiding over defendant's criminal trial, asserting that Judge Lock was a potential witness for the defense and projecting that defendant planned to focus at trial on the trauma that defendant experienced as a result of growing up in a family which was plagued by a dysfunctional parental dynamic. Defendant deemed this subject matter to be highly relevant to the jury's decisions in both the guilt–innocence and sentencing phases of defendant's trial on the charges arising from Taylor's death. In the motion to disqualify, defendant cited the Fifth, Sixth, and Eighth Amendments to the United States Constitution and Article I, §§ 19, 23, and 27 of the North Carolina Constitution, as well as N.C.G.S. § 15A-1223(e) and Canon 3(C)(1)(b) of the North Carolina Code of Judicial Conduct.[15]

In the motion to disqualify, defendant specifically represented that Judge Lock would have (1) "a lot of knowledge about the case against Sandra" including details not otherwise available, (2) knowledge about the manner in which the shooting affected defendant's father, and (3) "observations" about Sandra during her trial which would be "relevant to her stability and character." Defendant's trial team

---

[15] Defendant's motion to disqualify Judge Lock also discussed disqualifying Assistant District Attorney Michael Beam, who was co-counsel for the prosecution in Sandra Richardson's trial. On appeal, defendant does not argue any error regarding Beam's status in defendant's case, and thus we do not further address any portions of filings in the record on appeal which pertain to Beam.

acknowledged that they had been able to review the existing record in defendant's mother's criminal case. Defendant's trial team also divulged, with regard to the motion, that the team had interviewed defendant's mother, defendant's father, other Richardson family members, and defense counsel from defendant's mother's trial, but defense counsel suggested that "[t]hese witnesses are naturally going to lack the prosecutors' objectivity about Sandra['s]" criminal trial. Finally, defendant emphasized that the "motion is not based on any claim that Judge Lock would be biased against [defendant] because twenty years ago he prosecuted [defendant's] mother," but rather that if Judge Lock was not disqualified, "he cannot be called as a material witness" and "it would create an appearance of impropriety for Judge Lock to preside over [d]efendant's trial." On the same date of 1 October 2012, defendant also filed a motion for disclosure of information from Judge Lock about the trial of defendant's mother and the facts surrounding her alleged crimes. The motion for disclosure contained factual allegations and legal requests which are essentially the same as those found in the motion to disqualify and in defendant's original letter to Judge Lock.

As Judge Lock had promised during the 6 August 2012 hearing, he requested that another superior court judge determine both of the motions as they related to Judge Lock's participation as the assigned presiding judge in defendant's trial. Consequently, the motions were assigned to be heard by the Honorable James Floyd Ammons Jr. *See State v. Poole*, 305 N.C. 308, 320 (1982) (discussing circumstances

where a presiding trial judge who is being challenged should refer motions to recuse or to disqualify to another judge for consideration). On 9 November 2012, Judge Ammons entered an order denying defendant's motion for the disclosure of Judge Lock's knowledge of mitigation information while ordering "complete discovery" from the State as required by statute or caselaw. Judge Ammons found as fact that while Judge Lock remembered serving as the prosecutor in Sandra Richardson's trial, Judge Lock did not have any knowledge of "evidence which would be pertinent to . . . defendant's capital case." Judge Ammons also noted that Judge Lock had an ethical duty to disclose any exculpatory or mitigating evidence regarding defendant's criminal trial, and that Judge Lock had no knowledge of such evidence. Accordingly, Judge Ammons concluded (1) that defendant had not sufficiently demonstrated that "interviews or depositions of Judge Lock" were required here and (2) "that Judge Lock is not a material witness" in defendant's case.

Judge Ammons additionally found in an "Order on Judge's Status" that although Judge Lock had "played a major role" in the prosecution of Sandra Richardson for the attempted murder of defendant's father, Judge Lock did not "have any information, exculpatory or otherwise, . . . that would be material to . . . [d]efendant's case" and further that defendant "ha[d] numerous other sources [from whom] to attempt to obtain [the] information" which defendant sought from Judge Lock.

On 19 December 2012, defendant filed a petition for writ of certiorari which sought review by this Court of Judge Ammons's rulings that Judge Lock was not required to recuse or disqualify himself from presiding over defendant's trial and that Judge Lock would not be required to disclose any information about his recollections of the criminal trial of defendant's mother. In his petition, defendant reiterated his belief that Judge Lock would potentially be a material witness in defendant's trial and his contention that Judge Lock would create the appearance of impropriety in the event that Judge Lock presided over defendant's trial. This Court denied defendant's petition for writ of certiorari by order entered 11 April 2013.

Thereafter, Judge Lock presided over defendant's trial at which, as noted earlier, defendant was convicted on numerous charges arising out of the abuse and murder of Taylor. Defendant received a sentence of death. Defendant contests the orders entered by Judge Ammons regarding defendant's request for Judge Lock to have been disqualified from presiding over the trial.

### 1. Disqualification pursuant to N.C.G.S. § 15A-1223(e) and the Code of Judicial Conduct of judges who may be a potential witness

The need for a judge to recuse himself or herself or to be disqualified where he or she is a potential witness in the trial in question is obvious. In our judicial system, a trial judge should be a neutral manager of an adversarial trial proceeding rather than appearing as a witness for one side or the other. *See, e.g.*, *State v. Britt*, 288 N.C. 699, 710 (1975) (holding that "[e]very person charged with a crime has an absolute right to a fair trial . . . [including] a trial before an impartial judge"); *see also State v.*

-31-

*Williams*, 362 N.C. 628, 638 (2008) (quoting *Britt* for the same proposition). These fundamental legal principles comport with the provisions of North Carolina General Statutes Section 15A-1223(e) that "[a] judge must disqualify himself from presiding over a criminal trial or proceeding if he is a witness for or against one of the parties in the case." N.C.G.S. § 15A-1223(e) (2021). Likewise, Canon 3(C) of the North Carolina Code of Judicial Conduct states that a judge should recuse himself or herself whenever he or she has "personal knowledge of disputed evidentiary facts concerning the [matter]" and/or he or she is "likely to be a material witness in the proceeding." Code of Judicial Conduct, Canon 3(C)(1)(a) and (d)(iv). Defendant has not asserted that Judge Lock has any knowledge of any evidentiary facts in defendant's case. Therefore, in the case at bar, the issue is whether Judge Lock was potentially "a witness" or a "material witness" in defendant's murder trial as a result of Judge Lock's participation in a different criminal trial which occurred twenty years prior and which included parties that were different from those involved in defendant's trial.

When a ruling which resolves a motion to disqualify a judge under N.C.G.S. § 15A-1223 and Canon 3 of the Code of Judicial Conduct is at issue, this Court has opined that "the burden is upon the party moving for disqualification *to demonstrate objectively that grounds for disqualification actually exist.*" *State v. Fie*, 320 N.C. 626, 627 (1987) (emphasis added) (quoting *State v. Fie*, 80 N.C. App. 577, 584 (1986) (Martin, J., concurring)). To satisfy such a demonstration, "substantial evidence"

must be presented by the moving party in order to establish that recusal is required. *State v. Scott*, 343 N.C. 313, 325 (1996). If the allegations about the judge's potential disqualification are made with "sufficient force" to require findings of fact, the motion to recuse should be referred to another judge. *Id.* at 326. In such a case, the findings of fact must be supported by evidence and not solely based upon "inferred perceptions," and those factual findings must support the deciding court's conclusions of law. *Lange v. Lange*, 357 N.C. 645, 649 (2003).

On appeal to this Court, defendant argues that it was reversible error for Judge Ammons to determine that Judge Lock did not need to be disqualified from presiding over defendant's criminal case based upon defendant's assertions that Judge Lock was a potential witness in defendant's trial. First, defendant contends that due to Judge Lock's role as the prosecutor in the 1992 criminal trial of defendant's mother, Judge Lock "had personal knowledge, and made firsthand observations that were relevant to the defense" in the criminal case of defendant and "had information about the parties" in Sandra Richardson's trial. The specific information that defendant contends Judge Lock would possess about the parties was what defendant's parents "[were] like" in the early 1990s when defendant was an infant or a toddler at the time of the shooting of defendant's father and of his mother's trial.

Defendant primarily focuses on the determination that Judge Ammons made in his "Order on Judge's Status" that, in order for a judge to be called as a witness, "the judge must be a *material* witness or have personal knowledge of *disputed*

*material facts*" and that for Judge Lock to be called as a witness here, any evidence he possessed "must be *material* and disputed," while defendant emphasizes that N.C.G.S. § 15A-1223(e) does not include a materiality requirement. Although defendant is correct that the statute in question does not include a materiality component, nonetheless the State correctly notes that defendant repeatedly contended in his written motions and supporting oral arguments that Judge Lock could offer "material mitigating evidence," citing *both* N.C.G.S. § 15A-1223(e) (which includes no materiality requirement) *and* Code of Judicial Conduct Canon 3(C)(1)(b) (which explicitly *does* include a materiality requirement), along with various provisions of the United States Constitution and the North Carolina Constitution. Judge Ammons cited all of these legal resources in the following conclusion of law which he rendered on the issue: "That Judge Lock's presiding over [defendant's] case does not violate the Fifth, Sixth, and Eighth Amendments to the [U.S.] Constitution[;] Article I, [§§] 19, 23, and 27 of the North Carolina Constitution, N.C.[G.S. §] 15A-1223(e), and the North Carolina Code of Judicial Conduct Canon 3(C)(1)(b)."

In light of defendant's presentation of arguments for Judge Lock's recusal on each of these various bases, we cannot infer that Judge Ammons misapprehended the provisions of N.C.G.S. § 15A-1223(e) simply because Judge Ammons referenced materiality in his orders. During the hearing on the motion to recuse, Judge Ammons and defense counsel engaged in at least one exchange in which Judge Ammons expressly observed and discussed that one of the questions under his consideration

was whether Judge Lock "is a witness for or against" defendant. Later during the same hearing when the State referenced materiality, defense counsel agreed that "the material witness [consideration] is . . . part of it." Although during the hearing both parties and Judge Ammons discussed whether Judge Lock would potentially be a "witness" or a "material witness" in defendant's trial, defense counsel never expressed any concern that Judge Ammons misapprehended the legal questions before Judge Ammons regarding defendant's motion to disqualify.

It is also significant that in the two orders which he entered in his resolution of defendant's motion seeking disqualification of Judge Lock, Judge Ammons found as fact that Judge Lock "is not privy to any exculpatory or mitigating evidence relating to [defendant]" and that Judge Lock had repeatedly stated that he did not have *any* knowledge of "evidence which would be pertinent to . . . defendant's capital case." "Pertinent" means "relevant in the context of the crime charged." *State v. Bogle*, 324 N.C. 190, 198 (1989) (quoting *State v. Squire*, 321 N.C. 541, 548 (1988)). Defendant has not argued that Judge Lock was untruthful or dishonest in representing that Judge Lock did not have any knowledge of any evidence that would be exculpatory, mitigating, or otherwise pertinent to defendant's trial or sentencing. Only relevant evidence is admissible in the guilt–innocence phase of a trial, N.C.G.S. § 8C-1, Rule 402 (2021), and while the Rules of Evidence do not apply at capital sentencing proceedings, nonetheless a trial court may only permit the introduction of

evidence which is somehow relevant or pertinent to sentencing. *See State v. Warren*, 347 N.C. 309, 325 (1997), *cert. denied*, 523 U.S. 1109 (1998).

As the party moving for disqualification of the presiding trial judge under the governing law and the Code of Judicial Conduct, defendant had the burden "to demonstrate objectively that grounds for disqualification *actually* exist," *Fie*, 320 N.C. at 627 (emphasis added) (quoting *Fie*, 80 N.C. App. at 584 (Martin, J., concurring)), and that such grounds exist through the production of "substantial evidence," *Scott*, 343 N.C. at 325. Where a "[d]efendant carries the burden to produce substantial evidence . . . mere speculation or conjecture is not sufficient to satisfy this requirement." *State v. Polke*, 361 N.C. 65, 72 (2006) (citing *State v. Anderson*, 350 N.C. 152, 183, *cert. denied*, 528 U.S. 973 (1999)).

Although defendant speculated that Judge Lock "*potentially* has a lot of knowledge about the case against Sandra"—including circumstances regarding "her stability and character"—and "*presumably*" had sufficient familiarity with her husband so as to have impressions about how defendant's father was affected by defendant's mother's alleged harm which was inflicted upon defendant's father by his shooter, defendant has not identified any particular knowledge that Judge Lock could have that would be relevant to defendant or to the crimes for which defendant faced trial. Moreover, even if Judge Lock had recollections of, or thoughts about, defendant's parents, such evidence would not be admissible even as mitigation evidence in favor of defendant. "While a trial court should allow the jury to consider

any mitigating evidence related to a defendant's character and record or the circumstances of the crime, *the feelings, actions, and conduct of third parties have no mitigating value as to defendant and are irrelevant in capital sentencing proceedings.*" *State v. Smith*, 359 N.C. 199, 214–15 (emphasis added), *cert. denied*, 546 U.S. 850 (2005).

Judge Lock's surmised meaningful insight into any of defendant's family dynamics which may have been relevant to the accused's trial defenses or mitigation arguments upon sentencing on the basis of Judge Lock's limited exposure to defendant's parents for only a narrow period of time some twenty years before defendant's crimes occurred, arising only out of the constrained circumstances of the trial which Judge Lock prosecuted as the district attorney in which defendant's mother was the alleged wrongdoer and defendant's father was the victim, is only speculative conjecture and does not constitute the type of substantial evidence that a defendant must produce to compel a trial judge's disqualification from a proceeding. These circumstances are particularly determinative where Judge Lock has unequivocally represented that he does not have any evidence to offer which is pertinent to defendant's case and where defendant does not suggest that Judge Lock was untruthful in this representation.

### 2. *Appearance of impropriety*

Defendant also contends that Judge Lock should have been disqualified from presiding over defendant's trial because his prior role as a prosecutor of Sandra Richardson created an appearance and a risk of actual bias at defendant's trial.

As an initial matter, with regard to defendant's assertion on this appeal concerning any risk of Judge Lock's actual bias, we note that in defendant's motion to disqualify which was filed on the trial court level, defendant candidly and explicitly stated that "[t]his motion is not based on any claim Judge Lock would be biased against [defendant] because twenty years ago he prosecuted [defendant's] mother." In addition, during a pretrial hearing on the motions, defendant's counsel reiterated:

> [N]obody's suggesting here that Judge Lock is — did anything wrong either as a prosecutor or judge in this case.
>
> *And we're not claiming that he's biased* as a result of this. *We realize this happened twenty years ago and it did not directly involve this defendant.*
>
> What we are saying is this. Because he prosecuted Sandra Richardson those many years ago at a critical time in [defendant's] life, he is a potential witness in this case. And if he presides over the case, we're going to lose the right to call him as a witness.

(Emphasis added.) At the same hearing, defense counsel later reaffirmed that defendant was not alleging that Judge Lock would be prejudiced against defendant or for the prosecution, or that Judge Lock otherwise would be unable to preside at defendant's trial in an impartial manner, but that defendant's challenge to Judge Lock's ability to properly preside was based upon "him being a witness." Likewise, defendant did not claim that Judge Lock harbored any actual bias in defendant's

petition for writ of certiorari filed in this Court on 19 December 2012 in Case No. 526P12. *See State v. Benson*, 323 N.C. 318, 322 (1988) ("Defendant may not swap horses after trial in order to obtain a thoroughbred upon appeal."). Accordingly, defendant's argument that Judge Lock possessed actual bias at defendant's trial is unpersuasive here.

We next address defendant's contention that Judge Lock should have been disqualified because there was a potential for the *appearance* of impropriety in the event that Judge Lock presided over defendant's trial in light of Judge Lock's participation in the prosecution of defendant's mother on charges related to her alleged hiring of an individual to kill defendant's father. As discussed above, both N.C.G.S. § 15A-1223 and Canon 3(C) of the Code of Judicial Conduct "control the disqualification of a judge presiding over a criminal trial when partiality is claimed." *Scott*, 343 N.C. at 325. Prior to the year 2003, Canon 2 of the Code stated that "[a] judge should avoid impropriety and the *appearance of impropriety* in all his activities." *See* Code of Judicial Conduct, Canon 2 (2002) (emphasis added). Under this earlier version of the Code, a defendant who contended that a trial judge should be disqualified from presiding over a case due to partiality was required to present "substantial evidence of partiality or evidence that there was an *appearance of partiality*" on the part of the trial judge. *State v. Vick*, 341 N.C. 569, 576 (1995) (emphasis added); *see also Scott*, 343 N.C. at 326. However, under the current version of the Code of Judicial Conduct which applies in defendant's case, Canon 3(C)

provides that "a judge should disqualify himself/herself in a proceeding in which the judge's impartiality may reasonably be questioned, including but not limited to instances where . . . [t]he judge has a personal bias or prejudice concerning a party[.]" Code of Judicial Conduct, Canon 3(C)(1)(a). While defendant has expressly noted, and we have expressly acknowledged, that defendant here does not assert that Judge Lock maintained any actual bias or prejudice against defendant in this case, nonetheless we are left to consider the remaining factor of the cited canon as to whether, in presiding at defendant's trial, Judge Lock's "impartiality [might] reasonably be questioned." *Id.*

Defendant relies upon *Fie* as an illustration of the type of circumstances in which, despite the lack of any actual bias on the part of a trial judge or any lack of ability of the trial judge to preside impartially over a trial, nonetheless the *appearance* of impartiality required disqualification of the trial judge in question. In *Fie*, which was decided under the earlier version of Canon 3(C) of the Code of Judicial Conduct, this Court analyzed a situation in which the trial judge "initiated the criminal process against the two defendants" by writing a letter to the local district attorney which requested that a grand jury consider numerous criminal charges against the defendants after the trial judge had heard certain testimony in another trial over which the trial judge had presided. 320 N.C. at 626–28. Upon this particular background, this Court held that "a perception could be created in the mind of a reasonable person that [the trial judge] thought the defendants were guilty of the

crimes with which they were charged and that it would be difficult for the defendants to receive a fair and impartial trial before" the trial judge. *Id.* at 628. While we find unassailable the assertion in *Fie* that a trial judge who recommends that criminal charges be brought against a defendant should not then serve as the presiding judge over the defendant's trial in light of the appearance of the trial judge's partiality due to the trial judge's recommendation of the very charges which are the subject of defendant's trial over which the same trial judge presides, the extraordinary procedural facts presented in *Fie* are markedly distinguishable from the present case. Here, Judge Lock had no previous connection to defendant's criminal case and had no input in the initiation of criminal charges against defendant regarding the death of Taylor. Judge Lock's role as the prosecutor of defendant's mother in a criminal matter involving defendant's parents at a time period which was twenty years prior to defendant's trial, in a prosecution of defendant's mother at a time when defendant was two years of age, and in a prosecution of defendant's mother in which there was no issue of the trial's outcome which was premised upon defendant, is so different from the trial judge's relationship to the defendants in *Fie* that there is no consequential parallel to impact the current case.

Turning to defendant's due process claims, defendant acknowledges that the United States Constitution protects the guarantee of "an absence of actual bias" on the part of a presiding judge. *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016). In detecting the existence of a trial judge's inability to preside over a case due to bias,

the United States Supreme Court authorizes "an objective standard" in order to "avoid[ ] having to determine whether actual bias is present." *Id.* ("The Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." (extraneity omitted)). In *Williams*, which defendant frequently cites in his argument, the United States Supreme Court considered whether there was a due process violation in the form of "an impermissible risk of actual bias when a judge earlier had *significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case*." *Id.* (emphasis added). In *Williams*, Ronald Castille, then-district attorney, approved the pursuit of the death penalty in the defendant's first-degree murder case. *Id.* at 5. Two and one-half decades later, the defendant—who had been convicted of murder and sentenced to death—sought post-conviction relief, receiving both a stay of execution and a new sentencing hearing. *Id.* at 6. The Commonwealth of Pennsylvania then sought further review in the Pennsylvania Supreme Court where Castille, who as the district attorney had approved proceeding capitally against the defendant, was serving as its chief justice. *Id.* After the defendant's motion for the chief justice to recuse himself from the defendant's appellate case was denied, the lower court ruling which granted post-conviction relief to the defendant was vacated. *Id.* at 7. Consequently, the defendant's death sentence was reinstated. *Id.* In determining that the Chief Justice of the Pennsylvania Supreme Court should have been disqualified from considering

the defendant's appeal, the United States Supreme Court opined that "[t]he due process guarantee that 'no man can be a judge in his own case' would have little substance if it did not disqualify a former prosecutor from sitting in judgment of a prosecution in which he or she had made a critical decision." *Id.* at 9.

Just as with the *Fie* case, we find *Williams* to be inapposite here to defendant's case because Judge Lock had no involvement as a prosecutor in defendant's criminal case and had no apparent involvement in any previous legal proceeding directly involving defendant, much less "significant, personal involvement." *Id.* at 8. Thus, we believe that "the average judge in [Judge Lock's] position is 'likely' to be neutral." *Id.* (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009)).

In sum, we conclude that defendant has not established, at a minimum, the existence of the appearance of impropriety in Judge Lock's service as the presiding judge over defendant's trial due to Judge Lock's prior position as a prosecutor of defendant's mother at a point in time when defendant was a young child. Accordingly, we are unpersuaded by defendant's argument.

**B. Admissibility of photographic evidence**

Defendant next argues that the trial court committed reversible error in its admission of eighty-eight color photographs of Taylor's body and her injuries which were allowed into evidence through the testimony of eight of the State's witnesses. Defendant also contends that the trial court erred in permitting these photographs

to be displayed before the jury on a sixty-inch monitor,[16] with the ability for witnesses to utilize enlarged and close-up views of the photographs during the witnesses' respective accounts. Although defendant acknowledges that the number and nature of Taylor's injuries were relevant to the factual determinations to be made by the jury, he contends that "the manner and extent of the State's photographic display was excessive, inflammatory, and unfairly prejudicial[,] . . . because there was no dispute about who caused the injuries and whether they were extreme and tragic. Rather at both phases of trial, the primary issue was [defendant's] state of mind." We do not determine any abuse of the trial court's discretion with regard to the forum's admission of the challenged photographs.

"All relevant evidence is admissible" at trial unless the Constitution, the legislature or the Rules of Evidence provide otherwise. N.C.G.S. § 8C-1, Rule 402 (2021). Relevant evidence includes all evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action" either more or less probable. N.C.G.S. § 8C-1, Rule 401 (2021). A trial court may, however, exclude evidence when that evidence is "substantially outweighed by the danger of unfair prejudice, confus[es] the issues, . . . mislead[s] the jury," or causes "undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (2021). A trial court's decision whether to admit or exclude evidence under

---

[16] The monitor screen's diagonal measurement was sixty inches. The apparatus was twenty-nine inches high and fifty-three inches wide.

Rule 403 is reviewed for abuse of discretion. *State v. Roache*, 358 N.C. 243, 284 (2004). An abuse of discretion results where the court's ruling is "manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285 (1988). A defendant advancing such an argument must also demonstrate that any abuse of discretion prejudiced the defendant. *State v. Temple*, 302 N.C. 1, 14 (1981).

Photographs are allowed to prove "the character of the attack made by defendant upon the deceased," *State v. Gardner*, 228 N.C. 567, 573 (1948), and "to illustrate testimony regarding the manner of a killing in order "to prove circumstantially the elements of murder in the first degree," *Hennis*, 323 N.C. at 284. "Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *Id.* (citing *State v. Murphy*, 321 N.C. 738 (1988); *State v. King*, 299 N.C. 707 (1980)); *see also State v. Williams*, 334 N.C. 440, 460 (1993), *remanded for reconsideration on other grounds*, 511 U.S. 1001 (1994). But "when the use of photographs that have inflammatory potential is excessive or repetitious, the probative value of such evidence is eclipsed by its tendency to prejudice the jury." *Hennis*, 323 N.C. at 284. "The number of photographs alone is an insufficient measure of their capacity to prejudice and inflame the jury; instead, the court looks to their probative value and the circumstances of their introduction into evidence." *State v.*

*Phipps*, 331 N.C. 427, 454 (1992); *see also Hennis*, 323 N.C. at 284.

"The test for excess is not formulaic: there is no bright line indicating at what point the number of crime scene or autopsy photographs becomes too great." *Hennis*, 323 N.C. at 285. Ultimately, "[w]hether the use of photographic evidence is more probative than prejudicial and what constitutes an excessive number of photographs in the light of the illustrative value of each likewise lies within the discretion of the trial court." *Id.* Factors that may be considered in determining whether photographs should be excluded under Rule 403 include: (1) the number of photographs; (2) whether the photographs are unnecessarily duplicative of other testimony; (3) whether the purpose of the photographs is aimed solely at arousing the passions of the jury; and (4) the circumstances surrounding their presentation. *State v. Mlo*, 335 N.C. 353, 374–75 (1994). In addition,

> [w]hat a photograph depicts, its level of detail and scale, whether it is color or black and white, a slide or a print, where and how it is projected or presented, the scope and clarity of the testimony it accompanies—these are all factors the trial court must examine in determining the illustrative value of photographic evidence and in weighing its use by the [S]tate against its tendency to prejudice the jury.

*Hennis*, 323 N.C. at 285. "When a photograph 'add[s] nothing to the State's case,' then its probative value is nil, and nothing remains but its tendency to prejudice." *Id.* at 286 (alteration in original) (quoting *Temple*, 302 N.C. at 14).

Defendant relies heavily on *Hennis*, which defendant characterizes as "a triple

murder case involving the brutal stabbing of a mother and her two children[17] where the display of a total of thirty-five victim photographs was held to be so inflammatory as to require a new trial." In *Hennis*, slides of the thirty-five photographs approved by the trial court for display were projected on "a screen large enough to project two images 3 feet 10 inches by 5 feet 6 inches side-by-side on the courtroom wall opposite the jury. This design permitted the jury to view the slides projected just above [the] defendant's head." *Id.* at 282. In addition to nine pictures of the victims' bodies which were photographed at the crime scene, and "[d]espite the fact that [the] defendant had signed stipulations as to the cause of the victims' deaths that tracked the autopsy reports, twenty-six slides of the bodies taken at the autopsy were used by forensic pathologists to illustrate their testimony as to the nature and extent of the wounds." *Id.* at 283. Moreover, after the pathologists and other witnesses utilized the projected enlarged slides to illustrate their respective testimonies, exhibition of the same photographic evidence was repeated when

> thirty-five 8-by-10-inch glossy photographs, the majority of which were in color, were subsequently distributed, one at a time, to the jury. This process took a full hour *and was unaccompanied by further testimony*. The autopsy photographs generally depicted the head and chest areas of the victims and revealed in potent detail the severity of their wounds, made all the more gruesome by the visible protrusion of organs, caused by process of decomposition. The trial court's charge to the jury shortly before it retired to consider its verdicts included the admonition that the photographs and other illustrative evidence were to be

---

[17] A third child, who was an infant, was discovered unharmed in a crib. *State v. Hennis*, 323 N.C. 279, 281 (1988).

used "for the purpose of illustrating and explaining the testimony of the various witnesses. . . . [and that they were not to] be considered . . . for any other purpose."

*Id.* (alterations in original) (emphasis added).

In concluding that admission of this photographic evidence constituted prejudicial error and in awarding the defendant a new trial in *Hennis*, this Court observed:

> In spite of the trial court's appropriate determination that many of the photographs initially proffered by the [S]tate were repetitious and the court's consequential ruling that these could not be admitted into evidence, many other photographs with repetitive content were allowed. The record reflects such repetition even in the testimony of one of the pathologists, who at one point had nothing to say concerning a slide depicting a child's neck wound except to identify it and add, "This looks like the one we saw before." Likewise, the several color images of the same victim's neck wound taken at the autopsy cannot be said to have added anything in the way of probative value to the color images of that same wound taken at the crime scene and projected before the jury in illustration of the previous testimony, even when the witness was testifying to different facts. Although this Court has not disapproved the illustrative use of autopsy photographs, the majority of the twenty-six photographs taken at the victims' autopsies here added nothing to the [S]tate's case as already delineated in the crime scene slides and their accompanying testimony. Given this absence of additional probative value, these photographs—grotesque and macabre in and of themselves—had potential only for inflaming the jurors.
>
> In addition, the prejudicial effect of photographs used repetitiously in this case was compounded by the manner in which the photographs were presented. . . . [on] an unusually large screen on a wall directly over defendant's head [and in addition] the thirty-five

-48-

> duplicative photographs published to the jury one at a time just before the [S]tate rested its case were excessive in both their redundancy and in the slow, silent manner of their presentation.

*Id.* at 286 (citations omitted). Defendant analogizes the facts of *Hennis* to the facts existent in the present case to support his contention that the admission of eighty-eight photographs of Taylor and her injuries here were likewise an abuse of discretion which requires that defendant receive a new trial. We find defendant's comparison of the two cases to be unavailing.

Defendant suggests that the trial court here could have reduced the alleged prejudicial effect of the photographs by altering, in various ways, the manner in which the photographs were displayed. He posits that the photographs at issue could have been displayed on a smaller monitor; the monitor could have been positioned further away from the jury; the size of the photographs displayed on the monitor could have been reduced; or printed copies of the photographs could have been distributed individually to the jurors.

As an initial matter, we agree with defendant that the photographs in his trial that were presented on the monitor were displayed with "high definition and zooming capability" and in a manner "that did not exist in 1988," when this Court's *Hennis* opinion was issued. Further, defendant's trial took place in 2014—more than twenty-eight years after defendant Hennis's trial occurred—and advancements in technological areas such as photographic reproductions and electronic presentations have been acknowledged and accepted in society's various institutions, including the

judicial system. As a result, trial courts are certainly eligible, in the exercise of proper discretion, to utilize such advancements in an effort to maximize the effectiveness of the judicial system's ability to adapt such advancements in the evolution of technology to the achievement of justice.

With regard to the size and location of the monitor which was used to display the photographic evidence at issue, defendant asserts that as in "*Hennis*—where the jurors viewed 3 x 5 foot photos [projected] on a wall, then sat in eerie silence viewing and passing 8 x 10 photographs for an hour—the manner of presentation here was unfairly prejudicial and inflammatory." We recognize that there are numerous significant distinctions between the manner of display of the photographic evidence in *Hennis* and in the case at bar. First, the size of the photographic monitor here—a device twenty-nine inches high and fifty-three inches wide—was notably smaller than "a screen large enough to project two images 3 feet 10 inches by 5 feet 6 inches side-by-side" utilized in *Hennis*. *Id.* at 282. While defendant postulates that "[f]rom the jury's perspective, the display here was probably as large or larger than in *Hennis*"— noting that the monitor in defendant's trial was placed "seven feet from the jury"— he acknowledges that "[n]o measurement of the exact distance between the jurors and the courtroom wall appears in the *Hennis* opinion, so it is not possible to make an exact relative comparison."

Secondly, as opposed to the monitor which displayed the photographs in *Hennis*, the location of the projected images in the instant case did not "permit[ ] the

jury to view the slides projected just above defendant's head" in a way "that the jury would continually have [defendant] in its vision as it viewed the slides[, which] was a manner of presentation that in itself quite probably enhanced the prejudicial impact of the" photographic evidence. *Id.* at 282, 286. Moreover, after hearing from the parties about the placement of the monitor and the potential alternative of the distribution of copies of the photographs among the jurors, the trial court here determined that there was no better location in the courtroom than the selected one for the monitor to be placed that would permit all of the jurors and alternates, as well as the lawyers and witnesses, to see it; that placing the monitor in a courtroom location suggested by defendant which was more distant from the jury box would cause the courtroom to be too crowded; and that distributing smaller photographs of the evidence in question to the jurors by hand would take more time. The trial court also noted that employing the sixty-inch monitor rather than using a smaller one, or alternatively circulating eight-inch by ten-inch photographs would prevent the repetitive display of the pictures by making the evidence "visible to all jurors during a witness's testimony without the witness having to repeat the testimony, without having the exhibit shown at multiple locations along the jury box as would be required if a smaller monitor was being used or smaller photographs were being used."

The trial court's extended discussion with the parties of the benefits and drawbacks of potential methods for displaying the photographic evidence and the

trial court's ultimate discretionary decision regarding the location and manner of display of the pictures which (1) were not presented so as to have defendant closely and continually in the same visual field as graphic images of the victim, (2) involved a photographic monitor which was smaller than the display screen utilized in *Hennis*, and (3) conserved time and prevented repetitive exhibitions of the evidence as compared to the alternative option of the distribution of individual photographs among the jurors all combine as factors to render defendant's analogy to *Hennis* in this arena as unpersuasive. Therefore, we do not identify any abuse of the trial court's discretion in its chosen manner of display of the challenged photographic evidence which was shown during defendant's trial.

Defendant also objected both to the total number of photographs introduced into evidence and the multiple exhibitions of some of the photographs upon the State's occasional utilization of the same photographs to illustrate the respective testimonies of different witnesses. Defendant again cites *Hennis*, emphasizing that a trial court must engage in the "critical" determination of whether the proffered photographs "unduly reiterate illustrative evidence already presented" before ruling on admissibility where the number of disputed photographs is asserted to be excessive, because "[w]hen a photograph 'add[s] nothing to the State's case,' " it lacks any probative value, is solely prejudicial, and thus is inadmissible under the Rule of Evidence 403 balancing test. *Id.* at 286 (second alteration in original) (quoting *Temple*, 302 N.C. at 14).

As previously noted, in *Hennis*, this Court held that the trial court abused its discretion in admitting thirty-five color photographs because they were repetitious, lacked probative value and served only to inflame the jurors. *Id.* at 286. In making this determination, the Court perceived that multiple photographs of the same wounds were gratuitously displayed; the State's witnesses acknowledged that some of the photographs showing the same wound did not add anything to the illustration of their respective accounts; "the majority of the twenty-six photographs taken at the victims' autopsies . . . added nothing to the [S]tate's case as already delineated in the crime scene slides and their accompanying testimony"; and *all* of the thirty-five pictures, which had already been displayed to illustrate testimony during the presentation of the State's case, were published to the jury for a second time—one at a time—in a process that consumed a full hour and was *"unaccompanied by further testimony."* *Id.* at 283, 286 (emphasis added).

Once again, we find that aspects of *Hennis* upon which defendant heavily relies are readily distinguishable from the circumstances to which defendant offers parallels in his case. Here, any usage of a displayed photograph was in conjunction with the illustration of a witness's testimony. Also, the State in the current case did not ever show a photograph to the jury at any time, "unaccompanied by . . . testimony," while in *Hennis* the State displayed every admitted photograph to the jury one final time just prior to the jury's deliberations and without accompanying testimony. Having generally identified the salient distinctions between *Hennis* and

the present case with reference to defendant's arguments about the analogous nature of the presentation of photographic evidence, we now exercise a closer look at specific photographs which defendant features in his contentions.

State's Exhibit 26, which was a photograph of Taylor's full body as it appeared in the emergency room treatment area of Johnston Memorial Hospital, was used to illustrate the respective testimonies of Dr. Evans and nurses Butler and Gooch. These three medical providers all treated Taylor when defendant brought her to the facility. Gooch used State's Exhibit 26 in order to illustrate the "marks, lacerations, abrasions, bruises," and avulsions on the front side of Taylor's torso, arms, and legs, along with redness in Taylor's vaginal area, that were visible upon the removal of Taylor's clothes and in order to confirm that none of the injuries to Taylor's body were caused by any of the treatment that the medical professionals were providing, such as the insertion of a catheter into Taylor's urethra or the insertion of a needle into Taylor's body. Evans then used the exhibit to "give an idea of the extent of the injuries"; to illustrate his reason for making a notation on Taylor's medical chart that her injuries were "[t]oo numerous to count, bite marks, abrasions, and lesions"; and to demonstrate that the injuries were not eczema, as defendant had suggested. Each of these displays served to illustrate a different point and thus can be viewed to have "added" a component to the State's case. When the prosecution subsequently displayed State's Exhibit 26 during Butler's testimony, however, the only two questions posed by the State to Butler were whether Butler could identify the person

depicted in the photograph as Taylor. While the testimony elicited during this third display of State's Exhibit 26 was not probative, we view the presentation through this third witness as primarily corroborative testimony of the other two witnesses as to Taylor's identity.

Defendant contends that Dr. Kocis of the pediatric intensive care unit at UNCMC and Dr. Williams of the emergency room at UNCMC used some[18] of the same photographs to illustrate their testimony. Just before Williams testified, defendant asked to be heard outside of the presence of the jury regarding Williams's potential testimony and any photographic evidence that the State intended to introduce. Defendant expressed his apprehension that the evidence would be cumulative and prejudicial, and in agreeing that there was reason for concern, the trial court specifically inquired as to whether the State intended to show every photograph during Williams's testimony that had been displayed during Kocis's testimony. The State agreed to "cull them down" and the trial court then instituted a fifteen-minute recess. When the trial court and the parties' counsel discussed the matter of the photographs after the recess, the State proposed to display only five photographs

[18] Defendant represents to this Court that *five* photographs were displayed during both doctors' respective testimonies. Our review of the trial transcripts indicates, however, that only *three* photographs were displayed to the jury during both Kocis's and Williams's testimony: State's Exhibits 578, 579, and 586. Two photographs which are noted in the trial transcript as being *received* during Kocis's testimony—State's Exhibits 584 and 585—are specifically denoted as *not having been published to the jury* during Kocis's testimony, and at no point in the transcript portions covering Kocis's testimony did Kocis or the prosecutor mention those exhibits. State's Exhibits 584 and 585 were employed to illustrate Williams's testimony.

during Williams's testimony. An express entry regarding the operation of Rule of Evidence 403 was made thereafter in the record.

Kocis used State's Exhibit 578, which depicted a frontal view of Taylor from her head to her hips. The photograph apparently was taken while Taylor was waiting to be moved into the pediatric intensive care unit. The exhibit illustrated Taylor's appearance at the time that Kocis first saw the child. It showed that Taylor had been placed in a collar to prevent additional injury to the neck region of her body, that Taylor was using a breathing tube, and that there were "few spared areas" on the child's skin which avoided black and blue discoloration along with scabbed wounds in different shades of red. There were darker scabs indicating older wounds that had started to heal and other scabs with "fresh red blood," indicating that they had been caused "within hours." Kocis also noted an avulsion—"a pit" where layers of skin had been removed—in the location on the body where one of Taylor's nipples would have been and nearby areas of skin that were healing but appeared infected. Kocis also identified areas that were "scabbing, some healing,  and pus down below," as well as "pink healthier skin," bruising, and an older scar. He emphasized that in "the only place [on Taylor's body] that's spared . . . from the redness, from the lacerations, from the cuts, . . . you still see the bruising from underneath that. So it's not normal skin, it's just not as abnormal as everything else." Kocis related that he had observed "injuries on top of injuries," and stated, in describing the wounds depicted in State's Exhibit 578: "[T]his is within hours. This is within days. And then the more mature

scarring that I showed you a little earlier was closer to the seven-to-ten days." When Williams utilized this exhibit in his own testimony, he—like Kocis—also detected Taylor's missing right nipple and numerous other wounds, while also noting that the injuries had occurred over "a ten-day time frame." Williams then testified that Taylor's condition as revealed in the exhibit, in conjunction with medical tests, helped the treating team which was diagnosing Taylor to determine the timing of her head injury as compared to the other injuries she suffered:

> I think the most profound thing to us in terms of this happening over a period of days was all the evidence we had, based on her clinical appearance and based on the head CT scan, was that that injury had occurred several hours ago maybe, at most maybe the night prior. And then these obviously did not occur today. These, again, are starting to scab over to some extent. You know, that would happen over a period of time.

In light of defendant's indicted charge of murder by torture, which connotes the repeated infliction of suffering over time, *see State v. Lee*, 348 N.C. 474, 489 (1998), we cannot opine that Williams's use of this exhibit "add[ed] nothing" to the resolution of the issues before the jury in this case. *Hennis*, 323 N.C. at 286.

Kocis also used State's Exhibit 579 during the course of his testimony, which depicted the front of Taylor's body from shoulders to knees. Kocis identified "lots of linear lesions . . . typical of a whipping type injury," including on the child's labia majora, where Kocis noted a "deep pit" that appeared to be infected and that might have been healing and scabbing. In discussing this photograph with the jury, Williams noted "a retention sticker" used to keep a catheter in place and observed

that "the nurse or tech" who had placed the sticker had difficulty in applying it "without it covering up a wound." Williams then discussed "a deeper avulsion" which was attempting to heal in a manner that suggested a "wound[ that hadn't been] cared for and closed within a period of 24 or 36 hours." Williams's use of the photograph to explain to the jury that Taylor had suffered a deep wound, which was healing in a manner that suggested no one had treated it, added relevant information to the State's case given defendant's position at trial that he had undertaken some efforts to aid Taylor following the abuse he inflicted prior to causing her head injury.

In displaying State's Exhibit 586, a photograph of Taylor's head and face, Kocis again focused on illustrating that Taylor had received many varied types of injuries—wounds to her nose and a black eye—and that the injuries appeared to have occurred over a period of time—scabbing on the nose but a more recent black eye. Kocis also noted that although Taylor's eyes were open, she likely had minimal brain function at this point and noted that she had a breathing tube placed. Later, Williams used the same photograph to illustrate his testimony going into more detail about the effects of Taylor's head trauma on her brain function, stating that Taylor's eyes were fixed in an indication that "brain function at the time of this picture is essentially devastated," confirming the theory of Kocis's testimony. Williams also explained to the jury that the endotracheal tube that had been placed, distinct from the breathing tube Kocis had described, was intended "to help alleviate secretions that will occur under stress."

Defendant next identifies as cumulative five photographs taken by Barbaro, who testified as a bite mark expert, to illustrate his opinions. Defendant acknowledges that these photographs were not shown during the testimony of any other witness, but emphasizes that they depicted injuries already shown; to wit, bite marks on Taylor's body. Barbaro used the photographs to explain: (1) the different levels of bite marks Taylor sustained, (2) how Barbaro determined that the bites were caused by an adult rather than a child, (3) how Barbaro determined that certain of the bite marks were consistent with defendant's dentition, (4) that the bite marks had been inflicted "at different times" within a ten-day period, (5) that at least one bite cut through Taylor's skin and caused bleeding, and (6) that one injury to Taylor's cheek indicated an extended bite. While other medical professionals testified that they believed Taylor had suffered many bite marks across her body, no other witness used photos of the bite marks to illustrate the same testimony as Barbaro presented. Therefore, we cannot conclude that this expert witness's use of five photographs taken as part of his specific consultation was cumulative and added nothing to the State's case.

Defendant also states that "the medical examiner used 28 photographs from the autopsy, many showing the same injuries and body parts previously displayed." It does not appear that any of the photographs displayed during the medical examiner's testimony had previously been shown. Further, our review of the testimony from this witness in conjunction with the photographic evidence concerned

his identification of repetitious "pattern" injuries in various areas of Taylor's body; multiple foreign bodies discovered in many areas of Taylor's body (at least some of which appeared to be metal wire fragments); and *inter alia,* specific injuries to Taylor's cheek, legs, arms, ears, hands, fingers, legs, feet, and toes; wounds in her external and internal vaginal area; and multiple lacerations inside her mouth in addition to a likely self-inflicted bite to her lip. While different photographs of the same body parts were displayed to illustrate the testimony of other witnesses, because Taylor was no longer being treated medically, the autopsy photographs allowed the medical examiner to provide detailed testimony about the nature and number of various types of injuries to different areas of her body. In addition, a number of the photos in question were taken after the medical examiner had manipulated or cut into Taylor's body in a manner impossible before her death, plainly revealing information about her condition and injuries which could not have been evident to previous witnesses, each of whom testified about their opinions of Taylor's condition before her death and while they were providing urgent care to her. The medical examiner was also able to opine about the ways in which an extension cord with the metal interior strands exposed could have caused some of Taylor's injuries. We are unable to conclude that the autopsy photographs which the medical examiner used to illustrate his testimony failed to add to the State's case or that their prejudicial impact substantially outweighed their probative value.

Defendant also notes that expert witness McNeal-Trice, who testified

regarding whether the injuries defendant inflicted upon Taylor constituted torture "discussed four previously-used body photographs and five new close-up photographs of genitalia to illustrate her testimony." Defendant does not, however, explain how these photographs were duplicative of the evidence previously offered. As with the photographs used to illustrate Barbaro's bite mark testimony, this expert was testifying to a specific question—torture—not addressed by any previous witness, and we see no excess in her usage of a relatively small number of photographs, even if some may have been seen previously.

Finally, defendant notes that during its closing argument, the State showed eight photographs of Taylor's wounds, including bite marks and genital injuries, which had previously been published to the jury. As with the manner of presentation of the photographs, we find defendant's reliance on *Hennis* to support his argument that the repetition of the publication of some photographs of Taylor's body was cumulative and constituted prejudicial error to be unavailing. With the exception of the third display of Exhibit 26 during Butler's testimony, the purpose of the republication of photographs here is more analogous to that in *Williams*. The defendant in that case also relied on *Hennis* to support his argument "that the republication of [certain gory] photographs was 'unnecessarily repetitive' and that it was performed 'for no other reason than to inflame the jurors' anger towards defendant.' " *Williams*, 334 N.C. at 461. In rejecting the defendant's position and finding his analogy to *Hennis* "inapposite," the Court noted, *inter alia*, that the

repeated display of certain photographs during the State's case was a result of their use to illustrate both general testimony from one witness and then for more detailed purposes with another witness. *Id.* at 461–62; *see also State v. Dollar*, 292 N.C. 344, 354 (1977) (declining to find error where "photographs were not merely repetitious, each being useful to illustrate a portion of the testimony of the witness not illustrated by other photographs"). The Court in *Williams* also emphasized that the republication of photographs in that case did not involve presentation "in a fashion likely to heighten the jury's emotional reaction," such as passing individual photographs directly to each member of the jury separately, "one by one and in total silence," as occurred in *Hennis*. *Williams*, 334 N.C. at 461–62.

In addition to arguing that the trial court reversibly erred in admitting cumulative evidence by allowing the repeated presentation of certain photographic evidence, defendant characterizes the admission of eighty-eight photographs of Taylor's body as excessive to the point of prejudicial, suggesting that

> [i]t was not necessary to magnify in grim detail every square inch of Taylor's body, over and over again. Her injuries were horrible. No juror could have failed to grasp that fact, which could have been conveyed in a brief period of time, with a handful of photographs, through a few witnesses.

Defendant reminds us that in *Hennis*, thirty-five photographs were found to be excessive even though that case involved three victims, each of whom had several wounds. Yet, standing alone, the *number* of photographs offered is not dispositive to the question of their admissibility. *See, e.g., Phipps*, 331 N.C. at 454. For example, in

*State v. Pierce*, the trial court admitted "twenty-six photographs of the [single] victim's body to illustrate the testimony describing [the child's] injuries," including that she "had been severely beaten and . . . had bruises, grab marks, pinch marks, scratches, nicks, bumps, and other injuries on almost every inch of her body." 346 N.C. 471, 487 (1997). The Court concluded that, "[g]iven the number, nature, and extent of the victim's injuries, . . . the trial court did not abuse its discretion by admitting twenty-six photographs of the victim's body." *Id.* at 488.

We are mindful that the severity of the crimes with which defendant was being charged and the unusually extended time period over which those crimes were alleged to have occurred, when combined with the youth and complete vulnerability of the victim and the extraordinary number of injuries she sustained, created a situation where the emotions of jurors would be easily inflamed. In contrast to defendant's suggestion, however, the State was not attempting to demonstrate to the jury merely that Taylor's "injuries were horrible," a fact which was beyond dispute and could likely have been "conveyed in a brief period of time, with a handful of photographs." Rather, the State was not only faced with a case that involved "horrible" injuries—for example, according to the medical examiner Taylor's wounds encompassed "shallow lacerations and abrasions" that were "just too much [sic] to count," as well as at least 144 separate injuries, including at least sixty-six bite marks, multiple injuries from sexual assaults, and her fatal head injury—but was proceeding on charges that included, *inter alia*, murder by torture, felony murder, and felony child

abuse inflicting serious injury.

The conviction of a defendant on a charge of felony intentional child abuse inflicting serious bodily injury requires that the State prove "serious bodily injury," *see* N.C.G.S. § 14-318.4(a3) (2021), and "to sustain a conviction of first-degree murder by torture, the State must prove that the defendant intentionally tortured the victim and that such torture was a proximate cause of the victim's death," *State v. Stroud*, 345 N.C. 106, 112 (1996), *cert. denied*, 522 U.S. 826 (1997). "Torture is defined as the course of conduct by one or more persons which intentionally inflicts grievous pain and suffering upon another for the purpose of punishment, persuasion, or sadistic pleasure," and "[c]ourse of conduct has been defined as the pattern of the same or similar acts, repeated over a period of time, however short, which established that there existed in the mind of the defendant a plan, scheme, system or design to inflict cruel suffering upon another." *Lee*, 348 N.C. at 489 (extraneity omitted). "Felony murder on the basis of felonious child abuse requires the State to prove that the killing took place while the accused was perpetrating or attempting to perpetrate felonious child abuse with the use of a deadly weapon," which can include, *inter alia*, "an attack by hands alone upon a small child." *Pierce*, 346 N.C. at 493 (citing N.C.G.S. § 14-17(a)). Conviction of a defendant on a charge of felony intentional child abuse inflicting serious bodily injury requires the State to prove "serious bodily injury," *see* N.C.G.S. § 14-318.4(a3) (2021), which is defined as "[b]odily injury that creates a substantial risk of death or that causes serious permanent disfigurement, coma, a

permanent or protracted condition that causes extreme pain, or permanent or protracted loss or impairment of the function of any bodily member or organ, or that results in prolonged hospitalization," *id.* § 14-318.4(d) (2021).

While defendant admitted to inflicting some of the injuries upon Taylor, he pled not guilty to charges against him. The "prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense." *Estelle v. McGuire*, 502 U.S. 62, 69 (1991). Even "a stipulation as to the cause of death does not preclude the State from proving all essential elements of its case." *State v. Elkerson*, 304 N.C. 658, 665 (1982). Defendant also specifically denied sexually assaulting Taylor, argued that there was a legally significant break between his prior abuse of the child and his infliction of her head injury by shaking her, claimed that the head injury was accidental, and argued that he lacked the intent to torture Taylor or otherwise cause her death. Defendant's theory of the case made both the number and severity of the injuries to Taylor and the time frame over which they were inflicted central to numerous issues before the jury, including: (1) the seriousness of Taylor's injuries, (2) the level of pain and suffering she endured as a result of defendant's abuse, (3) defendant's intention in inflicting both the fatal head injury and the other abuse on Taylor, (4) whether there was any break in defendant's abuse of Taylor before he struck her head against the wall or door of the outbuilding, (5) whether defendant had treated or attempted to treat any of Taylor's injuries, and (6) whether defendant should have known Taylor

needed medical attention when he refused the help offered by his grandmother. The jury also needed to evaluate defendant's credibility as it considered his accounts of how Taylor's injuries had occurred—from falling off an air mattress, scratching areas of eczema, the bites of another child, or discipline by Reyes—and his denial that he sexually assaulted Taylor.

"[A]ny evidence probative of the State's case is always prejudicial to the defendant." *State v. Stager*, 329 N.C. 278, 310 (1991). Here, the challenged photographs accurately reflected the reality of the crimes with which defendant was being tried and were probative to the issues before the jury, and therefore they cannot be said to have added "*nothing* to the State's case," *Hennis*, 323 N.C. at 286 (emphasis added), or to have been offered for the sole purpose of inflaming the passions of the jury, *Mlo*, 335 N.C. at 375. In light of this Court's precedent and the totality of the circumstances in this case, we conclude that the eighty-eight photographs admitted to illustrate the testimony of the State's witnesses were not excessive, repetitive, or unduly prejudicial, and we see nothing in the trial court's considered limitation of the photographs permitted to illustrate the testimony of the State's witnesses that would suggest that the trial court's decision was "manifestly unsupported by reason or [was] so arbitrary that it could not have been the result of a reasoned decision." *Hennis*, 323 N.C. at 285. Defendant's argument to the contrary is overruled.

## C. **Evidence of emotional reactions from medical and law enforcement personnel**

Defendant next argues that the trial court erred by permitting various medical

personnel and law enforcement officers to testify during the guilt–innocence phase of trial about their emotional reactions to initially seeing Taylor's injuries. Defendant characterizes this testimony as "a version of victim impact evidence" and contends that it was both irrelevant and so highly prejudicial that its admission violated the North Carolina Rules of Evidence and requires that defendant receive a new trial. We are not persuaded.

As noted above, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," N.C.G.S. § 8C-1, Rule 401, and "relevant evidence is admissible" in most situations, *id.* § 8C-1, Rule 402. A trial court's rulings on the relevancy of evidence "are technically not discretionary," but they are accorded great deference on appeal. *State v. Lane*, 365 N.C. 7, 27, *cert. denied*, 565 U.S. 1081 (2011). When evidence is challenged on relevancy grounds,

> [t]he burden is on the party who asserts that evidence was improperly admitted to show both error and that he was prejudiced by its admission. The admission of evidence which is technically inadmissible will be treated as harmless unless prejudice is shown such that a different result likely would have ensued had the evidence been excluded.

*State v. Gappins*, 320 N.C. 64, 68 (1987) (citations omitted).

Further, even relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues,

or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (2021). As this Court has recognized, "most evidence tends to prejudice the party against whom it is offered. However, to be excluded under Rule 403, the probative value of the evidence must not only be outweighed by the danger of unfair prejudice, it must be *substantially* outweighed." *State v. Lyons*, 340 N.C. 646, 669 (1995). On appellate review, we will reverse a trial court's decision to admit evidence after undertaking the Rule 403 balancing determination only where an abuse of discretion is demonstrated. *Hennis*, 323 N.C. at 285. With these statutory definitions and standards of review in mind, we turn to a consideration of the evidence defendant challenges.

Defendant filed a pretrial motion to prohibit the State's witnesses from describing their emotional reactions to seeing Taylor's injuries, and following a hearing, the trial court allowed the motion in limine, determining that it would rule on the admissibility of such testimony on a witness-by-witness basis as each specific challenge arose at trial. The trial court stated that it perceived an important distinction between witnesses' testimony about their immediate reactions to seeing Taylor's injuries and any later aftereffects those witnesses may have experienced as a result, and thus informed the parties that the State would generally be permitted to elicit testimony regarding the former but not the latter. Once the trial began, defendant challenged the following portions of the testimony of five of the State's witnesses.

Registered nurse Gooch, who had ten years of medical experience, was on duty at Johnston Memorial Hospital when Taylor was brought in by defendant. Defendant objected when Gooch testified that Taylor's injuries were "distracting" and "unusual," at which point the trial court sustained the objection and struck the testimony. However, when the prosecutor asked Gooch about the effect of seeing Taylor's injuries, the trial court overruled defendant's objection and allowed Gooch to testify:

> I was kind of paralyzed for just a few moments. I really didn't know what to think or feel. I have been in the emergency room for quite some time. . . . I remember telling the dispatcher that I couldn't explain to them what it was that I was seeing, that I could not put it into words. And I just asked them if they'd please send law enforcement over here so they can see what it is that I'm seeing. . . . I just was unable to even verbalize what I was seeing to try to get them to send someone over there.

Similarly, Butler, a nurse with twenty years of experience who also treated Taylor at Johnston Memorial Hospital, was allowed to testify, over defendant's objections, about seeing Taylor's injuries generally, explaining, "It . . . was horrible. I mean, we see a lot of stuff, but to see, you know, I mean—." She then described her reaction to seeing a bruise on Taylor's rectum stating, "I just couldn't take any more . . . so I looked at him, . . . I said, 'Oh, my God!' . . . [and] it got kind of quiet. And then one of the other nurses, because a lot of us have children, one of the other nurses said, 'What have you done?' " Butler also explained why she chased and tackled defendant when he attempted to leave the emergency room:

> Well, after I had seen [Taylor] like that, I mean, I was very, very upset. . . . [H]e was trying to leave, and so I

come around the corner and jumped on him. I grabbed him by the throat, slung him around . . . .

. . . .

I caught him from behind. I caught him by the throat, and I slung him around, and I started pushing him for everything I was worth. I was trying to get him back to the E.R., you know.

. . . .

[When I grabbed him by the throat] I was trying my best — I tried to rip his esophagus out.

. . . .

. . . I'm standing in the doorway. And by this point, I'm crazy. I mean, I'll be honest with you, I mean, after you've seen something like that on a little child, with wounds everywhere and everything else that happened, and then he's going to run, you have to chase him down, and I got him in the room . . . . I just remember uniforms showed up on my left side. . . . By this time, . . . I have just lost it. I told them, I said, "Give me your gun—

. . . .

—I'll do what the hell needs to be done, right here, right now."

. . . .

. . . I realized that I had totally lost it, and — and I knew that [law enforcement officers] were there, and so I went outside. I couldn't take any more. That was it.

. . . .

. . . [I]t broke my heart to see [Taylor] like that. I just had had all I could take. That was it.

. . . .

> [After the incident, it was] at least thirty minutes
> before I could go back in and continue to work.

The trial court also overruled defendant's objection to testimony from Keith Kocis, an attending pediatric physician in the intensive care unit of the UNCMC with over ten years of experience treating patients who had suffered "severe child abuse," describing Taylor's condition as "deeply disturbing." Kocis was also permitted to testify that he had "a very visceral response where I felt I was going to vomit" upon viewing Taylor's injuries because, despite having been "exposed to serious and traumatic" injuries in the course of his work, he had "never seen" such harm in his career.

Matt DeSilva, a deputy with the Wake County Sheriff's Office with more than a decade of experience, including with child death investigations, was permitted to testify that when a physician rolled Taylor onto her side, DeSilva told the doctor he "just couldn't bear to look at it anymore, I asked him to stop . . . . I told him that was enough, I couldn't look at it. I couldn't bear to see that" and described viewing Taylor's body as "the most horrifying thing." Defendant objected to this final comment and the trial court sustained the objection. Citing Rule of Evidence 403 and noting that DeSilva "became visibly upset in the presence of the jury while testifying" such that "it's already obvious to the jury the emotional effect of observing [Taylor's injuries] upon the witness," the trial court prohibited the State from eliciting further testimony from DeSilva about the emotional impact of his seeing Taylor's injuries.

Finally, Jefferson Williams, an attending physician in the emergency room at the UNCMC with experience treating child abuse and trauma victims, was permitted to testify, over defendant's objections, that he was "shocked" by the "huge display of other injuries" on Taylor's body beyond the head injury which eventually proved fatal to the child. Williams was also allowed to testify about his initial reaction upon seeing Taylor's injuries:

> So, I was immediately nauseated I think. We moved beyond that, obviously you have to do your job. And I became—I think probably the best way to describe it is I became angry. Most of—when a person gets injured, when we see an injured patient in a Level 1 trauma center, most of the time that injury has happened in an instant. You know, they've been in a car wreck or they've been shot or been stabbed or, you know, obviously they had some pain and we work on that, we treat that. That happens in an instant and they bring them to us and we fix them up.
>
> When they unwrapped the sheet [covering Taylor], it became very clear that this person had been suffering for a long period of time and I was not prepared for that.

We begin our analysis with the question of relevance as regards these witnesses' remarks about their reactions to seeing Taylor's body and the injuries she suffered at the hands of defendant. Defendant was charged with and convicted of, *inter alia*, felony intentional child abuse inflicting serious bodily injury and first-degree murder on theories of murder by torture and felony murder. Evidence which goes to any element of an offense charged is plainly relevant since the State must "prove every element of a crime beyond a reasonable doubt before an accused may be convicted." *See, e.g., State v. Keel*, 333 N.C. 52, 59 (1992). First-degree murder by

torture plainly requires the State to prove torture as an element, and while the General Assembly did not define that term in its statutory enactment, *see* N.C.G.S. § 14-17 (2021), this Court has approved the following as a definition of the term: "the course of conduct by one or more persons which intentionally inflicts *grievous pain and suffering* upon another for the purpose of punishment, persuasion, or sadistic pleasure." *State v. Crawford*, 329 N.C. 466, 484 (1991) (emphasis added); *see also Stroud*, 345 N.C. at 112 ("In order to sustain a conviction of first-degree murder by torture, the State must prove that the defendant intentionally tortured the victim and that such torture was a proximate cause of the victim's death."). Likewise, conviction of a defendant on a charge of felony intentional child abuse inflicting serious bodily injury requires the State to prove "serious bodily injury," *see* N.C.G.S. § 14-318.4(a3) (2021), which is defined as "[b]odily injury that creates a substantial risk of death or that *causes serious permanent disfigurement*, coma, a permanent or protracted condition that *causes extreme pain*, or permanent or protracted loss or impairment of the function of any bodily member or organ, or that results in prolonged hospitalization," *id.* § 14-318.4(d) (emphases added).

Defendant acknowledges precedent of this Court holding both that a jury may consider the nature of a victim's injuries to determine their seriousness, *State v. Hedgepeth*, 330 N.C. 38, 53 (1991), in support of the felony child abuse charge, and that the State was entitled to present evidence supporting its allegation that Taylor experienced "grievous pain and suffering" as part of its case for murder by torture,

*State v. Anderson*, 346 N.C. 158, 161 (1997). However, defendant contends that the above-quoted testimony about certain witnesses' emotional reactions was not relevant—that it did not "satisf[y] the low bar of logical relevance"—to show the seriousness of Taylor's injuries or to shed light on the extent of her pain and suffering. *See State v. Hembree*, 368 N.C. 2, 17 (2015). We disagree.

The challenged testimony can fairly be characterized as expressions by witnesses, each of whom had regular exposure to traumatic physical injuries and/or physical and sexual child abuse, that Taylor's injuries were more severe and extensive than those usually seen in their work and, in some cases, were the worst injuries they had witnessed in their professional experience. That the number and degree of Taylor's physical injuries were far beyond what the experts expected to encounter or typically see in their professional capacities would appear to provide context for the jurors who were tasked with determining whether Taylor's bodily injuries were "serious" or would have caused her "grievous pain and suffering." Viewed in this light, the challenged testimony would certainly appear to have had at least a "*tendency* to make the existence of any fact that is of consequence to the determination of the action more probable . . . than it would be without the evidence." *See* N.C.G.S. § 8C-1, Rule 401 (emphasis added).[19] Accordingly, we hold that the

---

[19] We are also mindful that a trial court's rulings on relevancy are reviewed with great deference, *State v. Lane*, 365 N.C. 7, 27 (2011), and we observe that the trial court here considered defendant's motion to prohibit all such testimony, explained its general plan for assessing relevancy before the trial began, and then evaluated the admissibility of emotional

challenged testimony was relevant and properly admitted to the extent that it constituted expressions by the witnesses that Taylor's injuries were much more severe than those in a typical child abuse or trauma case and that the number and degree of these injuries indicated that Taylor would have experienced grievous pain and suffering.[20]

To the extent that any of the challenged portions of the five witnesses' testimony discussed here were not relevant and thus were "technically inadmissible," defendant cannot meet his additional burden to obtain relief on this issue by demonstrating that the erroneously admitted testimony prejudiced him "such that a different result likely would have ensued had the evidence been excluded." *Gappins*, 320 N.C. at 68. Regarding prejudice, defendant contends that "[b]ased on their inadmissible emotional reactions, these witnesses appeared to find [defendant] guilty, and among the worst of the worst offenders"; that this "dramatic testimony, standing alone, was powerful enough to convince a jury to root all of its deliberations

---

reaction testimony from each witness as it was challenged by defendant, sustaining some objections while overruling others.

[20] We decline defendant's suggestion that we analyze his challenges to this evidence by viewing the witnesses' testimony as akin to victim impact evidence, which is permissible for a jury's or court's consideration at a sentencing proceeding. *See* N.C.G.S. § 15A-833(a)(1) (2021) (defining such evidence as including "[a] description of the nature and extent of any physical, psychological, or emotional injury suffered by the victim as a result of the offense committed by the defendant"). The expert witnesses provided their testimony during the guilt–innocence phase of defendant's trial and were called by the State to meet its burden at that stage of the proceedings of proving beyond a reasonable doubt every element of each crime charged.

in improper prejudice and passion"; and that "[i]n the absence of that evidence, there is a reasonable possibility [defendant] would not have been convicted and sentenced to death." *See* N.C.G.S. § 15A-1443(a) (2021). Given the totality of the evidence introduced during defendant's trial, we cannot agree with these assertions.

In determining defendant's guilt and in recommending a sentence of death, the jury had before it, *inter alia*, evidence that: defendant was for ten days the sole caretaker for a four-year-old child upon whom he had previously used inappropriate and/or abusive "discipline"; defendant's first action upon obtaining sole control of the child was to purchase materials to permit him to lock her inside of the outbuilding where they were living; defendant took a video of the child being punished for toilet accidents despite the fact that the outbuilding lacked a bathroom or running water; defendant was aware of at least some injuries to the child during the ten days he cared for her as suggested by his purchase of first-aid supplies; defendant admitted causing the ultimately fatal injury to the child by causing her head to strike a wall in the outbuilding; defendant only took the child to the hospital for medical assistance after being directed to do so by the child's mother; upon arrival at the hospital, the child's body showed, in addition to the head injury, many dozens of bite marks, evidence of sexual abuse, and wounds from beatings with an electrical cord so severe that pieces of metal were embedded in her body; and defendant tried to flee the hospital once medical professionals saw the child's condition. The evidence of Taylor's injuries came from numerous witnesses, including medical and forensic professionals

to law enforcement personnel, who were properly permitted to offer lengthy and detailed testimony—beyond that challenged by defendant—regarding Taylor's condition, and in some cases, illustrated by photographs of her body and her injuries, which as we explained above were admissible. Given the overwhelming evidence of defendant's guilt and of Taylor's severe, painful, and ultimately fatal injuries inflicted over time, we conclude that there is no reasonable possibility that defendant would not have been convicted and sentenced to death *but for* the challenged testimony of the five witnesses about their emotional reactions to seeing Taylor's condition.

For the same reason, we see no abuse of discretion in the trial court's decisions to admit the challenged evidence after undertaking the required Rule 403 balancing determination and holding that the probative value of the evidence did not "substantially outweigh[ ]" the risk of unfair prejudice. *See Lyons*, 340 N.C. at 669. Particularly given the trial court's consideration of the parties' pretrial arguments on the relevancy and potential prejudice of the challenged testimony and its ongoing assessment of both questions throughout the presentation of the testimony from the State's witnesses, including numerous instances where defendant's objections were sustained, we cannot say that the trial court's "ruling[s were] manifestly unsupported by reason or [were] so arbitrary that [they] could not have been the result of a reasoned decision." *Hennis*, 323 N.C. at 285. Defendant's argument as to the testimony of various witnesses about their emotional reactions to seeing Taylor's injuries is overruled.

## D. Testimony from Dr. Richard Barbaro regarding bite marks

Defendant next argues that the trial court abused its discretion by allowing Dr. Richard Barbaro, a dentist, to testify as an expert in forensic dentistry about the bite marks on Taylor's body—testimony which defendant contends was unreliable, inflammatory, prejudicial, and constituted "an outlandish sideshow," citing Rules of Evidence 702 and 403. We review a trial court's ruling on the admission of expert testimony under Rule of Evidence 702 only for an abuse of discretion. *State v. McGrady*, 368 N.C. 880, 893 (2016). As previously noted, a trial court's ruling on admissibility under the balancing test of probative value versus prejudice under Rule 403 is also reviewed for abuse of discretion. *Hennis*, 323 N.C. at 285. We are not persuaded that the trial court here abused its discretion in allowing Barbaro's testimony.

Rule of Evidence 702 provides that when "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion." N.C.G.S. § 8C-1, Rule 702(a) (2009).[21] Courts should employ a "three-step inquiry for evaluating the admissibility of expert testimony: (1) Is the expert's proffered method

---

[21] Rule of Evidence 702 was amended in 2011, with that amendment applying to actions "commenced on or after October 1, 2011." Defendant was indicted in 2010, and thus the earlier version of Rule 702 applies to his case. Other aspects of the amendment are discussed in the following section of this decision. In any event, the trial court ruled that Barbaro's evidence was admissible under both versions of Rule of Evidence 702.

of proof sufficiently reliable as an area for expert testimony? (2) Is the witness testifying at trial qualified as an expert in that area of testimony? (3) Is the expert's testimony relevant?" *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458 (2004) (citations omitted). The proponent of the offered expert opinion has the burden to show its compliance with the requirements of Rule 702(a). *State v. Ward*, 364 N.C. 133, 140 (2010). Under Rule 403, evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403. Both determinations are reviewed under an abuse of discretion standard. *McGrady*, 368 N.C. at 893; *Hennis*, 323 N.C. at 285.

As an initial matter, we must clarify the testimony that is properly before the Court on appeal, as well as the bases for excluding such evidence that defendant has preserved for our consideration. In a pretrial motion, defendant sought to exclude Barbaro's testimony as an expert in forensic dentistry, arguing that the prejudice of his testimony would substantially outweigh any relevance it could provide under Rule 403 and that his data and methods were unreliable under Rule 702. Following a hearing on the question, the trial court filed a written order concluding that North Carolina precedent has previously allowed bite mark testimony; Barbaro was qualified to testify as an expert in forensic dentistry; his method of proof was sufficiently reliable under Rule 702; and the relevance of Barbaro's testimony would

not be outweighed by its prejudicial effect under Rule 403.

Once trial began, as the State emphasizes, defendant did not object to significant portions of Barbaro's testimony, such as his explanations of the methods used in the field of forensic dentistry, how Barbaro applied those methods to the facts of defendant's case, and Barbaro's opinion that Taylor had bite marks on her body which were inflicted by an adult. As a result of defendant's failure to object to this testimony at trial, defendant has waived his right to any argument of error regarding those issues on appeal. N.C. R. App. P. 10(a)(1). Thus, only Barbaro's testimony that the bite marks were consistent with defendant's dentition is a topic of testimony that could be challenged on appeal. However, in his brief, defendant concedes that "[t]he State had . . . established through [defendant's] statement to police that he was the only one watching Taylor during that time [when the bites were inflicted]" and then represents that "[t]he defense did not *meaningfully* contest that [defendant] had inflicted the injuries that occurred during the ten days before he brought her to the hospital."[22] (Emphasis added.) Thus, it appears that at trial the State's evidence showed that Taylor (1) suffered numerous bites (2) inflicted by defendant (3) during the ten days before defendant brought her to the hospital and that this evidence was

---

[22] Given defendant's concession in his brief, we note the remark of defense counsel that Barbaro "does have expertise to say that these are bite marks" just prior to his clarification to the trial court that defendant's position regarding Barbaro's testimony: "I'm more making a 403 argument on that, your Honor." Both of defendant's trial counsel conferred with each other, and then affirmatively informed the trial court "[w]e're not disputing that he can say they are bite marks, we're saying he can't say who put them, and give an opinion about who put them there."

not meaningfully contested. To the extent that there was any question that defendant inflicted multiple bites on Taylor in the ten days wherein he had sole access to the child, we conclude that in light of the precedent then existing, along with the findings and conclusions included in the trial court's order denying defendant's motion to exclude—in conjunction with the trial court's decision, nonetheless, to sustain certain of defendant's objections to portions of the expert's testimony—we cannot say that the trial court's allowance of other testimony by the expert witness was "manifestly unsupported by reason or [was] so arbitrary that [it] could not have been the result of a reasoned decision." *Hennis*, 323 N.C. at 285.

We recognize that as to the question of the reliability of Barbaro's testimony, defendant cites several reports and studies from government and scientific sources which address the increasing scientific skepticism regarding the validity of bite mark identification, including those that cast doubt on the ability for a witness to accurately identify a lesion on the skin as a human bite mark,[23] notes that "[n]o recent North Carolina [appellate decision] affirmatively accepts bite mark identification testimony," and urges that precedent from North Carolina's appellate courts which

---

[23] Defendant cites: (1) Committee on Identifying the Needs of the Forensic Sciences Community National Research Council, *Strengthening Forensic Science in the United States: A Path Forward* (2009), https://www.ojp.gov/pdffiles1/nij/grants/228091.pdf; (2) President's Council of Advisors on Sci. and Tech., *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (2016), https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_foren sic_science_report_final.pdf; and (3) Am. Bd. Of Forensic Odontology, *Standards and Guidelines for Evaluating Bitemarks*, http://abfo.org/wp-content/uploads/2012/08/ABFO-Standards-Guidelines-for-Evaluating-Bitemarks-Feb-2018.pdf.

accept bite mark testimony by an expert witness contested under Rule 702 should be overruled. Whatever the merits of defendant's assessment regarding the reliability of testimony concerning the identification of bite marks and related matters, we need not address any Rule 702 arguments regarding Barbaro's testimony, given defendant's concessions to the truth of the bite mark facts relevant to the elements of the offenses with which defendant was charged and to which Barbaro testified in this case.

This leaves for our consideration only defendant's argument that the trial court's decision to admit Barbaro's testimony constituted an abuse of discretion and likely altered the outcome of defendant's trial and sentence where defendant contends that Barbaro's testimony was needlessly repetitive because three physicians had already testified about the multiple marks and lesions on Taylor's body which they believed to be human bite marks inflicted within approximately three to ten days of Taylor's arrival at Johnston Memorial Hospital[24] and was otherwise substantially more prejudicial than probative of the issues before the jury, citing *State v. Barton*, 335 N.C. 696, 704–05 (1994).

As to repetition, in *Barton*, applying the abuse of discretion standard, we upheld a trial court's decision to exclude evidence from an expert witness as

---

[24] Dr. Evans identified multiple bite marks which he estimated had been inflicted between three and ten days prior to Taylor's hospitalization, Dr. Kocis identified multiple bite marks "mostly in the three- to seven-day range," and Dr. Williams suggested that the bite marks had occurred within a ten-day timeframe.

cumulative pursuant to Rule 403. *Id.* at 704. *Barton*, therefore, simply demonstrates the appropriate deference given to trial court rulings under Rule 403 on appeal. *See* N.C.G.S. § 8C-1, Rule 403 (providing that relevant evidence "*may* be excluded if its probative value is substantially outweighed . . . by considerations of . . . needless presentation of cumulative evidence"). Barbaro's testimony opining that Taylor suffered numerous bite marks by an adult human during the time period when defendant had sole access to the child, even if cumulative, did not likely tip the scales in defendant's case either as to his convictions or sentences given defendant's acknowledgment that "[t]he defense did not meaningfully contest that [defendant] had inflicted the injuries that occurred during the ten days before he brought her to the hospital."[25]

Regarding the "inflammatory potential" of Barbaro's testimony otherwise, including its content and its manner of presentation, defendant contends that Barbaro "inflamed the jury with a series of dramatic and baseless assertions and gruesome commentary," including Barbaro's "comments that 'most . . . bite mark injuries are caused by animals — bears and dogs' 'tearing and using their teeth as their tool or weapon to tear or maim their victim' and that particular bite marks on Taylor's body evidenced 'a lot of intention' and lasted 'for a significant amount of time.'" While "[t]his Court does not condone comparisons between defendants and animals," *Roache*, 358 N.C. at 297, Barbaro's comment that most bite injuries to

---

[25] See footnote 22.

humans are caused by animals does not compare defendant to an animal but rather makes a factual statement with which defendant does not disagree. Further, defendant does not appear to have meaningfully contested that he inflicted the numerous bite marks on Taylor's body, and we also conclude that, in light of the facts presented in this case, the intentionality of the biting is a reasonable inference for any witness to draw. Finally, whether the bites inflicted upon Taylor were brief or sustained, given their large number and when viewed in conjunction with the other physical and sexual abuse inflicted upon the child, we cannot say that Barbaro's testimony made the difference in defendant's conviction or sentence. Accordingly, defendant's arguments regarding Barbaro's testimony are overruled.

**E. Expert testimony about whether Taylor was tortured**

Defendant argues that the trial court erred by allowing testimony which was inadmissible under Rules of Evidence 401, 403, and 702 from two physicians—from Dr. McNeal-Trice during the guilt–innocence phase and from Dr. Cooper during the sentencing phase—on the question of whether Taylor was tortured. Defendant also contends that the opinions expressed during the testimony in question "were not based on reliable or established medical science, nor on a complete factual basis; were biased; were unhelpful; and were unfairly prejudicial," citing specific examples of testimony where he asserts that these two doctors "improperly speculated about [defendant's] intent and state of mind, concluding the injuries were 'intentionally inflicted,' 'deliberate,' 'systematic,' 'carefully calculated,' 'wanton,' and [were] done for

the 'purpose of inflicting pain' and for 'sadistic gratification.' "

As previously noted, we review rulings under Rules 401, 403, and 702 regarding the admission of evidence at the guilt–innocence phase of a trial for an abuse of discretion. *McGrady*, 368 N.C. at 893; *Hennis*, 323 N.C. at 285. Further, to obtain relief, a defendant must demonstrate not only an abuse of discretion by the trial court in admitting challenged evidence but also that there would likely have been a different result but for the admission of that evidence. *State v. White*, 355 N.C. 696, 707–08 (2002).

At the sentencing stage of a capital proceeding, the Rules of Evidence do not apply, but "the ultimate issue concerning the admissibility of evidence must still be decided by the presiding trial judge, and his decision is guided by the usual rules which exclude repetitive or unreliable evidence or that lacking an adequate foundation." *State v. Rose*, 339 N.C. 172, 200 (1994) (extraneity omitted); *see State v. Daniels*, 337 N.C. 243 (1994) (applying Rule of Evidence 702 standards to the review of expert testimony at a capital sentencing hearing). At a capital sentencing hearing, however, the Rule 403 balancing test of probity versus prejudice is not applied, *White*, 355 N.C. at 714, although only competent, relevant evidence pertaining to the jury's sentencing decision may be introduced by the State, N.C.G.S. § 15A-2000(a)(3) (2021). In this case, we see no abuse of discretion or any other legal error by the trial court's decision to allow expert testimony from McNeal-Trice and Cooper regarding torture.

Defendant's challenge to the admission of torture testimony from McNeal-

Trice and Cooper concerns three sub-arguments: (1) whether "torture" is an area or field of expertise upon which expert testimony is appropriate, (2) whether McNeal-Trice and Cooper were qualified to opine about whether Taylor was tortured, and (3) whether the expert testimony regarding torture was relevant in defendant's case. We address these questions as they apply to each of these two experts in turn.

### 1. *Precedent regarding the applicable version of Rule 702*

Citing Rule of Evidence 702 and addressing expert testimony regarding torture from both McNeal-Trice and Cooper, defendant contends that "[t]he State did not meet its burden to show the existence of widely accepted medical literature or consensus on the ability to diagnose torture. The factors used to determine reliability, such as testing of a theory; peer review and publication; evaluation of error rates; standards; and general acceptance; are all absent in this 'field,' " citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94 (1993), and *McGrady*, 368 N.C. at 890–91. As an initial point, defendant's citations are inapposite to this portion of his argument as *Daubert* and *McGrady* did not address the version of Rule of Evidence 702 that was applicable at defendant's trial and therefore the standards and provisions enunciated in those cases and advanced by defendant here are of limited help in supporting defendant's position.

The United States Supreme Court's decision in *Daubert* involved the interpretation of Rule 702 of the Federal Rules of Evidence, as that rule existed in 1993. 509 U.S. at 588–89. In *Daubert*, the Court held that a trial court must perform

a "gatekeeping" function in determining the admissibility of expert testimony under Federal Rule 702 in order to ensure "that any and all scientific testimony or evidence admitted is not only relevant, but reliable," based upon "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 589, 592–93. A decade later, this Court construed the then-existing North Carolina Rule of Evidence 702—the same version of the rule which applies in defendant's case—and observed that while the "text of North Carolina's Rule 702 was largely identical to the . . . text of Federal Rule 702 [as discussed in *Daubert*,] . . . the judicial construction of North Carolina's rule took a different path" than that pursued by the U.S. Supreme Court in *Daubert* and its progeny. *McGrady*, 368 N.C. at 886 (citations omitted). "In *Howerton*, [the Court] examined the development of Rule 702(a) in North Carolina law and concluded that 'North Carolina is not, nor has it ever been, a *Daubert* jurisdiction.' " *Id.* (quoting *Howerton*, 358 N.C. at 469); *see also Howerton*, 358 N.C. at 469 ("expressly reject[ing] the federal *Daubert* standard" for analysis of decisions under the version of Rule 702 at issue in *Howerton* and in defendant's case).

The Court in *Howerton* denoted that the proper assessment under North Carolina's version of Rule 702 which is applicable here involves three considerations, the first of which being whether an area is sufficiently reliable for expert testimony. 358 N.C. at 458. Thus, "reliability is . . . a preliminary, foundational inquiry into the

basic methodological adequacy of an area of expert testimony. This assessment does not, however, go so far as to require the expert's testimony to be proven conclusively reliable or indisputably valid before it can be admitted into evidence." *Id.* at 460. "In this regard, [the Court] emphasize[d] the fundamental distinction between the admissibility of evidence and its weight, the latter of which is a matter traditionally reserved for the jury." *Id.* Accordingly, the Court in *Howerton* opined "that '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' " *Id.* at 461 (alteration in original) (quoting *Daubert*, 509 U.S. at 596). In order to prevent trial judges from being inappropriately tasked with evaluating "the substantive merits of the scientific or technical theories undergirding an expert's opinion," the Court held that "application of the North Carolina approach [to Rule 702] is decidedly less mechanistic and rigorous than the 'exacting standards of reliability' demanded by the federal approach." *Id.* at 464 (quoting *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000)). In other words, as regards the statutory law applicable to defendant's case, "North Carolina law . . . favor[s] liberal admission of expert witness testimony and [leaves] the role of determining its weight to the jury." *McGrady*, 368 N.C. at 886 (citing *Howerton*, 358 N.C. at 468–69).

Not until the amendment of North Carolina Rule of Evidence 702 in 2011, did the considerations cited in defendant's appellate argument regarding the evaluation of reliability—lack of "the existence of widely accepted medical literature or

consensus on the ability to diagnose torture . . . [and additional] factors used to determine reliability, such as testing of a theory; peer review and publication; evaluation of error rates; standards; and general acceptance"—explicitly become part of the applicable standard when determining the admissibility of expert testimony. Thus, the question for the Court here is whether, in light of a liberal construction of Rule 702 favoring admissibility, the trial court abused its discretion in determining that "the basic methodological adequacy of" the doctors' testimony about torture, even if "shaky," was sufficiently reliable for the testimony to be allowed and then to be tested via cross-examination, and ultimately, weighed by the jury. *Howerton*, 358 N.C. at 460, 468–69.

Defendant asserts that the area or field of expertise relevant here is torture and represents that "[t]he State presented both Cooper and McNeal-Trice as medical experts in diagnosing child torture; the prosecutor called Cooper a 'world-renowned expert' in child torture." To clarify, McNeal-Trice was offered and accepted without objection from defendant as an expert in pediatrics and child abuse, not as an expert in "torture." Likewise, although defendant emphasizes that Cooper was initially offered as an expert in, *inter alia,* "torture," the trial court actually accepted Cooper as an expert in "developmental and forensic pediatrics" with a specialization in "child abuse and maltreatment." Thus, we consider not whether the two doctors were experts in the "field" of torture or even whether such a field exists, but rather whether these two medical experts in child abuse should have been allowed to testify about

whether they believed that Taylor had been tortured.

## 2. *Testimony about torture from McNeal-Trice*

After McNeal-Trice had been accepted as an expert in pediatrics and child abuse and gave testimony on a number of topics without objection, the trial court excused the jury and allowed voir dire before McNeal-Trice testified regarding whether Taylor had been tortured.[26] On voir dire, McNeal-Trice acknowledged that she had never previously diagnosed torture in her work in child abuse cases, but she also explained that she had never "seen anyone with injuries this significant before." McNeal-Trice further stated that, in her written report, she had cited three definitions for torture for reference—one from "the Merriam[-]Webster dictionary," one from the "United Nations Convention Against Torture," and the third "from Webster's Third New International Dictionary"—none of which definitions was from a "medical textbook[ ]." Defense counsel then cited Rule 403 and "the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution" in asking the trial court to prevent McNeal-Trice from bringing "the word torture [into] her testimony." Defense counsel argued that by using "lay definitions of torture," McNeal-Trice's testimony would create a greater "danger of invading the province of the jury in this regard," noting concerns about both the charge of first-degree murder by torture and the aggravating factor of the murder being "heinous, atrocious, and

---

[26] There was an earlier pretrial hearing on the defense motion to exclude torture opinions. The trial court deferred ruling, asking to see the experts' reports. The following week, the trial court denied the motion to exclude in limine but held the matter open for trial.

cruel."

The discussion which occurred upon defendant's objection at trial to McNeal-Trice using the word "torture" in her testimony largely focused on the potential applicability of the Court of Appeals decision in *State v. Paddock*, 204 N.C. App. 280 (2010)—an otherwise unrelated case in which Cooper happened to be the expert whose torture testimony was at issue. Defendant argued that *Paddock*, a decision in which Cooper's testimony that child victims had been tortured was held to be admissible, was distinguishable from defendant's case because, in the *Paddock* case the expert had relied upon "a greatly used medical diagnosis of torture" while McNeal-Trice had not previously diagnosed torture and relied on "lay definitions of torture." Defense counsel also suggested that, in any event, *Paddock* was wrongly decided by the Court of Appeals.

In *Paddock*, the defendant was being tried on charges of felonious child abuse inflicting serious bodily injury and first-degree murder in connection with the death of her three-year-old child and the severe abuse of three of her other children. 204 N.C. App. at 281. The defendant in *Paddock* argued to the Court of Appeals that the trial court erred in admitting the offered expert's testimony on torture because, according to the defendant, the offered expert was using a medical definition of torture[27] rather than a legal definition of torture; for that reason, the defendant

---

[27] Nothing in the Court of Appeals decision indicates the source of Cooper's definition of torture or upon what research, training, or resources—medical or otherwise—she relied in forming her expert opinion that the children in *Paddock* were tortured.

characterized the offered expert's testimony about torture as either unhelpful or misleading to the jury. *Id.* at 287. The offered expert was accepted as an expert in "the field of developmental and forensic pediatrics" and during the guilt–innocence phase, she testified that three of defendant's children were "victim[s] of ritualistic child abuse, sadistic child abuse, and torture." *Id.* at 282, 287. That opinion was formed after the expert reviewed, *inter alia*, photographs of the children, medical records, reports and interviews from a guardian ad litem and law enforcement officials, and histories taken from the surviving children by the expert. *Id.* at 288–89. The expert also

> testified to the nature of . . . torture: torture occurs when a person "takes total control and totally dominates a person's behavior and most the [sic] basic of behaviors are taken control of. Those basic behaviors are eating, eliminating and sleeping. Those are the three more common behaviors that a person will take total control of."

*Id.* at 289 (second alteration in original). The expert then provided examples of the torture of children and "stated that she was not testifying to a legal definition of torture but was defining the term based on her medical expertise." *Id.* The lower appellate court concluded that the trial court did not abuse its discretion in admitting the expert's testimony regarding torture, citing *State v. Jennings*, 333 N.C. 579, 599 (1993).[28] *Id.*

---

[28] *Jennings*, like *Paddock,* was decided prior to the 2011 amendment to Rule of Evidence 702 and thus applies the *Howerton* precedent which is appropriate in defendant's case.

In *Jennings*, another capital case wherein one of the theories for the charge of first-degree murder was murder by torture, this Court held that

> the term "torture" is not a legal term of art which carries a specific meaning not readily apparent to the witness. "Torture" does not denote a criminal offense in North Carolina and therefore does not carry a precise legal definition, as "murder" and "rape" do, involving elements of intent as well as acts. Further, the commonly understood meaning of the term is approximately the same as the instructions the trial court gave the jurors—"inflict[ion of] pain or suffering upon the victim for the purpose of satisfying some untoward propensity." *Cf. Webster's Third New International Dictionary* 2414 (1976) (torture means the "infliction of intense pain . . . to punish or coerce someone"; "torment or agony induced to give sadistic pleasure to the torturer").

333 N.C. at 589, 599.[29] The Court emphasized that the expert in that case

> did not testify that, in his opinion, [the] defendant tortured [the victim]; he gave his expert medical opinion about the pattern and types of injuries he observed during the autopsy. [The expert] had previously testified, *inter alia*, that the bruises to the head, chest, and abdomen were caused by a blunt force, and that the blow to the head may have stunned [the victim]. The blood loss occasioned by the blow to the abdomen would cause considerable pain, drowsiness, eventual unconsciousness and death, if unattended. The scrapes and bruises to [the victim's] legs, arms, and buttocks were not received in a fall—there were no graze wounds, skid type marks, concrete or gravel burns. [The expert] testified that in his opinion most of the wounds were fresh, recent, suffered "pretty close to time of

---

[29] Defendant suggests that torture, in addition to not being a legal term of art, is not a medical term of art or an appropriate diagnosis, citing caselaw from Ohio where the *Daubert* standard was applied to that jurisdiction's version of Rule of Evidence 702 considerations. *See State v. Hawkey*, 62 N.E.3d 721, 725 (Oh. Ct. App. 2016). In light of the express application of the *Daubert* standard employed by the Ohio court*,* the cited authority is not useful in our resolution of defendant's case, even as persuasive authority.

death," and not self-inflicted. Finally, the amount of mucus collected in the lower part of [the victim's] bronchial tubes was "common in persons who die slowly of multiple injuries." The challenged testimony summarized this pattern of injuries and constituted a medical conclusion which [the expert], [a] forensic pathologist and Chief Medical Examiner, was fully qualified to reach.

*Id.* (alterations in original). The trial court permitted the prosecutor to ask the expert, "[C]onsidering all of the injuries that you observed on the body of [the victim], do you have an opinion as to whether or not [he] had been the victim of torturous activity?" *Id.* at 598–99. The expert responded, "In my opinion, he had been tortured." *Id.* This Court found no abuse of discretion or other error where a doctor who had been tendered and accepted as an expert in forensic pathology testified that the murder victim "had been tortured," "considering all of the injuries" that the expert had observed on the body of the victim. *Id.*

Nothing in the *Jennings* opinion explicates any specific type or number of research studies, medical literature, or other source required to undergird the expert's opinion or suggests that any torture-specific training or background would be required of an expert witness in order to support the expert's testimony that, based upon the injuries that the expert had observed on the victim's body, the victim suffered torture. The *Jennings* decision also specifically noted with approval that the medical expert's reliance upon the definition of torture from "*Webster's Third New International Dictionary* 2414 (1976) (torture means the 'infliction of intense pain . . . to punish or coerce someone'; 'torment or agony induced to give sadistic pleasure to

the torturer')" was "approximately the same as" the definition which the trial court provided to the jurors in its instruction—the "inflict[ion of] pain or suffering upon the victim for the purpose of satisfying some untoward propensity." *Id.* at 599 (alterations in original).

In discussing the admissibility of McNeal-Trice's testimony using the word "torture" here, the prosecutor cited *Paddock*, asserted "that torture is a subset of child abuse," like battered child syndrome, and contended that "this type of diagnosis and this type of opinion is permissible." When the trial court issued its oral ruling on the record that "the proffered testimony of . . . McNeal-Trice that [Taylor] suffered torture" was admissible under Rule 702 and was not unfairly prejudicial under Rule 403, the trial court noted that it would "define the term torture for the jury if appropriate later in the trial."

Before the jury, McNeal-Trice, much like the expert in the *Jennings* case, was accepted without objection as an expert, here in pediatrics and child abuse as opposed to pathology as was the case with the expert in *Jennings*, and then testified to the jury in detail about Taylor's injuries—specifically, that Taylor, *inter alia*, suffered "global physical scarring that was too extensive to enumerate" including "lacerations, puncture wounds, burns, bite marks, and bruising"; had scars and healing indicating that her wounds had been inflicted over time, consistent with a ten-day period; had lacerations to the external buttocks and intergluteal folds plus lacerations to the vaginal area in various states of healing, some of which were caused within the past

24-72 hours; had injuries from the buttocks to the vaginal area that displayed a "multiple kind of pattern and repetitive injuries" consistent with the "child being restrained or being . . . unable to move"; had vaginal injuries "consistent with penetrating trauma" supporting a diagnosis of sexual abuse; had "a rectal fissure" due to trauma; experienced head trauma due to the child being shaken or her head striking a hard surface; showed evidence of two broken forearm bones in the early stages of healing; and had multiple tiny pieces of metal embedded deeply enough not to be easily seen by visual examination in "[h]er feet, her legs, over her knees, her thighs, the pelvic region, [and] her buttocks"; to the extent that these injuries "indicated a delay in seeking medical attention." Like the expert in *Jennings*, based on these observations of all of the injuries suffered by the victim, McNeal-Trice then opined that Taylor's injuries were the result of "intentionally inflicted trauma" and were "consistent with severe physical child abuse, also known as battered child syndrome, abusive head trauma, and torture associated with significant morbidity and high risk [of] mortality." Very similar to the expert in *Paddock*, McNeal-Trice explained to the jury that her opinion that Taylor's injuries were consistent with torture was based not only on her own observations of Taylor while the child was hospitalized, but also upon a case history review which included statements regarding defendant's various accounts to law enforcement and medical professionals about the causes of Taylor's injuries, along with McNeal-Trice's discussion with Reyes. In considering the injuries inflicted upon Taylor, McNeal-Trice was able to

testify that Taylor's "pain would probably have been indescribable" because "the number of lacerations and marks to her skin [would have been] extremely painful" and because Taylor would have experienced, "[n]ot only the pain associated with initially getting the injuries, but injuries on top of injuries, not having medical treatment for the injuries, not having pain medicine for the injuries, [and] not having antibiotics for the injuries."

We conclude that the facts and circumstances in this case and those presented in *Jennings* are not meaningfully distinguishable. In each case, a medical professional was admitted as an expert witness in a case where murder by torture was one theory of first-degree murder charged by the State and then testified about multiple severe injuries suffered by the victim as observed by the expert before opining that the victim had likely suffered torture. McNeal-Trice, like the expert in *Jennings*, referred to the definition of torture contained in Webster's Third New International Dictionary in forming her opinion. Nothing in the *Jennings* decision suggests that the expert there had previously "diagnosed" or testified about a victim being tortured; McNeal-Trice acknowledged that she had not done so, but also explained that she had never before witnessed the level of abuse that was inflicted on Taylor. In any event, this Court has stated that "[a]s pertains to the sufficiency of an expert's qualifications, we discern no qualitative difference between credentials based on formal, academic training and those acquired through practical experience," because "[i]n either instance, the trial court must be satisfied that the expert

possesses 'scientific, technical or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue.' N.C.G.S. § 8C-1, Rule 702(a)." *Howerton*, 358 N.C. at 462 (alteration in original) (also citing 2 Kenneth S. Broun, *Brandis & Broun on North Carolina Evidence* § 184, at 44–45 (6th ed. 2004) ("[A] jury may be enlightened by the opinion of an experienced cellar-digger, or factory worker, or shoe merchant, or a person experienced in any other line of human activity. Such a person, when performing such a function, is as truly an 'expert' as is a learned specialist . . . ." (footnotes omitted)). As to McNeal-Trice's testimony that Taylor's injuries were the result of "intentionally inflicted trauma," at the guilt phase, expert testimony is relevant and admissible to support the State's position that a defendant did not "snap and lose control" but instead "engaged in a deliberate, prolonged process of severely beating and torturing" a child victim. *State v. Atkins*, 349 N.C. 62, 100 (1998).

The apparent distinctions between the expert testimony here and in *Jennings*, to the extent that they are pertinent, reveal that McNeal-Trice was potentially better equipped and positioned to offer her testimony regarding torture. For example, McNeal-Trice referenced two additional definitions of torture beyond that contained in Webster's Third New International Dictionary as relied upon by the expert in *Jennings*. Furthermore, while the expert in *Jennings* testified that the victim "had been tortured," McNeal-Trice's testimony was only that Taylor's injuries "were consistent with" torture. Another distinction between the experts here and in

*Jennings* is that McNeal-Trice, unlike the pathologist in *Jennings*, was admitted as an expert in child abuse and, while not having previously testified that a child had been tortured, she had experience working with living victims who had survived their abuse, and thus McNeal-Trice might reasonably be expected to have more knowledge of the pain and suffering those victims experienced as compared to the pathologist and Chief Medical Examiner in *Jennings*, who definitionally spent much of his professional time examining deceased victims who could not communicate about any pain and suffering they had experienced prior to their deaths. Further, the expert in *Jennings* was relying solely on his examination of the deceased victim in developing his expert opinion regarding torture, while McNeal-Trice in addition to examining Taylor before her death had spoken to medical professionals who treated Taylor, to Reyes, and to law enforcement officials.

In light of these circumstances and viewed in conjunction with this Court's precedent, we see no abuse of discretion in the trial court's determination that McNeal-Trice's testimony that Taylor's injuries were consistent with torture was admissible pursuant to the *Howerton* test applicable under the pre-2011 version of Rule of Evidence 702. *See Jennings*, 333 N.C. at 599 (holding that a medical expert's "testimony summariz[ing a] pattern of injuries and [providing] a medical conclusion" that a victim's injuries were consistent with torture is admissible under that version of Rule 702).

3. ***Torture testimony from Cooper***

As we observed previously, at the sentencing phase of a capital proceeding, the Rules of Evidence do not apply, although "repetitive or unreliable evidence or that lacking an adequate foundation" may not be admitted. *Rose*, 339 N.C. at 200 (citation omitted). The Rule 403 balancing test does not apply. *White*, 355 N.C. at 714 (2002). "Evidence may be presented as to any matter that the court deems relevant to sentence, and may include matters relating to any of the aggravating or mitigating circumstances . . . . Any evidence which the court deems to have probative value may be received." N.C.G.S. § 15A-2000(a)(3) (2021).

Cooper was set to be the first witness called to testify during the State's case during the sentencing phase of defendant's trial. The defense objected, asserting bases that included cumulative expert testimony, the torture diagnosis, and the state of mind conclusions in Cooper's report, arguing that these were unfairly prejudicial and unfairly inflammatory. Prior to Cooper appearing before the jury, counsel for both parties and the trial court discussed defendant's motion concerning Cooper's testimony. Defense counsel stated that defendant was "not challenging [Cooper's] qualifications." The trial court then clarified that defendant was objecting to opinions in Cooper's "report in which she expresses, or seems to express, in any event the opinions about the defendant's state of mind, . . . among other things, that such opinions are beyond her area of expertise, . . . [and] . . . Cooper's use of inflammatory language." After resolving one aspect of defendant's motion with the agreement of defense counsel, the trial court stated, "the motion challenges opinions stated by . . .

Cooper to the effect that [Taylor] was tortured. Essentially, the same arguments

which the [c]ourt entertained and ultimately [rejected] during the testimony of . . .

McNeal-Trice." Defense counsel noted concerns about the repeated use of

photographs and then stated:

> On the torture area, I understand the [c]ourt's ruling
> and we certainly, although except—made an exception to
> it, respectfully, we think that there is a little bit of
> difference because now they're talking about supporting it
> for the EHAC[30] aggravator, which unlike murder by
> torture, which is one of the things we talked about, is the
> [c]ourt would be giving the very definition, the definition of
> torture for that.
>
> When it come[s] to the EHAC aggravator, it in fact
> uses torture as the definition of EHAC. So, I think that
> puts it in a slightly different situation. And therefore, we
> argue it's more akin to invading the province of the jury at
> this stage even in the light of *Paddock* than it would be if
> this was just given during the guilt/innocence presentation.

After reminding the parties that the Rules of Evidence do not apply at a sentencing

proceeding, the trial court acknowledged that "there is arguably some constitutional

concern about what is described in Rule 403 as a needless presentation of cumulative

evidence," and then asked the State whether "it is your purpose in calling . . . Cooper

to further offer proof of what the defense is calling . . . the especially heinous,

atrocious, and cruel aggravating circumstances[?]" The State agreed, referring to

Cooper as "a world[-]renowned expert in the area of child abuse torture." But the

---

[30] An "[a]ggravating circumstance which may be considered" during the sentencing phase of a capital case is whether "[t]he capital felony was especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9) (2021).

State tendered, and the trial court accepted, Cooper "as an expert in the area of developmental forensic pediatrics with a subspecialty in child abuse." Defendant did not object.

On voir dire, Cooper explained that she had based her opinions about Taylor being tortured after review of "the investigative report[;] all hospital records for this patient[;] the autopsy report[;] video and digital images that were part of the investigative report[;] normal pictures that had been taken of this child[;] the neuropathology as part of the autopsy[; and] the mental health assessment of [defendant]," as well as "certain videos." When the trial court then asked defendant what concerns remained about Cooper's testimony, defense counsel responded that they fell into

> three primary areas. One is—and maybe we have enough.
> I am certainly concerned about [Cooper's] psychological
> conclusions. I am concerned about the use of torture and
> how—furthermore, from the testimony that's come up, and
> concerned about the piling on effect for lack of a better
> word—403 purposes for however we're going to describe it
> at the sentencing phase.

After defense counsel questioned Cooper during voir dire, counsel clarified to the trial court that "Cooper is incredibly accomplished in her field and we certainly are not disputing that, but our concerns are several here about it":

> The first has to do with her giving opinions
> regarding psychiatric or mental health conclusions in this
> case and all. And not only concerns about her giving those
> opinions, given both her qualifications, which I admit are
> not in that particular area, but second in a situation where
> she did not perform a psychiatric evaluation of the

> defendant by any means. She did not interview the defendant. She reviewed the reports of the two experts that we had but not yet underlying data about that.
>
> And even though I understand that the State was going with that, that she's comparing—well, it can't be because of this health and mental health break. I think one thing the Court has to take into mind is confusion of the jurors in that aspect about it. It sounds like reading the report—it's her testimony that she's basically making a mental health diagnosis, which I think using as a guidance the Rule 702, she's not in position to make in this particular case. I think it would be highly prejudicial.

After hearing extended arguments from each party regarding Cooper's proposed testimony, the trial court eventually stated it would allow Cooper's testimony.

Before the jury, Cooper provided information about her training and background more generally and explained her "specialized training, education or experience . . . focusing on child torture." Cooper stated that she had done teaching on the topic for the National District Attorneys Association and Interpol,[31] providing training "for the FBI and also ICE,"[32] had been "a trainer in this particular area for at least the last three years although I have testified in child torture cases for more than ten years," and was a peer reviewer for "a scientific article on the torture of children." Cooper agreed that torture is a "medical diagnosis," noting "the Tokyo

---

[31] The International Criminal Police Organization, an intergovernmental organization that assists police in member countries. *See* INTERPOL, *What is INTERPOL?*, https://www.interpol.int/en/Who-we-are/What-is-INTERPOL (last visited Aug. 17, 2023).

[32] Apparently, these are references to the Federal Bureau of Investigation and the Immigration and Customs Enforcement Agency. *See FBI: What We Investigate*, https://www.fbi.gov/investigate, and U.S. Immigration and Customs Enforcement, https://www.ice.gov/.

Declaration" issued in 1975 "by the World Medical Association."

Cooper then testified about the materials she had reviewed in Taylor's case and explained the differences between battered child syndrome or severe child abuse and torture. Cooper stated that battered child syndrome was a diagnosis that indicated intentional rather than accidental injuries to a child victim, which are "severe" and which usually "have occurred at one time" as the result of an "extreme loss of control." Cooper testified that torture, in contrast, is "very deliberate . . . very systematic" with an intent by the offender "to cause both mental and/or physical pain and suffering" to the victim, rather than simply "a sudden loss of control." Cooper also noted that torture usually occurs over "a significant duration in the child's life."

Defendant on appeal contends that Cooper lacked a sufficient factual basis for her testimony "about the state of mind of a person" who tortures, to wit: "It's really about the offender" "who has one of three desires"; it is "carefully calculated"; it "includes a need for power and control"; it involves "a lack of empathy"; and is done for "sadistic pleasure" or "gratification." In these portions of the testimony cited by defendant, however, Cooper is providing background information about torture and people who torture generally, and plainly was not testifying in reference to defendant's specific acts against Taylor. The same analysis applies to other portions of the testimony from Cooper to which defendant draws our attention on appeal: "Biting of children is a science unto itself"; "duct tape . . . across the mouth and all around the hair, over the scalp, which is usually how children are duct taped in

torture scenarios"; and "[T]he purpose for individuals videotaping these kinds of scenes is because they want to come back and look at it again. . . . [T]his is part of sadistic gratification. It makes that person happy. It gives them pleasure to be able to see how much pain they were able to inflict upon someone else." While defendant correctly states that "Rule 702 does not allow a doctor to opine about what went on in the mind of the person who inflicted the injuries absent a sufficient basis and level of expertise for that opinion," emphasizing that Cooper was not a psychologist or psychiatrist and never interviewed defendant, our review of the transcript cited above reveals that Cooper did not make these statements as part of any diagnosis of defendant or regarding the specific injuries that Taylor had suffered. That testimony provided context for the testimony from Cooper that directly addressed Taylor's injuries.

Defendant also objects to Cooper's use of the term "cat o' nine tails," which is defined as "a whip made of nine knotted cords fastened to a handle." *See* https://www.merriam-webster.com/dictionary/cat-o'-nine-tails (last visited August 17, 2023). Cooper did refer to certain wounds on Taylor's body—linear wounds, some of which were embedded with tiny slivers of copper filament—that appeared to have been caused by defendant beating Taylor with an electrical cord which had been partially stripped of its covering to reveal the wiring which was found inside the outbuilding as being like those caused by a "cat o' nine tails" and then used that term as a short-hand reference to an implement defendant created to cause certain injuries

in several other portions of Cooper's testimony. Cooper clearly identified that she was using this term to refer to the electrical cord as modified by defendant. Defendant does not explain his objection to Cooper's use of this term beyond characterizing it as a reference to an "instrument[ ] . . . from 'torture literature.' " While the electrical cord which defendant altered and used to whip Taylor over much of her body, including her genital area and buttocks, may not technically have been a "cat o' nine tails," we see no additional prejudice beyond the reality of these particular injuries suffered by Taylor in Cooper's decision to use the challenged term in a short-hand fashion rather than to repeatedly refer to the electrical cord cut and stripped of its insulation in a manner so that its metal wire interior was exposed such that, when Taylor was whipped with it, she received lacerations severe enough that tiny pieces of metal were embedded inside her wounds.

Defendant also objects to Cooper opining that Taylor's "injuries . . . were carefully calculated. Her imprisonment was carefully calculated." In light of the evidence presented during the guilt–innocence phase which showed that defendant bought and installed a mechanism by which he could lock Taylor inside the outbuilding without her ability to escape almost immediately after he gained sole control of the child, that Taylor was not seen outside the outbuilding during the last ten days of her life, and that defendant rejected an offer of help in caring for Taylor from his grandmother, the fact that Taylor was intentionally and "carefully" imprisoned by defendant appears to be uncontroverted. Moreover, Cooper gave this

specific testimony in response to the prosecutor's question about whether Taylor's injuries could have been the result of "a sudden lack of control." Cooper replied

> And the answer is no, this is not consistent with a sudden lack of control. Because typically in a sudden lack of control, [a] patient can be fatally injured and most commonly that is going to be from either abusive head trauma or from direct blunt force trauma to the abdomen. Those are the two most common ways in which children are fatally injured from a sudden loss of control. But you usually don't see any other evidence of other injuries for the child. Because this child had new and old injuries, healing injuries, very carefully inflicted injuries, the 66 bite marks that this child had, the removal of a fingernail, these are not the kinds of injuries that you see from a sudden loss of control. These are injuries that were carefully calculated. Her imprisonment was carefully calculated.

Thus, read in context, Cooper's testimony was that, in her expert opinion, Taylor's injuries were not accidental or the result of "a sudden loss of control" as opposed to ongoing, intentional child abuse. Cooper went on to buttress this opinion by noting that defendant had purchased and installed the lock on the outbuilding, left Taylor locked inside that structure while defendant came and went over the next ten days, and never sought help from any of the people whom defendant knew could and would have helped to care for Taylor. Cooper explained that "that's not the kind of behavior that you see . . . from a lack of control. Because a lack of control is an impulsive, unpredictable response. This was not only predictable, but it was calculated. So, this is not consistent with a lack of control."

After giving additional testimony about Taylor's specific injuries, including her

severe sexual abuse, her nipple being bitten off, the "hundreds" of places where tiny metal fragments were embedded in Taylor's wounds, the removal of a fingernail, and more, Cooper gave her ultimate opinion that Taylor "sustained severe torture." Cooper testified that the "presence of and nature of the injuries that this child sustained as well as the memorialization of the victim's trauma and psychological damage as well as her imprisonment over the period of time that she was under the power and control of [defendant], it's consistent with not only torture but an individual who does these things basically for the purpose of sadistic pleasure."

Defendant also objects to the admission of the torture testimony from Cooper by asserting that it was unhelpful to the jury, because "[w]hether something might constitute torture is well within common knowledge." While the Rules of Evidence do not apply at a capital sentencing hearing, *Rose*, 339 at 200, and "[e]vidence may be presented as to *any* matter that the court deems relevant to sentence, and may include matters relating to any of the aggravating or mitigating circumstances . . . and [*a*]*ny* evidence which the court deems to have probative value may be received," N.C.G.S. § 15A-2000(a)(3) (emphasis added), the challenged evidence from Cooper would likely be admissible even under Rule 702.

As we discussed above, while torture is not a legal term of art but rather should be apprehended in "the commonly understood meaning of the term," *Jennings*, 333 N.C. at 599, regarding admissibility of expert testimony under Rule 702, the proper inquiry is "whether the witness because of [her] expertise is in a better position to

have an opinion on the subject than is the trier of fact," *State v. Wilkerson*, 295 N.C. 559, 568–69 (1978); *see also State v. Evangelista*, 319 N.C. 152, 163 (1987) (holding that expert testimony is admissible "when it can assist the jury in drawing certain inferences from facts and the expert is better qualified than the jury to draw such inferences"). Certainly, Cooper was more experienced than the jurors in viewing a large number and wide range of child abuse circumstances. "Although the trial court 'should avoid unduly influencing the jury's ability to draw its own inferences, expert testimony is proper in most facets of human knowledge or experience.' " *State v. Jennings*, 209 N.C. App. 329, 337 (2011) (quoting *State v. Brockett*, 185 N.C. App. 18, 28, *disc. review denied*, 361 N.C. 697 (2007)). Further, a trial court does not engage in the balancing test under Rule of Evidence 403 during a capital sentencing proceeding. *White*, 355 N.C. at 714. In *Jennings*, the same physician testified about the "nature and extent" of the victim's injuries during both the guilt and sentencing phases. 333 N.C. at 593.

At the sentencing phase specifically, "what makes a murder especially heinous, atrocious, or cruel is the entire set of circumstances surrounding the killing," including evidence that supports both the defendant's motive as well as his depravity of mind. *White*, 355 N.C. at 705 (extraneity omitted). Murders which may be deemed especially heinous, atrocious, or cruel may include cases involving physical injury or torture inflicted prior to death; killings that are physically agonizing or dehumanizing to the victim; murders which are less violent but which are

"conscienceless, pitiless, or unnecessarily torturous" including those where the victim was aware yet helpless to prevent her death; and murders that demonstrate a defendant's unusual depravity of mind even if that fact is not an element in other first-degree murders. *State v. Gibbs*, 335 N.C. 1, 61–62 (1993).

In sum, defendant has failed to demonstrate that the trial court abused its discretion by admitting any of the testimony from Cooper during defendant's capital sentencing hearing in a manner that was "manifestly unsupported by reason or [was] so arbitrary that it could not have been the result of a reasoned decision." *Hennis*, 323 N.C. at 285.

## F. Defendant's statements at Johnston Memorial Hospital

Defendant next raises concerns arising under *Miranda v. Arizona*, 384 U.S. 436 (1966), specifically arguing that defendant "on being detained by a nurse who tackled him, pulled him by the throat down a hall and into a room, and then handed him over to two armed officers who closed the door behind them and began an interrogation—was restrained to a degree associated with formal arrest." Specifically, defendant contends that his initial detention by the nurse "was a black-letter 'citizen's detention' culminating in 'surrender of the person detained to a law-enforcement officer' as provided by statute," citing N.C.G.S. § 15A-404, and that the nurse then "surrendered custody of" defendant to law enforcement officers, after which "[n]othing the officers did or said would have led a reasonable person to believe his detention had ended simply because he had not yet been formally arrested."

Defendant's argument misconstrues the essential tenets of *Miranda* and inappropriately shifts the focus away from the key question of whether a "custodial interrogation" occurred.

Defendant moved to suppress statements he made to law enforcement officers while in the hospital on grounds that he was not advised of his rights and his request for legal counsel was not honored. At the hearing on that motion, the following evidence was received: Two law enforcement officers with the Johnston County Sheriff's Office, Lieutenant Norman Whitley, in uniform and armed, and Detective Jamey Snipes, in plainclothes but displaying a badge and visible sidearm, arrived at the hospital after receiving a report of suspected child abuse. The officers entered the exam room where defendant was seated alone and closed the door, at which point Snipes identified himself to defendant as a detective. In response to questions from the officers, defendant provided Taylor's and Reyes's names, explained that he been caring for Taylor while Reyes was away, and stated that Taylor had fallen while jumping on a bed and struck her head the previous night. Snipes then left the exam room, while Whitley asked defendant about Taylor's other injuries. Defendant told Whitley that Taylor's cousin, a child, had bitten her and stated that Taylor's other wounds were the result of Taylor scratching herself. After Snipes returned to the exam room and Whitley stepped out, Snipes asked defendant what, other than falling off a bed, had caused Taylor's injuries. Defendant stated that he might need legal counsel, at which point Snipes told defendant that he was not under arrest. Snipes

continued questioning defendant. In response to Snipes' questions, defendant confessed that he had "lost it" and whipped Taylor with an electrical cord after she urinated and defecated on the bed, and defendant also stated that he is bipolar and little things set him off. After their exchange, Snipes had defendant review and sign Snipes's handwritten account of the interview. Thereafter, Snipes handcuffed defendant, told him he was under arrest for child abuse, and transported him to the Johnston County Sheriff's office where defendant was read his *Miranda* rights.

Following the hearing, the trial court entered an order in which it concluded that defendant was not in custody while at the hospital and denied defendant's motion to suppress. In that order, the trial court made findings of fact that when the two officers with the Johnston County Sheriff's Office arrived, one in plainclothes and one in uniform, they found defendant seated in a chair in an exam room, alone; that the officers had received information that a child brought to the hospital by defendant was badly injured; that the officers did not arrest, handcuff, or otherwise restrain defendant; that they questioned defendant about how Taylor had been injured; that defendant initially claimed that Taylor had struck her head after jumping on a bed, had been bitten by another child, and already had some of her injuries when Taylor's mother left the child with defendant; that when defendant said that he thought he needed a lawyer, one of the officers told defendant that he was not under arrest; that at various times one of the officers would leave the room to look at or take photos of Taylor and on one occasion both officers stepped out of the room together to discuss

Taylor's injuries; that after defendant eventually made statements acknowledging that he had whipped Taylor with a power cord, one of the officers reduced defendant's statement to writing and had defendant sign the statement; and that defendant was then arrested and taken to the Sheriff's Department where he was read his *Miranda* rights. The trial court also found, *inter alia*: that after being read his *Miranda* rights, defendant asked to speak to an attorney at which point questioning by law enforcement officers ceased; that officers did allow defendant's mother, who had arrived at the Sheriff's Department, to speak to defendant after cautioning her that she could not ask defendant any questions on behalf of law enforcement and could not ask defendant about Taylor's injuries; and that when defendant's mother asked him if he wanted to talk to her, defendant made several incriminating statements, including "that he had hit the child with a power cord." The trial court concluded that defendant had not been arrested when he made his statement in the exam room at the hospital and that he had not been restrained "to any degree associated with a formal arrest." The trial court also concluded that defendant's incriminating statements to his mother while under arrest did not implicate *Miranda* concerns because defendant's mother was not acting as an agent of law enforcement and defendant made the statements "freely and voluntarily."

After defendant received supplemental discovery material which showed that a nurse at the hospital, Mary Butler, had forcibly detained defendant before law enforcement officers arrived to question defendant, defendant requested

reconsideration of his motion to suppress. The relevant evidence introduced during the two hearings on this topic showed that Butler was present when defendant brought Taylor into the emergency room and during the initial examination of Taylor where the extent of her injuries was revealed. After medical professionals began to question defendant about how Taylor's injuries had occurred and their level of distress about the injuries became apparent, defendant stated that he needed to "move his truck," and ran out of the trauma room toward the lobby. Butler followed defendant and, in her own words, "grabbed him around the throat, and told him he ain't going no damn where, and pulled him back down the hall. . . . I got down the hall with him, and I put him in [exam] room 5. And I said, "Motherfucker, you ain't going no damn where." Defendant sat in a chair and did not attempt to leave the room as Butler stood in the doorway. After some period of time, two law enforcement officers with the Johnston County Sheriff's Office, Lieutenant Norman Whitley, in uniform and armed, and Detective Jamey Snipes, in plainclothes but displaying a badge and visible sidearm, approached and briefly spoke to Butler, who stated, "Give me your gun. I'm going to do what the hell needs to be done, right here, right now."[33] The officers briefly walked away from the exam room where defendant was, but returned within a minute or two, at which point the officers entered the exam room

---

[33] Defendant contends that this statement was made within defendant's hearing, but as the State noted at the 19 February 2014 suppression hearing, there was no evidence to support defendant's assertion since Butler could not testify as to what defendant heard. The evidence was only that defendant "may have been in close proximity" when Butler made these remarks.

and Butler departed the area.

After Butler's evidence was received at the second suppression hearing, defense counsel contended to the trial court that based upon Butler's actions, defendant would not have felt free to leave and that he was in effect in custody at that point. The trial court stated that "Butler was not a law enforcement officer, and the evidence suggests that she was not acting at the behest of any law enforcement officer," and then asked defense counsel for "any case at all discussing the applicability of *Miranda* when a private citizen restrains or attempts to restrain the movement of someone who may have committed a crime." (Italics added.) Defense counsel stated that he had not found any such case. In response to the same inquiry, the prosecutor cited "Illinois versus Perkins" and asserted for *Miranda* concerns to apply "not only does there have to be State action, the defendant has to know that the person they're talking to is acting on the behest of law enforcement." The State then cited several North Carolina cases—*State v. Holcomb*, 295 N.C. 608 (1978), *State v. Powell*, 340 N.C. 674 (1995), *State v. Johnson*, 29 N.C. App. 141 (1976), *State v. Perry*, 50 N.C. App. 540 (1981), and *State v. Conrad*, 55 N.C. App. 63 (1981)—which the State contended stood for the same proposition.

On 24 February 2014, the trial court entered an "Order Denying Defendant's Second Motion to Suppress Statements," incorporating the findings of fact and conclusions of law contained in the trial court's first order denying defendant's original motion to suppress and including additional findings of fact about

defendant's interactions with Butler, beginning with defendant bringing Taylor into the emergency room and continuing through defendant's attempt to leave the hospital, Butler's actions in physically putting defendant into an exam room, and her keeping defendant there until Snipes and Whitley entered the room with defendant and closed the door as described above. The trial court also found the following facts:

> 13. At no time was Butler acting at the behest of or as an agent of law enforcement office[r]s.

> 14. The uniformed law enforcement officers who approached Butler at the door of treatment room 5 did not know about or acquiesce in her conduct or give prior approval to her actions.

The order also included the following conclusions of law:

> 1. Butler's actions were those of a private person and did not constitute an arrest of defendant or a seizure of his person within the meaning of the Fourth Amendment.

> 2. None of Butler's actions triggered defendant's *Miranda* rights and they did not transform the officers' subsequent questioning of defendant in the hospital emergency treatment room into a custodial interrogation.

> 3. None of Butler's actions rendered defendant's statements to the officers in the hospital emergency room involuntary.

> 4. None of defendant's federal or state constitutional rights were violated by Butler's actions.

In reviewing a suppression order, an appellate court must determine whether competent evidence supports the trial court's findings of fact, and whether those findings of fact in turn support the trial court's conclusions of law, which are reviewed

de novo. *Williams*, 362 N.C. at 632–33. Here, defendant does not challenge any of the trial court's findings of fact as unsupported by the evidence presented at the hearings, but citing *Stansbury v. California*, 511 U.S. 318 (1994), he contends that in the second order denying defendant's motion to suppress his statements made at the hospital, "the trial court failed to address 'how a reasonable person in [defendant's] position would perceive his or her freedom to leave.'" Among the relevant circumstances here, defendant identifies: (1) medical staff believed that defendant had committed a serious crime; (2) defendant was unable to get through the locked doors which led to the lobby and the hospital exit without the assistance of hospital staff; (3) Butler physically placed defendant in a room, stood in the doorway blocking his exit, and prevented him from leaving if he tried; (4) hospital staff contacted law enforcement to report that defendant had committed a serious crime; (5) Butler made clear to defendant that she would not permit him to leave the room; and (6) once the law enforcement officers arrived, they entered the room, closed the door, and began to question defendant without informing defendant that he had the option of leaving or providing him with *Miranda* warnings.

A criminal suspect must be advised of his pertinent constitutional rights before being "questioned while in custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 445; *see also State v. Buchanan*, 353 N.C. 332, 336 (2001) (stating that *Miranda* safeguards were "conceived to protect an individual's Fifth Amendment right against self-incrimination in the inherently

compelling context of custodial interrogations by police officers"). The relevant inquiry under *Miranda* is more narrow than the broad "free to leave" test employed to determine whether a person has been seized within the meaning of the Fourth Amendment. *Buchanan*, 353 N.C. at 339; *see also Howes v. Fields*, 565 U.S. 499, 509 (2012) (stating that "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*," which only applies where "the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*" (citation omitted)).

"Both the United States Supreme Court and this Court have held that *Miranda* applies *only* in the situation where a defendant is subject to custodial interrogation." *State v. Barden*, 356 N.C. 316, 337 (2002) citations omitted (emphasis added). "Custodial interrogation means 'questioning initiated by law enforcement officers after a person has been taken into custody . . . .' " *Illinois v. Perkins*, 496 U.S. 292, 296 (1990) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). When considering statements challenged under *Miranda*, a court must consider "whether, based on the totality of the circumstances, there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." *State v. Hammonds*, 370 N.C. 158, 162 (2017) (extraneity omitted). When considering "the circumstances surrounding the interrogation," the question for a court is not whether an individual being questioned actually felt that he or she was being restrained, but rather an objective inquiry, to wit: "would a reasonable person have felt he or she was not at

liberty to terminate the interrogation and leave." *Id.* at 162–63 (extraneity omitted).

Circumstances which may be considered include "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning," *Howes*, 565 U.S. at 509 (citations omitted), as well as whether there was a police officer "standing guard at the door, [or] locked doors," *Buchanan*, 353 N.C. at 339, whether the defendant was told he was not under arrest, *State v. Waring*, 364 N.C. 443, 471 (2010), *cert. denied*, 565 U.S. 832 (2011), and whether law enforcement officers raised their voices, threatened the defendant, or made promises to him, *State v. Garcia*, 358 N.C. 382, 397 (2004). Regardless of which of these or other circumstances apply in a particular case, no single factor controls under the *Miranda* analysis. *Hammonds*, 370 N.C. at 167.

In light of the limitations on *Miranda*'s intent and reach as noted in *Buchanan* and *Howes*, statements made to private individuals unconnected with law enforcement are generally admissible so long as they were made freely and voluntarily. *State v. Etheridge*, 319 N.C. 34, 43 (1987). An exception to this rule is if the private citizen was acting as an instrument or agent of the State which could bring an interrogation by a private citizen within the ambit of *Miranda. Etheridge*, 319 N.C. at 44. Each of the cases cited by the State at the second suppression hearing pertains to such situations. For example, in *Illinois v. Perkins*, the case initially cited by the prosecutor during the second suppression hearing,

> [a]n undercover government agent was placed in the cell of respondent Perkins, who was incarcerated on charges unrelated to the subject of the agent's investigation. Respondent made statements that implicated him in the crime that the agent sought to solve. Respondent claims that the statements should be inadmissible because he had not been given *Miranda* warnings by the agent. We hold that the statements are admissible. *Miranda* warnings are not required when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement.

496 U.S. 292, 294 (1990). In explaining its decision, the Court noted that

> [t]he warning mandated by *Miranda* was meant to preserve the privilege during "incommunicado interrogation of individuals in a police-dominated atmosphere." [*Miranda*, 384 U.S.] at 445. That atmosphere is said to generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467.

*Id.* at 296. Thus, "[f]idelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984)). The same holding is found in the North Carolina cases cited by the State during the second suppression hearing. *See Holcomb*, 295 N.C. at 611–12 (holding that "dialogue between [the] defendant and his uncles at the sheriff's office [where defendant was in custody] which resulted in his assistance in finding the murder weapon [did not] constitute[ ] a 'custodial interrogation' which was conducted without the warnings or procedural safeguards required by *Miranda*" because the uncles were not acting as agents of the State); *Powell*, 340 N.C. at 686–87 (holding that there was

no *Miranda* violation where the defendant's incriminating telephone call from prison to two non-law enforcement parties was recorded by those parties "for personal reasons" and those parties then turned the recording over to the police); *Johnson*, 29 N.C. App. at 143–44 (finding no *Miranda* violation where a witness who worked as a radio dispatcher for the local police department testified about the defendant's confession to the witness while the witness was visiting her relative who happened to be defendant's cellmate); *Perry*, 50 N.C. App. at 542 (holding that "[w]hen taking a bail jumper into custody, a bail bondsman is not acting as a law enforcement officer or as an agent of the state in any regard . . . and [t]hus, there was no obligation on the part of the bail bondsman to give *Miranda* warnings"); *Conrad*, 55 N.C. App. at 65 (finding that *Miranda* was not offended where a juvenile defendant asked to speak to a magistrate with whom the defendant "had worked . . . in the past [when the magistrate had been] a juvenile officer"). We do not find any of these cases applicable in defendant's case, however, because as defendant correctly notes, "[i]n every one of the authorities cited by the State to the trial court, the contested issue was not 'custody' per se, but the private or official character of the person to whom contested statements were made." The statement which defendant challenges here was not made to Butler, a private citizen, but rather to Whitley and/or Snipes, who were law enforcement officers acting in their official capacities at the time.

Instead, defendant begins his appellate argument by stating that, "Butler conducted a legal citizen's detention, then surrendered custody of [defendant] to

Whitley and Snipes," such that "a reasonable person in [defendant's] position would not have felt free to leave at any time during questioning by Lt. Whitley and Det. Snipes. There was a restraint on [defendant's] freedom associated with formal arrest." Defendant cites N.C.G.S. § 15A-404 ("Detention of offenders by private persons"), which permits a private party to detain another of whom there is probable cause to believe has committed "[a] felony" or "[a] crime involving physical injury to another person" "in a reasonable manner considering the offense involved and the circumstances of the detention." N.C.G.S. § 15A-404(b)(1), (3), and -404(c) (2021). The only references to law enforcement officers in the statute are in subsection (d)—"The detention may be no longer than the time required for the earliest of the following: (1) The determination that no offense has been committed [and] (2) Surrender of the person detained to a law-enforcement officer as provided in subsection (e)"; and in subsection (e)—"A private person who detains another must immediately notify a law-enforcement officer and must, unless he releases the person earlier as required by subsection (d), surrender the person detained to the law-enforcement officer." N.C.G.S. § 15A-404(d), (e) (2021). We agree with defendant that Butler's actions here would appear to have constituted a "citizen's detention" under express terms of the statute; we also recognize that this Court has opined that "the ordinary meaning of the word 'detain,' and the meaning we believe our legislature intended when it enacted [N.C.]G.S. 15A-404, is 'To hold or keep in or as if in custody.'" *State v. Wall*, 304 N.C. 609, 615–16 (1982) (quoting Webster's Third New International Dictionary

616 (1976)).

Neither *Wall*, which concerned a convenience store worker who chased a shoplifter out of the store, fired into an automobile the thief entered, and killed another occupant of the car, *id.* at 615, nor any of the few other cases citing this statute, are useful as regards the substantive issue presented here, namely, how a citizen's detention under N.C.G.S. § 15A-404 implicates *Miranda* concerns when the citizen "surrender[s] the person detained to a law-enforcement officer." *See, e.g.*, *State v. Gaines*, 332 N.C. 461, 475 (1992) (citing, *inter alia*, the statute in question and stating that "[a] uniformed law enforcement officer is expected under his duty to use the powers a private security guard does not possess, i.e., the power to enforce the law and to arrest where necessary"); *State v. Ataei-Kachuei*, 68 N.C. App. 209 (1984) (discussing the statute in relation to a defendant, the owner of an ice cream company, who shot and killed an employee whom, in the defendant's telling, was attempting to quit his job and abscond without settling up his debts to the defendant); *Caldwell v. Linker*, 901 F. Supp. 1010 (M.D.N.C. 1995) (discussing a teacher who was briefly detained by school officials upon refusing to return keys to the school); *State v. Gilreath*, 118 N.C. App. 200 (1995) (discussing the interplay between the statute in question and self-defense law); *State v. Beal*, 181 N.C. App. 100 (2007) (discussing the statute in question in conjunction with false imprisonment jurisprudence).

While the interplay between a citizen's detention of a suspected criminal, the citizen's subsequent "surrender" of the detainee to law enforcement officers, and

-123-

incriminating statements thereafter made to law enforcement officers by the suspected criminal before he or she has received the required *Miranda* warnings appears to be a matter of first impression in North Carolina,[34] as noted above, the standard of review for motions to suppress evidence is well established, and in our view, the trial court's 24 February 2014 "Order Denying Defendant's Second Motion to Suppress Statements" fails to make findings of fact which would address the essence of defendant's argument: that Butler's actions as a private person, not an agent of the State, constituted a detention of defendant and that the circumstances of her detention and subsequent "surrender" of defendant to the Sheriff's Department officers, when considered along with the factors surrounding the officers' questioning of defendant, created a situation where a reasonable person would not have felt able to leave and thus resulted in "a restraint on freedom of movement of the degree associated with a formal arrest." *See Hammonds*, 370 N.C. at 162 (quoting *Buchanan*, 353 N.C. at 339).

Neither of the trial court's orders denying defendant's motion to suppress his

---

[34] Nor does caselaw from other jurisdictions concerning *Miranda* and citizen's arrests shed light on the specific situation here. *See, e.g.*, *Estelle v. Smith*, 451 U.S. 454, 467 (1981) (holding that a psychiatrist performing court-ordered pretrial psychiatric examination of a defendant in custody was required to provide a *Miranda* warning as an "agent of the State"); *Hood v. Commonwealth*, 448 S.W.2d 388, 391 (Ky. 1969) ("rejecting the proposition that *Miranda* applies to a citizen's arrest lies in the fact that the ordinary citizen, not being a police officer, would not have the faintest notion concerning the matter of advising of rights"); *State v. La Rose*, 174 N.W.2d 247, 248 (Minn. 1970) ("hold[ing] that the exclusionary rule adopted in the *Miranda* case has no application with respect to [statements made by a detainee to the citizen detainer during] a citizen's arrest"); *State v. Kelly*, 294 A.2d 41 (N.J. 1972) (holding that *Miranda* did not apply during a citizen's arrest situation); *In re Deborah C.*, 635 P.2d 446 (Ca. 1981) (discussing the application of *Miranda* to store detectives).

statements made at the hospital include crucial findings of fact that would be helpful in resolving this argument from defendant, although the trial court did make findings that Butler was not an agent of the State and that law enforcement officers were not aware of Butler's actions in detaining defendant when they questioned him in the exam room.[35] Accordingly, the trial court's second suppression order did not include findings of fact that would support its conclusions that "[n]one of Butler's actions triggered defendant's *Miranda* rights and they did not transform the officers' subsequent questioning of defendant in the hospital emergency treatment room into a custodial interrogation"; "[n]one of Butler's actions rendered defendant's statements to the officers in the hospital emergency room involuntary"; and "[n]one of defendant's federal or state constitutional rights were violated by Butler's actions."[36]

---

[35] We are mindful that defendant, while stating his argument at the second suppression hearing with sufficient clarity, had no caselaw to cite in support thereof, and that the State cited a number of cases which, as discussed previously, concerned *Miranda*'s application to statements made to private parties and were thus inapposite. Thus, the trial court's mistaken focus on whether Butler was acting as an agent of the State is understandable.

[36] None of the cases cited by the State on appeal line up convincingly with those here where defendant, when attempting to leave the hospital was confronted with a locked door and was then physically forced into a room by a private citizen who repeatedly cursed defendant, stated in no uncertain terms that she would not permit him to leave, and stood in the doorway to prevent defendant from departing until law enforcement officers arrived. The State's brief contains the following citations: *"See, e.g., Waring*, 364 N.C. at 471 . . . (holding the defendant was not in custody where he voluntarily agreed to accompany detectives to the police station; the defendant was told he was not under arrest and was never restrained; he was frequently left alone in the interview room with the door unlocked; the officers never raised their voice, threatened the defendant, or made him promises; and once he implicated himself in the murder, the interview ended and he was read his *Miranda* rights); *Garcia*, 358 N.C. at 397 . . . (no custody where the defendant was twice informed he was not under arrest;

Where the admission of evidence violates a defendant's constitutional rights, the burden shifted to the State to demonstrate beyond a reasonable doubt that the admission was harmless. *See* N.C.G.S. § 15A-1443(b) (2021) ("A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt."). Defendant argues that he was prejudiced by the admission of his statement made to Snipes at the hospital because "[t]he State was then able to use [the] statement to argue in closing at the guilt phase that he was guilty of murder by torture because the wounds inflicted on [Taylor] were 'all punishment. The shaking was punishment by his own admission' "; "[Taylor] was picking at her scabs and he whipped her for it"; and "Doctor [Schwartz-Watts, defendant's mental health expert witness] said that [defendant] didn't know anything about those bites. Really? He didn't know anything about the bites. You're still going with the [cousin] story."

The State contends that it can meet the burden of showing harmless error beyond a reasonable doubt here because

> [t]he only inculpatory admission contained in defendant's
> statement to law enforcement in the emergency room was

was free to move about unescorted to get a drink from the water fountain; was interviewed by a plain-clothed, unarmed officer with the interview room door closed; no party raised their voice, the defendant was not threatened, and no promises were made); *State v. Sweatt*, 333 N.C. 407 . . . (1993) (where the defendant was in the hospital because of his own intentional actions, there was an absence of a guard posted outside of his door, and lack of any overt actions by police officers indicated that defendant was not in custody when interviewed at the hospital); *accord State v. Alston*, 295 N.C. 629, 632 . . . (1978) (incriminating statements made in response to general on-the-scene police questioning, such as "what happened" when the defendant walked into the emergency room, are admissible)."

that he whipped Taylor with a power cord when she used the bathroom in his bed. The admission did not remotely touch the bulk of overwhelming evidence which showed defendant murdered Taylor by torture over a period of ten days. And although he now argues such an admission was "unduly prejudicial," defendant himself vigorously attempted to get similar statements admitted into evidence during his case-in-chief that he made . . . to his own mental health expert.

In allowing the admission of defendant's statements to Schwartz-Watts, his mental health expert witness, as the basis of her opinion, the trial court noted that his statements to Schwartz-Watts were "substantially similar" to the statement he made to Detective Snipes when he was at the hospital. Schwartz-Watts was permitted to testify that she spoke to defendant about his crimes in order to determine whether any mental illness was related to his acts against Taylor. Pertinent to the consideration of prejudice to defendant from the admission of defendant's statement to Snipes at the hospital, Schwartz-Watts testified about several statements that defendant made to her: that defendant said "in regards to her head injury that [Taylor] had been picking scabs and [defendant] was shaking her and when he shook her that her head hit the door"; that defendant "put all the marks on [Taylor] because she peed in the bed"; and that defendant "reported whipping [Taylor] with the cord . . . the day before he cut the power cord into pieces. I don't know if that was that evening when he shook her and she then was picking the scabs and he grabbed her again." In light of this testimony from defendant's witness, we see no possible prejudice in the admission of the statement defendant

made to Snipes at the hospital to the extent the challenged statement touched upon defendant's admissions that he shook Taylor and struck her head on a door due to Taylor picking at scabs, that defendant caused "all the marks on" Taylor's body because Taylor had urinated in the bed, or that defendant had whipped Taylor with an electrical cord, possibly due to further picking at scabs. To the extent that defendant objects to the State's argument during closing arguments that such injuries were inflicted "as punishment," that detail would seem to be exculpatory regarding the charge against defendant of murder by torture, in that murder by torture implicates pain and suffering inflicted in order for the defendant to achieve sadistic gratification from the pain and suffering, while injuries inflicted in even an ill-conceived and overzealous attempt to discipline or punish a child for perceived misbehavior might not qualify as torture.

Finally, the "[cousin] story" remark by the prosecutor which defendant notes as prejudicial in connection to the bites covering Taylor's body appears to refer to defendant's claim in the challenged statement that the bites had been inflicted by one of Taylor's cousins, who was also a young child. The intent of this remark by the prosecutor appears to have been to suggest that defendant had lied to his mental health expert witness when he said he knew nothing about the source of the more than five dozen bites on Taylor's body, some of which involved the removal of flesh. Schwartz-Watts testified that defendant had "denied" the bite marks, but then clarified that she did not "recall [defendant] saying anything about the bite marks."

The challenged statement was also referenced, without objection from defendant, during the following exchange between the prosecutor and Schwartz-Watts:

> Q.     Now, I know that you reported what he said he told the detective, but in reading the detective's report he never admitted to putting all the marks on Taylor; is that correct?
>
> A.     That's correct.

In light of the extensive testimony from multiple witnesses regarding those human bite wounds—which, as already discussed, was properly admitted—that the bites had been inflicted by an adult rather than by a child during the ten-day period when Taylor was in the sole custody of defendant and when she was never in the presence of any other person, much less her cousin, the passing remark by the State was plainly harmless beyond a reasonable doubt.

In sum, any alleged error in the admission of the statement defendant made to the law enforcement officer at Johnston Memorial Hospital was harmless beyond a reasonable doubt in light of (1) the fact that all of the information which defendant has identified as potentially prejudicial was placed before the jury by defendant's own witness and (2) because of the overwhelming evidence of defendant's guilt as set forth above in the statement of facts. *State v. Morgan*, 359 N.C. 131, 156 (2004).

## G. Cumulative prejudice from alleged evidentiary errors

Defendant next argues that "[t]he combined effect of the inadmissible evidence influenced the jury toward passion and prejudice, compounding the prejudice of each single instance," citing *Hembree*, 368 N.C. at 20 ("Regardless of whether any single

error would have been prejudicial in isolation, we conclude that the cumulative effect of these three errors deprived defendant of a fair trial."). This Court's precedent provides that even where "none of the trial court's errors, when considered in isolation, [a]re necessarily sufficiently prejudicial to require a new trial, the cumulative effect of the errors [may] create[ ] sufficient prejudice to deny [a] defendant a fair trial." *State v. Canady*, 355 N.C. 242, 246 (2002); *see also State v. Wilkerson*, 363 N.C. 382, 426 (2009) ("Cumulative errors lead to reversal when taken as a whole they deprive[ ] the defendant of his due process right to a fair trial free from prejudicial error." (extraneity omitted)). We are not persuaded by defendant's argument.

In *Hembree*, the defendant was charged with two unrelated murders, for each of which he was tried separately. 368 N.C. at 5–6. At the trial discussed in *Hembree*, defendant admitted that he had been present when the victim died after the two had used cocaine together and that he had disposed of her body; thus, "[t]he principal contested issue of fact at trial was the cause of [the victim's] death," whether murder or "cocaine toxicity." *Id.* at 14. The Court concluded that, in one of the murder trials, "the trial court [had] committed three errors: first, by allowing admission of an excessive amount of the [second] murder evidence under Evidence Rule 404(b), including more than a dozen photographs of [the second victim's] burnt body; second, by allowing [the second victim's] sister . . . to testify about [the second victim's] good character; and third, by allowing the prosecution to argue without basis to the jury

that defense counsel had in effect suborned perjury." *Id.* at 9. The Court held that defendant was entitled to a new trial because "the cumulative effect of [those errors] deprived him of a fair trial." *Id.*

In reaching this result, the Court first "note[d] the particular dangers presented by Rule 404(b) evidence. . . . [S]uch evidence can be misused, especially by allowing the jury to convict the accused for a crime not actually before it." *Id.* at 13 (citations omitted). The State had presented this Rule 404(b) evidence regarding the alleged second victim "on seven of the eight days it offered evidence" at the guilt–innocence phase of the defendant's trial, and the Court "conclude[d] that the decision to allow the State to present so much evidence about the [second] murder stretched beyond the trial court's broad discretion." *Id.* at 14, 16. The Court then found that the testimony from the second victim's sister about the second victim's good character was plainly irrelevant at defendant's trial for the alleged murder of a different victim, and therefore "any probative value the testimony might have had was substantially outweighed by the danger of unfair prejudice." *Id.* at 16. In regard to closing arguments, the Court determined that

> [t]he State argued to the jury, not only that [the] defendant had confessed truly and recanted falsely, but that he had lied on the stand in cooperation with defense counsel. Whether or not [the] defendant committed perjury, there was no evidence showing that he had done so at the behest of his attorneys. Accordingly, we hold that the prosecutor's statements to this effect were grossly improper, and the trial court erred by failing to intervene *ex mero motu*.

*Id.* at 20. "Regardless of whether any single error would have been prejudicial in

isolation, [the Court] conclude[d] that the cumulative effect of these three errors deprived defendant of a fair trial." *Id.*

The State contends that, in regard to cumulative error, the case at bar is more analogous to *Wilkerson*. The defendant in *Wilkerson*, who sold drugs illegally, was convicted of, *inter alia*, two counts of first-degree murder. 363 N.C. at 391. On appeal, the Court identified four errors in defendant's capital trial: (1) the admission of a police report of the arrest of one of defendant's drug sources which "was admitted for the purpose of establishing [the source's] cellular telephone number, . . . the same number [the] defendant dialed while hiding . . . immediately after the" murders, which the Court concluded was hearsay; (2) the admission of "opinion testimony concerning [one of the victim's] reputation for peacefulness"; (3) the admission of hearsay testimony from the drug source's wife "that her husband sold drugs to defendant in their back bedroom"; and (4) the failure of the trial court to intervene *ex mero motu* in response to the prosecutor's personal vouching for the veracity of one of the State's witnesses during closing arguments. *Id.* at 419, 426. After "review[ing] the record as a whole and, after comparing the overwhelming evidence of [the] defendant's guilt with the evidence improperly admitted, [the Court] conclude[d] that, taken together, these errors did not deprive defendant of his due process right to a fair trial." *Id.* at 426.

Before this Court, defendant states that his "defense at both phases of trial [was] that he was not guilty of the most serious charges, and should not receive a

death sentence, because his actions with regard to Taylor were influenced heavily by

his dysfunctional upbringing" and represents that

> the excessive manner and display of photographs, presented as professional witnesses exclaimed about their personal horror, multiplied the prejudice of each photo and each witness. Then Drs. Barbaro, McNeal-Trice, and Cooper gave unreliable opinions, unmoored from any reliable research or science, about bite marks and torture. Their opinions were replete with gratuitous, graphic commentary, inappropriate in a court of law where someone's life is being determined. Combined, they spent hours repeatedly describing gruesome injuries while displaying color photographs of injuries in a display excessive in size and scope by any prior standard. And as they narrated the photographs, they gave opinions prejudicially dictating to the jury how it should decide the case on guilt and on sentence.
>
> The prejudice to [defendant] increased even further when the trial court allowed the State to present statements he made to law enforcement without the necessary *Miranda* warnings. The State used [defendant's] un-*Mirandized* statements against him in closing argument to impugn his mental health experts and the defense theories at both phases of trial.

As we have opined above, the only evidence that we have determined was

clearly erroneously admitted at defendant's trial consisted of the brief display to the

jury of State's Exhibit 26, a full-body photograph of Taylor taken at Johnston

Memorial Hospital, which was properly published to the jury during the testimony of

other medical professionals, but which was unnecessarily shown during the

testimony of nurse Butler. We have also stated that some portions of testimony from

law enforcement and medical expert witnesses about their emotional reactions to

seeing Taylor's injuries may have been improper, although we found the challenged evidence was not prejudicial. Finally, we determined that the trial court's order denying defendant's second motion to suppress the statement defendant made to law enforcement officers at Johnston Memorial Hospital was erroneous in that it failed to adequately address defendant's argument in favor of suppression. However, the potentially inculpatory evidence contained in that statement was admitted through one of defendant's own witnesses, such that there was no prejudice whatsoever in the trial court's error.

We find the facts here easily distinguishable from those in *Hembree*, where it was unclear whether the victim had died by murder or as a result of her ingestion of cocaine, and the State spent the majority of its case-in-chief introducing evidence of an unrelated murder. The uncontradicted evidence in this case tended to show that defendant: (1) had a history of physically disciplining Taylor; (2) volunteered to take care of Taylor while Reyes was away although they were living in a one-room outbuilding that lacked a kitchen, bathroom, or running water; (3) within an hour of gaining total control of Taylor purchased materials to install a padlock on the outbuilding to prevent Taylor from being able to open the only door of the structure from the inside; (4) over the next ten days was the only person who had access to Taylor; (5) left Taylor, who turned four during the ten-day period, alone and locked inside the outbuilding on multiple occasions while defendant worked and made purchases; (6) refused his grandmother's offer to help care for Taylor once the

grandmother learned that the child had been left alone with defendant; (7) brought Taylor to a hospital emergency room in a hypothermic and near-death condition with her body revealing at least 144 separate injuries that appeared to have been inflicted at different points over a ten-day period and some of which were badly infected, including signs of vaginal and anal sexual trauma, numerous lacerations apparently from the electrical cord—in some of which tiny pieces of metal wire were embedded, more than five dozen bite marks—some of which involved the removal of flesh, and head trauma which had rendered Taylor's brain function minimal and ultimately led to her death; (8) first lied about the cause of Taylor's head injury being a fall from jumping on a bed; and (9) later admitted to whipping Taylor with an electrical cord and shaking her in a manner that caused the child's head to strike a door inside the outbuilding for soiling the inflatable mattress Taylor slept on with defendant. In light of this overwhelming evidence that defendant intentionally inflicted all of these injuries to Taylor over an extended period of time and caused the child great pain and suffering, as well as being responsible for her death, the minimal points of evidence which were even arguably admitted in error, even considered cumulatively, did not prejudice defendant by depriving him of a fair trial. We cannot agree with defendant that the erroneous repeated showing of a single photograph of Taylor's body as she appeared when defendant brought her to the hospital and the testimony of witnesses that they found seeing the child's extraordinarily numerous and severe injuries emotionally upsetting, even taken together, had a meaningful impact on the jury's

determinations at either the guilt–innocence or sentencing phase of trial. Accordingly, defendant's argument regarding cumulative prejudice is overruled.

**H. Defendant's claims of intentional discrimination in jury selection**

Defendant next argues the trial court erred in addressing defendant's assertions that the prosecutor in his case used the State's peremptory challenges against jurors in a manner that was discriminatory as to both race and gender in violation of the federal and state constitutions. We disagree.

"[A] prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried," subject to constitutional restrictions. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986) (quoting *United States v. Robinson*, 421 F. Supp. 467, 473 (Conn. 1976), mandamus granted *sub nom. United States v. Newman*, 549 F.2d 240 (2d Cir. 1977)). In the capital case at bar, the State and defendant were each able to use up to eighteen peremptory challenges during jury selection. *See* N.C.G.S. § 15A-1217(a), (c) (2021). When the State indicated it would exercise its fifth peremptory strike to remove prospective juror Cubia Massey,[37] a Black woman, the defense objected, arguing the strike was impermissibly based on Massey's race and gender.

After the venire was excused from the courtroom, defendant first emphasized

---

[37] The transcript notes the prospective juror's name as Cubia McLean-Massey, but the juror stated that she preferred to use the surname "Massey" during voir dire. In this opinion, we refer to Ms. Massey in the manner she requested.

that the State had peremptorily struck two of three (~67%) Black prospective jurors who had not been challenged for cause, while the State had only struck three of sixteen (~19%) white jurors. Defendant then asserted that one of the appropriate considerations upon a *Batson* challenge is "the particular strike rates of the particular prosecutors involved," offering an affidavit (the MSU affidavit) that was from two academic researchers who had studied jury selection in North Carolina capital cases tried between 1990 and 2009 and that had been offered in various Racial Justice Act[38] appeals, which defendant purported showed that the prosecutor who stated that he planned to strike Massey had, in four prior capital cases, disproportionately excused Black jurors using peremptory challenges. The State objected to admission of the MSU affidavit, characterizing it as "one of the most ridiculous studies [he had] seen in [his] entire life," as well as challenging its relevance. Defendant noted that "patterns and practices of the individual prosecutors" in a case have been held relevant under *Miller-El v. Cockrell*, 537 U.S. 322 (2003). The trial court, after framing the prosecutor's objection as being based on hearsay grounds, sustained that objection but held open the question of whether the affidavit might later be included "in the record for possible appellate review."

Following defendant's argument that the State's proposed strike of Massey was impermissibly race-based and the State's response, defendant turned to the issue of

---

[38] Defendant was clear at trial that he was not making any claim under the Racial Justice Act in regard to his jury challenges as discussed here.

gender-based peremptory challenges, stating

> I was just going to also point out that under—that is our
> argument concerning the *Batson* challenge. As far as
> gender, . . . there have been seven male jurors [and the
> State has] struck one with a strike rate of 14.28 percent.
> There have been twelve women who have reached that
> stage and they have struck four.

(Italics added.) After those brief remarks by defendant, the trial court asked the State

to respond "to the prima facie showing issue," in regard to both race- and gender-

based juror strikes. The State remarked, "First of all, I would also say that, well, I

disagree with that on the gender issue, *Batson*. We'll deal with that at the appropriate

time." (Italics added.)

The State then made several points, first appearing to challenge defendant's

strike rate evidence by suggesting that the *Batson* challenges as to racially

discriminatory strikes were coming too early in the jury selection process for the

statistical strike rate to be sufficient to meet the prima facie burden, with the

prosecutor noting that if the first potential juror who is questioned is struck and also

happens to be Black, then the strike rate for Black jurors at that point would be one

hundred percent of Black jurors. The prosecutor then pointed out that defendant is

white, that the victim was white and of "El Salvador[an]" background, and that "most,

if not all, [of] the key witnesses in this case are either . . . from El Salvador or white."

The State noted "questions about [Massey's] job, . . . [Massey's] issues with the death

penalty and so forth." Finally, the State noted that it had struck the first potential

juror who was Black but had accepted the second prospective juror who was Black,

and asserted that in light of all of these circumstances, the State's use of a peremptory challenge to strike the third Black potential juror was insufficient to establish the required prima facie showing under *Batson*.

With respect to gender, the prosecutor then stated,

> I would also want to say, if they intend, and I'm going to do some research on it, but if [the defense] intend[s] to make an issue and try to say *Batson* applies to gender, then we will be — I can go ahead and put the [c]ourt and [d]efense on notice that we will begin challenging reverse *Batson* issue [sic] as far as gender also, because they are repeatedly removing male jurors in this case, and so if that's where – an issue we're going to go to, we'll have — we'll put everybody on notice of that, because that is a common — and you go back in history, that is a common issue that comes to rise from the [d]efense in these cases, so we'll address that as appropriate.

(Italics added.) The State then referred again to the racial discrimination issue and asked the trial court to deny defendant's motion.

The trial court overruled both defendant's *Batson* and *J.E.B.* objections, stating,

> All right, I do believe that the appellate opinions in this State indicate that a numerical or statistical analysis of a prosecutor's use of peremptory strikes could be helpful to the [c]ourt in ruling on a prima facie decision, a prima facie showing decision, but that such analysis is not dispositive. The Court has carefully reviewed and considered the voir dire process in this case thus far, and has considered its observations of the prosecutors' conduct and method of voir dire.
>
> The [c]ourt does find that the prosecutors' statements and questions during voir dire, whether asked by [either prosecutor], have been consistent and

> evenhanded throughout. The [c]ourt does not find that any of the statements and questions have been racially motivated thus far. And the [c]ourt does rule that [d]efendant, at this time, has failed to establish a prima facie showing of either racial or gender discrimination in its use of peremptory challenges.

The trial court then gave the State an opportunity to offer any race-neutral or gender-neutral reasons for its use of a peremptory challenge against Massey for the record, but the State declined to do so, stating that "the record is clear."

### 1. *Racial discrimination in jury selection*

The North Carolina court system has a well-documented problem with Black citizens being disproportionately excluded from the fundamental civil right to serve on juries. *See, e.g.*, *State v. Robinson*, 375 N.C. 173, 181 (2020) (noting a trial court's "meticulously detailed findings . . . that race was a significant factor in the decisions of prosecutors to exercise peremptory challenges to strike African-American jurors . . . [across] the State of North Carolina" in capital trials). In this case, according to defendant: (1) "when . . . trial counsel objected to the State's peremptory strike of a prospective Black juror, and supported the objection with evidence showing the prosecutor had a history of disproportionately removing Black jurors in capital cases, the trial court categorically refused to consider the evidence"; (2) "the trial court failed to make specific findings, as this Court's precedent requires, about the statistical evidence of discrimination that [defendant] raised"; (3) "when considering whether [defendant] established a prima facie case of discrimination, rather than applying the correct legal standard that asks only whether a defendant produced

sufficient evidence to make an arguable claim, the trial court focused on whether the prosecutors' comments were facially 'evenhanded' or 'racially motivated' " which is "not the test at the prima facie stage"; and (4) "the trial court concluded erroneously that [defendant] failed to establish a prima facie case of discrimination even though the State had struck 67% of the Black jurors at the time the objection was raised, and where the prosecutor had a history of disproportionately removing Black jurors over the course of four other capital trials."

The race-based exclusion of jurors violates both the state and federal constitutions. *See* N.C. Const. art. I, § 26 (prohibiting exclusion "from jury service on account of sex, race, color, religion, or national origin"); *see also* N.C. Const. art. I, § 19 (guaranteeing "the equal protection of the laws"). In *Batson*, the United States "Supreme Court deemed purposeful discrimination in jury selection to be an equal protection violation." *State v. Bennett*, 374 N.C. 579, 592 (2020) (citing *Batson*, 476 U.S. at 88–89). An objecting party will prevail if it can demonstrate that a peremptory strike was "motivated in substantial part" by an improper factor. *Foster v. Chatman*, 578 U.S. 488, 514 (2016). When a *Batson* challenge is raised during jury selection, the trial court must engage in a three-step inquiry:

> First, the party raising the claim must make a prima facie showing of intentional discrimination under the totality of the relevant facts in the case. Second, if a prima facie case is established, the burden shifts to the State to present a race-neutral explanation for the challenge. Finally, the trial court must then determine whether the defendant has met the burden of proving purposeful discrimination.

*State v. Waring*, 364 N.C. 443, 474–75 (2010) (extraneity omitted). Here, only the first prong of the *Batson* analysis is at issue, to wit: whether defendant made "a prima facie showing of intentional discrimination" by the prosecutor. *Id.*

"Step one of the *Batson* analysis, a *prima facie* showing of racial discrimination, is not intended to be a high hurdle for defendants to cross." *State v. Hoffman*, 348 N.C. 548, 553 (1998). Thus, "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005). At the prima facie stage of its analysis, the question is not "whether a prosecutor has actually engaged in impermissible purposeful discrimination at the first step of the *Batson* inquiry because '[t]he inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question.' " *Bennett*, 374 N.C. at 599 (quoting *Johnson,* 545 U.S. at 172). Instead, "the burden on a defendant at this stage is one of production, not of persuasion." *State v. Hobbs*, 374 N.C. 345, 351 (2020).

Among the relevant facts which a trial court should consider in their totality at the prima facie stage are

> the defendant's race, the victim's race, the race of the key witnesses, questions and statements of the prosecutor which tend to support or refute an inference of discrimination, repeated use of peremptory challenges against blacks such that it tends to establish a pattern of strikes against blacks in the venire, the prosecution's use

> of a disproportionate number of peremptory challenges to strike black jurors in a single case, and the State's acceptance rate of potential black jurors.

*State v. Quick*, 341 N.C. 141, 145 (1995). Statistical analyses of peremptory challenge patterns, while "not necessarily dispositive" of whether a defendant has succeeded in making out a prima facie case, show that such evidence "can be useful in helping . . . the trial court determine whether a *prima facie* case of discrimination has been established." *State v. Barden*, 356 N.C. 316, 344 (2002). Other relevant factors must be considered by a trial court, including historical evidence of racial discrimination in a jurisdiction. *Hobbs*, 374 N.C. at 351. In sum, to establish a prima facie case at the first stage of a *Batson* inquiry, a defendant must offer sufficient evidence which may be drawn from a wide range of factors from which the trial court can infer racial discrimination in jury selection, and the trial court has substantial discretion in reaching such a determination.

For this reason, when a trial court rules that a defendant has failed to establish a prima facie case of racial discrimination during jury selection, that ruling is accorded deference upon appellate review and will not be disturbed unless it is "clearly erroneous." *State v. Augustine*, 359 N.C. 709, 715 (2005), *cert. denied*, 548 U.S. 925 (2006). Appellate courts must be "mindful that trial courts, given their experience in supervising *voir dire* and their ability to observe the prosecutor's questions and demeanor firsthand, are well qualified to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case

of discrimination." *State v. Taylor*, 362 N.C. 514, 527 (2008) (quotation marks and citation omitted), *cert. denied*, 558 U.S. 851 (2009).

In this case, many of the typical factors suggested by applicable precedent—namely, those that concern the racial identification of the defendant, the victim, and key witnesses—are absent or muted. Defendant is white, Taylor was apparently white and of an El Salvadoran background, and the primary witnesses appear, upon the record, to be white and/or of El Salvadoran background. Moreover, race does not appear to have been a motivation or relevant aspect in the crimes alleged or in their prosecution. Further, upon resolving defendant's *Batson* challenge, the trial court opined that "the prosecutors' statements and questions during voir dire . . . have been consistent and evenhanded throughout. The [c]ourt does not find that any of the statements and questions have been racially motivated thus far." Defendant does not present any arguments to the contrary regarding these factors. Instead, defendant contends that the trial court erred because it

> refused to consider the prosecutor's race-based strike history across cases[;] applied an incorrect legal standard when deciding whether the prima facie case was met[;] failed to make specific findings about the statistical evidence[; a]nd . . . failed to appreciate that the statistical racial disparity in this case, in tandem with the prosecutor's multi-case track record of disproportionately excluding Black jurors, combined to establish a prima facie showing.

Considering defendant's argument regarding the MSU affidavit, which defendant averred showed a multi-case pattern of racially disparate juror strike rates

for one of the State's two prosecutors in this case, we agree that this Court has held that "a court *must* consider historical evidence of discrimination in a jurisdiction" if it has been admitted. *Hobbs*, 374 N.C. at 351 (emphasis added) (citing *Miller-El v. Cockrell*, 537 U.S. at 346; *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019)). However, nothing in *Hobbs* touches upon the *admissibility* of evidence of historical strike patterns.

The trial court here decided to exclude the MSU affidavit because the State was not able to cross-examine the affiants or the authors of the research from which the MSU affidavit was drawn, using the term "hearsay" to describe the affidavit. According to defendant, "[e]videntiary rules do not strictly govern *Batson* proceedings," citing *Foster* and *State v. Jackson*, 322 N.C. 251 (1988)—cases which defendant asserts shed light on his argument here. We find these cases to be inapposite and unhelpful in our consideration of defendant's argument regarding whether the trial court clearly erred in exercising its discretion by declining to admit the MSU affidavit at the first stage of *Batson*—the determination of whether defendant established a prima facie case of racial discrimination.

In *Foster*, for example, a post-conviction *Batson* case, the "parties agree[d] that [the defendant had] demonstrated a prima facie case, and that the prosecutors ha[d] offered race-neutral reasons for their strikes." 578 U.S. at 500. Thus, the Supreme Court "address[ed] only *Batson*'s third step, . . . [which] turns on factual determinations, [where], 'in the absence of exceptional circumstances,' [appellate

courts] defer to state court factual findings unless [the appellate courts] conclude that they are clearly erroneous." *Id.* (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)). The evidence in question in *Foster* was "a 'certif[ied] . . . true and correct copy of 103 pages of the State's case file' " from the defendant's trial, which Foster had received in response to an open records request. *Id.* (alterations in original). Applying a deferential review to the State's challenge of the trial court's decision to admit the portion of the State's case file in the defendant's case, the Supreme Court upheld the trial court's decision to "admit[ ] the file into evidence, reserving 'a determination as to what weight the Court is going to put on any of [it]' in light of the objections urged by the State," some of which were potentially hearsay-based. *Id.* at 501. While the Supreme Court then stated that it could not

> accept the State's invitation to blind ourselves to [the file's] existence. We have "made it clear that in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder*, 552 U.S., at 478. . . . As we have said in a related context, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial . . . evidence of intent as may be available." *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). At a minimum, we are comfortable that all documents in the file were authored by *someone* in the district attorney's office. Any uncertainties concerning the documents are pertinent only as potential limits on their probative value.

*Id.* at 501 (third and fourth alterations in original). We find *Foster* distinguishable because that appeal concerned: (1) the third—and ultimate—stage of a *Batson*

inquiry, as opposed to the stage one prima facie inquiry at issue in this case; (2) the deferential review of a trial (or hearing) court's decision to *admit* challenged evidence as part of a *Batson* claim as opposed to such a court's decision to *exclude* offered evidence; and (3) evidence specific to the jury selection in the defendant's own trial as opposed to an analysis of historical jury strikes across other trials involving a prosecutor in defendant's trial here. In sum, *Foster* does not address the admissibility of evidence at the prima facie stage of a *Batson* hearing during jury selection and unsurprisingly does not explicitly state that rules of evidence do not apply in *Batson* determinations.

Similarly, in *Jackson*, this Court considered the trial court's ultimate determination after a post-trial full *Batson* proceeding, not upon a first stage, prima facie sufficiency argument raised during trial. 322 N.C. at 254. Applying the deference just discussed, the Court opined, that the Court "might not have reached the same result as the superior court but giving, as we must, deference to its findings, we hold it was not error to deny the defendant's motion for mistrial." *Id.* at 257. Specifically, in considering "the quashing of the subpoenas to . . . the prosecutors in the case," the Court held that

> a defendant who makes a *Batson* challenge does not have the right to examine the prosecuting attorney. In balancing the arguments for and against such an examination, we believe the disruption to a trial which could occur if an attorney in a case were called as a witness overbears any good which could be obtained by his testimony. We do not believe we should have a trial within a trial. The presiding judges are capable of passing on the credibility of

-147-

prosecuting attorneys without the benefit of cross-examination.

*Id.* at 257–58. As with *Foster*, this case does not bar a trial court's use of the rules of evidence and evidentiary concepts such as hearsay from serving as guidance in *Batson* hearings, does not pertain to prima facie *Batson* determinations, and employs a deference to the decisions of the trial court rather than providing this Court with a precedential basis to reverse a trial court's discretionary evidentiary determination.

We find defendant's citations to *Waring*, 364 N.C. at 487, and *State v. Smith*, 352 N.C. 531, 540 (2000), cases that defendant asserts demonstrate that "[t]his Court has repeatedly affirmed trial court denials of *Batson* objections by relying on the prosecutor's assertion at trial that the juror had a criminal record," equally unavailing. Neither of those cases involved review of the trial court's decision to exclude hearsay evidence upon the proffer of an affidavit at the prima facie stage of a *Batson* inquiry. In *Waring*, the prosecutor, at the second stage of the test set forth in *Batson*, noted as one race-neutral reason among several for striking a Black prospective juror "that she had been charged with a felony and both her jury questionnaire and [voir dire] testimony concerning the disposition of the charges were inconsistent with the 'AOC records.'" 364 N.C. at 487. This Court did not address any "hearsay" concerns in its decision, because no such objection was apparently made as to the "AOC records," but rather the defendant there had argued that the reason was pretextual because similar consultation of "AOC records" was not done in connection to white jurors. *Id.* at 489–90.

In *Smith*, the defendant "contend[ed] the jury selection was flawed" at his trial, in part because "he did not have equal access to the criminal records of prospective jurors." 352 N.C. at 539. The trial court then accepted the State's race-neutral reason for excusing one potential juror—that the juror appeared to have lied about her previous criminal history on her jury questionnaire—without any consideration of hearsay concerns. *Id.* at 540. However, the record in that case does not indicate that the defendant made any objection to the evidence in question on hearsay grounds and thus it is unsurprising that the trial court, and this Court on appellate review, simply addressed the non-hearsay arguments brought forward as error. *See id.* at 540–41.

We acknowledge the lack of any precedent which categorically provides that the rules of evidence may not be employed in the discretion of a trial court during the prima facie stage of a *Batson* challenge during jury selection and therefore decline to create such an exception to the general applicability of the evidentiary rules during trial proceedings based on the facts presented here with regard to the MSU affidavit. *See, e.g.*, *N.C. State Bar v. Sheffield*, 73 N.C. App. 349, 362 ("Affidavits are generally inadmissible as evidence during trial, as they are an inherently weak method of proof, prepared without notice and without opportunity for cross[-]examination."), *cert. denied*, 314 N.C. 117, *cert. denied*, 474 U.S. 981 (1985). In light of the broad discretion given to trial courts at the first stage of a *Batson* inquiry and the great deference that we must give such determinations on appellate review, we do not perceive clear error in the trial court's decision to sustain the State's hearsay objection to the MSU

affidavit.

We therefore must look at the factors properly before the trial court here at the prima facie stage of defendant's *Batson* challenge based upon the State's alleged racially discriminatory use of peremptory strikes at the point when defendant lodged his objection: (1) it was relatively early in the jury selection process and only three Black prospective jurors had been individually questioned; (2) strike statistics showed that the State had struck Black potential jurors at a higher rate than white prospective jurors; (3) there were no apparent racial concerns raised by the racial and ethnic backgrounds of defendant, Taylor, or any of the key witnesses in this case; and (4) "the prosecutors' statements and questions during voir dire . . . [did not appear to be] racially motivated." In other words, the only evidence before the trial court at the prima facie stage tending to suggest potential discrimination consisted of the disparate strike rates of Black and non-Black potential jurors. But, such statistical analyses of peremptory challenge patterns, while "useful in helping . . . the trial court determine whether a *prima facie* case of discrimination has been established," are "not necessarily dispositive." *Barden*, 356 N.C. at 344. Giving the appropriate deference to the trial court's ruling, we do not believe that defendant has established that the trial court's decision was "clearly erroneous." *Augustine*, 359 N.C. at 715; *see also Taylor*, 362 N.C. at 527 (cautioning that reviewing courts should be "mindful that trial courts, given their experience in supervising *voir dire* and their ability to observe the prosecutor's questions and demeanor firsthand, are well qualified to

decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination" (extraneity omitted)).

Defendant next cites *Hobbs* in support of his argument "that a trial court commits error requiring remand when it fails to 'explain how it weighed the totality of the circumstances surrounding the prosecution's use of peremptory challenges . . .' and fails to explain 'how or whether [the defendant's evidence was] evaluated.' " 374 N.C. at 358–59. The *Hobbs* decision, however, explicitly noted that its analysis was *not* regarding the prima facie prong under *Batson*, that issue being moot at the point when the *Hobbs* appeal reached this Court, but rather addressed the ultimate determinations by the trial court upon its consideration of the State's race-neutral reasons for its peremptory strikes against Black prospective jurors. *Id.* at 355–57. Defendant cites no precedent requiring specific findings of fact by the trial court in holding that defendant failed to make a prima facie case under *Batson* and the Court has in fact expressly rejected the argument that findings are required at the prima facie stage. *See State v. Williams*, 343 N.C. 345, 359 (1996) (upholding trial court's ruling from bench, over argument that further findings were required, that "there hasn't been a prima facia [sic] showing"). In any event, the trial court, from the bench, here identified the factors it considered in concluding that defendant had not met its burden of production.

Relatedly, defendant takes issue with the trial court's statement that none of "the statements and questions [by the State during voir dire] have been racially

motivated" as evidence that the trial court was erroneously "jumping ahead" in the *Batson* process to the third stage of that analysis. This assertion by defendant is unpersuasive as the State had not at that point (and in fact never did) offer race-neutral reasons for its peremptory strikes—the process of stage two under *Batson*—because the trial court quite clearly noted that it was opining about defendant's prima facie showing. Further, whether the prosecutor had asked questions or made statements during voir dire that suggested racial discrimination is specifically identified in *Quick* as an appropriate factor for consideration at this point in the evaluation of a *Batson* challenge. *Quick*, 341 N.C. at 145 (listing "questions and statements of the prosecutor which tend to support or refute an inference of discrimination" as a factor to be considered at the prima facie stage of a *Batson* hearing). It is thus clear that the trial court's statements were not regarding any determination of purposeful discrimination, but rather, as the trial court stated, were about defendant's prima facie challenge. We therefore reject this part of defendant's argument.

In sum, we hold that defendant has not shown clear error by the trial court in regard to its determination that defendant failed to establish a prima facie case of racial discrimination at the point when his *Batson* challenge was raised.

### 2. *Defendant's J.E.B. claim*

Defendant next contends that he is entitled to a new trial, or in the alternative, for remand to the trial court for a new hearing, because the State's strike of potential

juror Massey—a Black woman whose excusal was discussed above in regard to defendant's racial discrimination *Batson* argument—was also impermissibly based upon her gender. We disagree.

The exclusion of jurors based upon gender is barred by both the state and federal constitutions. *See* N.C. Const. art. I, § 26 (prohibiting exclusion "from jury service on account of sex, race, color, religion, or national origin"); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 130–31 (1994) ("Intentional discrimination on the basis of gender by state actors violates the Equal Protection Clause . . . ."); *see also* N.C. Const. art. I, § 19 (also guaranteeing "the equal protection of the laws"). "Discrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process." *J.E.B.*, 511 U.S. at 140. Specifically, "[s]triking individual jurors on the assumption that they hold particular views simply because of their gender is practically a brand upon them, affixed by the law, an assertion of their inferiority." *Id.* at 142 (extraneity omitted).

In considering an objection to the proposed strike of jurors based on gender, a trial court applies the same three-prong analysis set forth in *Batson*. *See State v. Maness*, 363 N.C. 261, 271–72 (2009). Thus, a party lodging an objection to a juror strike alleged to have been made based upon gender must "make a *prima facie* showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike." *State v. Call*, 349 N.C. 382, 403 (1998)

(quoting *J.E.B.*, 511 U.S. at 144–45). We review such determinations for clear error. *See State v. Barnes*, 345 N.C. 184, 210, *cert. denied sub nom.*, *Chambers v. North Carolina*, 522 U.S. 876 (1997), and *cert. denied*, 306 U.S. 666 (1998).

As with a challenge under *Batson* raising racial discrimination, relevant factors to be considered when determining whether a prima facie case of gender-based discrimination in jury selection has been shown include:

> the gender of the defendant, the victim and any key witnesses; questions and comments made by the prosecutor during jury selection which tend to support or contradict an inference of gender discrimination; the frequent exercise of peremptory challenges to prospective jurors of one gender that tend[s] to establish a pattern, or the use of a disproportionate number of peremptory challenges against venire members of one gender; whether the State exercised all of its peremptory challenges; and the ultimate gender makeup of the jury.

*Call*, 349 N.C. at 403–04. A trial court's ruling on an objection asserting that a peremptory strike was discriminatory is reviewed for clear error. *Snyder*, 552 U.S. at 477, 487; *Bennett*, 374 N.C. at 592.

At the point during jury selection when the State proposed to strike Massey, the State had used its peremptory strikes to remove four of twelve (33%) female prospective jurors and one of seven (14%) male prospective jurors. Defendant first asserts that this "numerical pattern alone raised an inference of discrimination." When Massey was challenged, sixteen potential jurors were still eligible to serve, eleven women and five men. The State had previously used its peremptory challenges on three female prospective jurors and one male prospective juror. Five jurors had

been seated at that point: one man and four women. Given that twice as many female potential jurors were available as male potential jurors, and in light of the composition of the jury as it existed in part at the point of defendant's *Batson* challenge, we cannot see "clear error" in the trial court's ruling on this ground alone.

Defendant's only other argument of error by the trial court regarding gender-based discrimination is based upon statements by one of the prosecutors in response to defendant's challenge:

> I would also want to say, if they intend, and I'm going to do some research on it, but if [the defense] intend[s] to make an issue and try to say *Batson* applies to gender, then we will be – I can go ahead and put the [c]ourt and [d]efense on notice that we will begin challenging reverse *Batson* issue [sic] as far as gender also, because they are repeatedly removing male jurors in this case, and so if that's where — an issue we're going to go to, we'll have — we'll put everybody on notice of that, because that is a common – and you go back in history, that is a common issue that comes to rise from the [d]efense in these cases, so we'll address that as appropriate.

(Italics added.) Defendant asserts that these remarks indicate "that the prosecutor did not know *J.E.B.* prevented him from removing jurors based on gender, and that he felt free to do so . . . [and t]he second comment shows the prosecutor was striking women to counterbalance his (inaccurate) belief that the defense was disproportionately striking men." We cannot adopt defendant's suggested interpretation of these statements by one of the prosecutors at defendant's trial. Even if we were to agree with defendant that, in the first statement, this prosecutor was expressing a complete lack of familiarity with precedent making clear that gender-

based juror strikes are prohibited, the prosecutor's alleged ignorance on that point does not itself indicate that he was seeking to strike Massey or had struck other jurors based on gender. A prosecutor could theoretically be unaware of such caselaw and still actually proceed in jury selection without any gender-based discriminatory intent. Further, we read the prosecutor's second remark as simply suggesting that it might potentially make a *Batson* objection against the defendant for gender-based discrimination in juror selection.

Defendant asks the Court to take judicial notice of the prosecutor's statements which are part of a different case, part of which is pending in this Court. Defendant contends that these statements are pertinent to this prosecutor's intent in excusing female prospective jurors. We decline defendant's invitation because here we are reviewing the trial court's ruling on defendant's prima facie challenge to the strike of Massey for clear error, and the trial court here did not have the benefit of the appellate filings in other cases involving the prosecutor here. Accordingly, we find no error in the trial court's ruling related to defendant's attempt to establish a prima facie case of gender-based discrimination.

## I. Excusal of jurors for cause

Defendant next argues that the trial court improperly excused prospective jurors Steven Pierce and Slade Long for cause, violating defendant's constitutional right to a fair and impartial jury. Specifically, defendant contends that

> Pierce said he believed in the death penalty for some cases,
> and said he could consider both death and life sentences.

His hesitation in personally imposing a death sentence was morally appropriate and did not show he was substantially impaired. . . . Long used drugs in his youth but had been clean for 27 years. His expression of empathy for people addicted to drugs did not render him incapable of being fair in this case. Further, the trial court erred in denying defense counsel the opportunity to question . . . Long.

Both the United States Constitution and the North Carolina Constitution guarantee capital defendants have a right under the United States Constitution to trial by an impartial jury. *Wainwright v. Witt*, 469 U.S. 412, 416 (1985) (citing Sixth and Fourteenth Amendments); *State v. Crump*, 376 N.C. 375, 381 (2020) (citing N.C. Const. art. I, § 24). The standard for determining when a potential juror may be excluded for cause is whether his or her views "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *State v. Davis*, 325 N.C. 607, 622 (1989) (quoting *Wainwright*, 469 U.S. at 424).

A juror may not be excused for cause simply for "voic[ing] general objections to the death penalty or expressed conscientious or religious scruples against its infliction," *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968), and even "those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law," *Lockhart v. McCree*, 476 U.S. 162, 176 (1986). A prospective juror may be excused for cause, however, if his or her views on capital punishment would serve to "prevent or substantially impair the

performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at 424 (footnote omitted). The North Carolina General Assembly has codified these constitutional principles in subsection 15A-1212(8) of the General Statutes. *See* N.C.G.S. § 15A-1212(8) (2021) (providing that a challenge for cause to an individual juror may be made by any party on the ground that the juror, "[a]s a matter of conscience, regardless of the facts and circumstances, would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina").

"[E]xcusals for cause may properly include persons who equivocate or who state that although they believe generally in the death penalty, they indicate that they personally would be unable or would find it difficult to vote for the death penalty." *State v. Simpson*, 341 N.C. 316, 342–43 (1995); *see also State v. Jones*, 355 N.C. 117, 122 (2002) (holding no abuse of discretion in allowing the State's challenge for cause based on "the equivocating nature of her responses" regarding whether the prospective juror could impose a death sentence which led the trial judge to conclude that she "would be unable to faithfully and impartially apply the law in this case"); *State v. Greene*, 351 N.C. 562, 567–68 (no abuse of discretion where the prospective juror gave conflicting responses including that (1) it would be hard for him to impose the death penalty because of his religious beliefs, and (2) he could follow the law and vote for the death penalty but it would be against what he believed), *cert. denied*, 531 U.S. 1041 (2000); *State v. Yelverton*, 334 N.C. 532, 544 (1993) (no abuse of discretion

in excusing a juror where he answered that he could follow the trial court's instructions, but also "steadfastly indicated reluctance or uncertainty as to his ability to carry out [his] duties as a juror" in regards to imposing a death sentence (alteration in original)); *State v. Bowman*, 349 N.C. 459, 471 (1998) (holding no abuse of discretion in excusing a juror because she clearly stated that she felt her personal beliefs might affect her consideration of the death penalty for the defendant and her responses were at best equivocal, in comparison, and "the trial court gave ample opportunity to both sides to explore and elicit [her] views"), *cert. denied*, 527 U.S. 1040 (1999); *Davis*, 325 N.C. at 624 (finding no abuse of discretion where prospective juror's answers "reveal that he wanted to follow the law, but thought his views on capital punishment would interfere with the performance of his duties during the sentencing phase").

"Challenges for cause in jury selection are matters in the discretion of the court and are not reviewable on appeal except for abuse of discretion." *State v. Kennedy*, 320 N.C. 20, 28 (1987). This is so because the trial judge "has the opportunity to see and hear the juror on voir dire and to make findings based on the juror's credibility and demeanor, to ultimately determine whether the juror could be fair and impartial." *Id.* at 26. Because a prospective juror's biases may not always be provable with unmistakable clarity, reviewing courts must "defer to the trial court's judgment concerning whether the prospective juror would be able to follow the law impartially." *State v. Brogden*, 334 N.C. 39, 43 (1993) (quoting *Davis*, 325 N.C. at 624); *see also*

*State v. Walls*, 342 N.C. 1, 33 (1995) ("Based on the superior vantage point of the trial court, its decision as to whether a juror's views would substantially impair the performance of his duties is to be afforded deference."), *cert. denied*, 517 U.S. 1197 (1996).

In addition, "[a] defendant has no absolute right to question or to rehabilitate prospective jurors before or after the trial court excuses such jurors for cause." *Warren*, 347 N.C. at 326. In capital cases, the trial court is vested with discretion to regulate and supervise jury selection. *Gibbs*, 335 N.C. at 26. "[W]here the record shows the challenge is supported by the prospective juror's answers to the prosecutor's and court's questions, absent a showing that further questioning would have elicited different answers, the court does not err by refusing to permit the defendant to propound questions about the same matter." *Id.* at 35. Whether to allow a defendant an opportunity to rehabilitate a prospective juror challenged for cause also lies within the trial court's discretion. *State v. Stephens*, 347 N.C. 352, 366 (1997), *cert. denied*, 525 U.S. 831 (1998).

### 1. *Prospective juror Pierce*

During the voir dire, after confirming that Pierce did not know any of the parties, possible witnesses, or attorneys involved in the case and had no media or other exposure to the crimes with which defendant was charged, after the prosecutor described the offenses with which defendant was charged, the prosecutor turned to questions about Pierce's "thoughts about the death penalty." Pierce's initial response

was:

> That's difficult, because I'm a Christian. I value life, both physically and spiritually. I read in the Bible that God does submit the death penalty at times. And I have thought about already the possibilities; the Judge had mentioned it. If it came down to it, my — my thoughts are that I would go with the facts presented and look at the situation, with much prayer, I would make a call [based on] the evidence put before me, the arguments. As far as capital punishment, I'm still — I have a hard time with it. Am I totally against it? I'm not sure. And that's my honest answer.

The prosecutor followed up by asking whether Pierce felt he could "personally be a part of [the capital sentencing] process," and the following exchange occurred:

> MR. PIERCE: I do not know. That's a good question. I've thought about it. I just do not know. That would be hard. I value life, like I said.
>
> [PROSECUTOR]: And we all do. I mean, we — we understand that. And we all do value life. So —
>
> MR. PIERCE: With that said, I value life on both sides, the one who lost their life, too. There's more than one affected.
>
> [PROSECUTOR]: Now, do you feel like that you might have some moral or religious — based upon your religious or moral beliefs that you might have some real problems with doing that; that it might cause you some personal — your conscience some personal trouble?
>
> MR. PIERCE: No. And I'll say that because I have a relationship with the Lord, and I will be talking to him about it, and I will make a decision on how he leads me.

The prosecutor then clarified that Pierce would need to apply "man's law" in the case and asked, "Do you feel like [the death penalty] is an appropriate sentence in some

-161-

cases?" and Pierce responded, "I would have to say yes. Again, it's difficult. It's difficult." Pierce went on to explain, "The only reason—the only reason I would say yes is because—because I believe in an eternity as well. Although someone could have a short life here, they could have an eternal life; will have eternal life." He further noted that he had held "reservations about the death penalty" for "twenty-five or thirty years" based upon his reading of the Bible. Pierce did agree that "the sentence of death . . . is a necessary law." The prosecutor then asked Pierce whether, if the State had proved its capital case against defendant beyond a reasonable doubt, he could "personally" vote for a death sentence for defendant. Pierce replied, "It's hard." When the prosecutor pressed Pierce about whether his "religious beliefs and . . . personal convictions . . . may substantially impair [his] ability to" impose the death penalty in defendant's case and Pierce first stated, "Oh, it definitely makes it—I mean, it affected my decision, obviously, to be able to make the decision, I mean—"; and then responded to the question being posed again by saying, "It would—there is a potential, I'm going to tell you, because it's hard. It's definitely difficult." Pierce went on to say, "I wouldn't be able to—and it would be hard for me to separate the—my beliefs . . . in making the decisions that I make. I know it would be better for y'all if I were able to . . . give you a yes-or-no answer." Eventually, in response to being asked yet again about the impact Pierce's religious convictions might have on his ability to follow the law, he affirmed, "It would not impair my ability to follow the law, but it would be very difficult." But when the prosecutor asked Pierce a final time

about the same issue, Pierce responded:

> MR. PIERCE: I guess the best answer is there is a potential for that. I don't think I can say yes or no. If I were firm in my conviction of whether the death penalty was okay for me as a Christian, then I could say yes or no, but I have not settled that conviction in my heart. And there's—I mean, there's—obviously, you've realized by now there's a potential. I hate to keep going in circles, I know.

> [PROSECUTOR]: It's okay. So what I'm hearing from you, and you correct me if I'm wrong, is that there is this personal religious conscientious conviction that you have that could potentially impair your ability to render a sentence of death, even though the State has proven the case beyond a reasonable doubt?

> MR. PIERCE: That would be correct.

> [PROSECUTOR]: So—and it's hard, and I get that. And that's sort of what we're getting at, if you are that person—

>  You need to be honest, you know, honest about it, and I know that you are being honest. Obviously, you are a very honest man.

> —is that if that is the case, that you—that that personal conviction substantially impairs your ability to come into this courtroom and announce a sentence of death to this [d]efendant, then that means that you would not be—it would not be appropriate for you to sit on the jury. And so do you feel like that that is the case?

> MR. PIERCE: I'll have to say yes.

> [PROSECUTOR]: And so, you know, you are going to be instructed that you have to follow the law; that, you know, it would be your obligation to follow the law, that you would swear an oath to do that. And I know that that's important to you. Following the law is important to you and seeing that the process works. I mean, that's why we have

this part of the process, the voir dire process. We talk to people about whether or not they will be able to do that, even if it's your strongest desire to do that, I understand, to follow the law and follow the Court's instruction. And there's nothing wrong with being honest and saying that, "Because of my personal beliefs regarding the death penalty, I would be substantially impaired in doing that."

And so I just want to make sure that I understand you correctly, that even though you strongly believe that you have a duty to follow the law, that you would be substantially impaired when it came to coming in and announcing the death penalty, a sentence of death, even though the State had met its burden. Am I understanding you correctly?

MR. PIERCE: There is a potential for that. And the problem is the difference between God's law and man's law. And I do want to abide by man's law. If it came down to it, if I had to choose between God's and man's, I'm going to go with God's.

. . . .

[PROSECUTOR]: It's going to impair—yes, impair your ability.

MR. PIERCE: There's very good potential. I'll just say yes.

The State then moved to excuse Pierce for cause, but the trial court denied that motion. After the prosecutor again asked Pierce "the ultimate question is, after thinking about it, after understanding that there is this process, do you feel like if the State proves its case beyond a reasonable doubt in both phases, that your ability to come—because of your beliefs and convictions, that your ability to come into this courtroom and announce a sentence of death would be substantially impaired?"

Pierce replied, "Yes," and the trial court then gave the defense an opportunity to question Pierce before making its decision regarding an excusal for cause.

In his exchanges with defense counsel, Pierce agreed several times that he was "struggling" with the question of the death penalty. Defense counsel explained the jury's role in deciding the presence of aggravating and mitigating circumstances and then weighing them before the death sentence can be recommended in capital cases where a guilty verdict has been reached on a first-degree murder charge. Defense counsel then asked Pierce if he could follow the trial court's instructions on those issues, and Pierce replied

> I could listen to his instructions and follow what he said. The problem would come down to if the circumstances had been all weighed out and [d]efendant was found guilty and it came down to administering the death penalty, I would have difficulty. I would have difficulty with that. It's difficult.

The trial court then questioned Pierce briefly, asking whether he could "return a sentence of death against a defendant," and Pierce then responded that he was "struggling." The following exchange then occurred:

> THE COURT: . . . . What we're trying to determine, if you can answer the question for us, is whether or not you as a juror could return a sentence of death against a defendant found guilty of first[-]degree murder, if you were convinced beyond a reasonable doubt under the facts and the law that the penalty of death was the appropriate punishment.
>
> MR. PIERCE: I know you're asking me to decide right now. And if I had to decide right now, I would probably say no.

> THE COURT: So is it fair to say, then, that based upon your religious or moral convictions, that you believe your ability to return a sentence of death against a defendant found guilty of first[-]degree murder would be substantially impaired even if you were convinced beyond a reasonable doubt under the facts and the law that death was the appropriate punishment?

> MR. PIERCE: That is correct.

At that point, Pierce was excused from the courtroom and the parties engaged in a discussion with the trial court about the State's request to excuse the potential juror for cause. The trial court acknowledged defendant's

> observations about the intelligence and thoughtfulness of this juror. It does appear to the [c]ourt, based upon the totality of his answers, that his beliefs concerning the penalty of death are such that that is a matter of his conscience. Those feelings would interfere with or substantially impair his ability to return a sentence of death against [d]efendant even if he were convinced beyond a reasonable doubt under the law and the facts that the penalty of death was the appropriate punishment and should be imposed.

The trial court then allowed the State's challenge for cause.

We see no abuse of discretion here. "Based on the superior vantage point of the trial court," given its ability to see and hear the voir dire of prospective juror Pierce, we afford deference to "its decision as to whether a juror's views would substantially impair the performance of his duties." *Walls*, 342 N.C. at 33. Even before Pierce directly agreed at least three times that his religious convictions could or would substantially impair his ability to impose the death penalty where it was warranted

under law, he stated multiple times that it would be "difficult" or "very difficult" for him to vote to impose the death penalty, said that he was "struggling" with the question, and said that between "God's law and man's law," he would have to follow God's law. In light of the extended amount of time the trial court provided to the parties for an opportunity to discuss with Pierce his obviously sincere and deeply thoughtful concerns regarding capital punishment, we cannot say that the trial court's decision to excuse Pierce for cause was the result of an unreasoned or arbitrary decision.

### 2. *Prospective juror Long*

On voir dire, once the State turned to the issue of the death penalty, Long initially expressed that he had

> a little problem with my faith as far as being able to actually — I watch a lot of shows where people get twenty years and down the road, they're found innocent and stuff like that. I feel like — I'd feel guilty if I put an innocent man to death, or even locked him up for life. I've just got issues with that.

Long also expressed concerns about life sentences and long delays before death sentences are carried out. Long then stated that he was "not totally opposed to" capital punishment. When Long was asked if he "believe[d] it's a necessary law that we have the death penalty as a potential punishment in some first[-]degree murder cases," Long responded "That's a hard one for me as a human being, being the judge on someone's life." When the question was repeated, Long added, "It's in the Bible, and I study it every day, that if a man kills another man, then his penalty — I mean,

there's — if you go back in the Old Testament, there were safe — safe towns they had because sometimes there were accidents. But if they were going with death, they didn't waste no time, they just stoned them." The State then asked Long if he "could be part of the legal machinery, be part of the process that might bring about the death penalty in this particular case if the evidence was appropriate," and Long responded, "It's possible. I mean, I just — I didn't expect this." When the prosecutor clarified that the question was not specific to defendant's case but rather was whether Long could hypothetically "be part of the process that . . . might ultimately bring about the death penalty," Long affirmed, "Yes, I believe I could." Yet as the State continued to speak with Long about the issue of imposing the death penalty, Long raised concerns about the sufficiency of evidence. The voir dire of Long was continued to the following day.

The following morning, the State turned to other issues and Long stated that he was self-employed as a finish carpenter, was hoping to get a new project soon, and was deeply in debt, but he did not previously reveal this information because he "didn't want to be a complainer" when the trial court had questioned the entire venire about hardships. Long noted a legal proceeding of some type regarding a builder who "went under." When the prosecutor turned to the theories of first-degree murder that the State had alleged in defendant's case—felony murder and murder by torture— Long volunteered information about being charged and found "guilty of torturing and killing an animal" in connection with the unintentional killing of "[a] scarlet macaw parrot" in California when Long was nineteen years old. Long further stated that he

had missed restitution payments which resulted in his being "locked . . . up." Long emphasized that he "got accused of torturing," although Long represented that he was only trying to "wing" the bird to catch it so that he could sell it.

Thereafter, the prosecutor and Long had the following exchange:

> [PROSECUTOR]: Well—and again, I'm not trying to put any words in your mouth or anything about this, but I want to ask you, do you—you mentioned that you have actually been prosecuted and convicted for being—what they described as torturing an animal, convicted of that some time ago, but do you—that, and I guess you also mentioned, seriously, about the issues with your financial situation that you're the main—almost the only breadwinner in your family; is that correct?

> MR. LONG: Yes, sir.

> [PROSECUTOR]: Do you feel like the—let me ask you, the fact that you have—what you went through, and we're talking about torture in this case, do you feel like that would in any way affect your ability to sit on this jury and fairly consider these issues, or do you feel like that might influence—your past history, that that might influence you?

> MR. LONG: I was in another murder trial, too.

> [PROSECUTOR]: Were you charged?

> MR. LONG: No. My best friend I grew up with, we was out in Barstow, California, at a party joint where they had a lake where everybody went to, and someone stole his cassette tape, and he went over to the van next to it where we were camped at, and pulled it off the guy's dash, and we were twenty-four at the time, me and my buddy, Jim, we grew up ever since we—

> [PROSECUTOR]: Right. I'm not trying to cut you off—

MR. LONG: I had to go sit through the whole thing of a murder trial.

[PROSECUTOR]: Was your buddy the one charged?

MR. LONG: My buddy was the one that got killed. The other—the nineteen-year-old boy killed him in a fistfight, which I never thought it would have happened, but just a—just appeared—I thought it was going to be a little fistfight.

[PROSECUTOR]: Right. Have you had any other— any other dealings with the court system or law, either yourself or someone close to you?

MR. LONG: I've been—I'm twenty-seven years straight now. I got saved that night, accepted Jesus Christ as my Lord and Savior in California. I had a ten-year heroin addiction. I started that drug when I was sixteen years old, and by the time I was nineteen, I was shooting up every day, so I've been in and out of—usually I'm not on this side.

[PROSECUTOR]: And I appreciate it, and I'm happy to see that you—twenty-seven years you've been clean and straight.

MR. LONG: Right.

[PROSECUTOR]: Did you have any other criminal charges against you while you were in California?

MR. LONG: I had eight petty thefts, stealing for my habit. And then I got pulled, I don't know how many times. The detectives knew me when they see me driving the road. They would just pull me over and then they would go ahead and take a magnifying glass, check me, identify fresh marks, and then they would haul me off to jail, and I'd have to sign a promise to appear. I mean, I spent a lot of time in these places back then.

The State then asked whether Long "had any experience of either yourself, a close family member, a close friend, with either child abuse, or child sexual abuse, or domestic violence in your life? And you can just say yes or no at this point." The following discussion then ensued:

> MR. LONG: Yes.
>
> [PROSECUTOR]: Okay. But that's something—was it more back in your previous—sometime now or back—or was it—
>
> MR. LONG: Well, it was after I moved out here, a pretty similar case to this right here.
>
> [PROSECUTOR]: Do what, now?
>
> MR. LONG: Pretty similar case to what I think this case is.
>
> [PROSECUTOR]: Okay. Similar to this case, what you think the case is? And is that—was that involving—who was the person that was involved?
>
> MR. LONG: It was a good friend I went to junior high and high school with.
>
> [PROSECUTOR]: And they were charged with something like a sex or child sexual case?
>
> MR. LONG: Well, shook the baby to death.
>
> [PROSECUTOR]: Just sort of—I'm sorry.
>
> MR. LONG: Shook the baby to death. He was on crystal meth, baby wouldn't quit crying, and he just yelling at it and shook it up. He's out of prison now. I mean, he got, like, ten years or something like that.
>
> [PROSECUTOR]: So, you got—so, how old was the

-171-

baby?

> MR. LONG: He had a girlfriend. The baby was just—I don't even know if it was about a year old, something like that. I was living out here.

> . . . .

> [PROSECUTOR]: Were you familiar with the situation and everything?

> MR. LONG: Well—

> [PROSECUTOR]: I mean, as far as talking to him when it was happening, him going to court and what happened there?

> MR. LONG: I was getting information from my friend that used to be married to this man, and so as far as personally, I have talked to the boy a few times since he's been out, but he doesn't like to—

The prosecutor then broke in and summarized Long's "life experiences" that might impact his ability to serve as a fair and impartial juror in a potentially extended trial:

> [Y]our issue with your work and your paying bills and things[,] . . . what you know about this case, do you feel like that your experiences and knowledge of other situations with the torture, and the sex offense involving your friend, your issues with drugs, and so forth, and your job situation, do you feel like that would be—substantially impair your ability in this particular case, because of the issues that are in this case, to say that you could not be a—fulfill the duties as a juror in this particular case? In other words, be totally fair and impartial in this case?

Long responded that he would "have compassion" for people in "that situation"—apparently referring to those who have substance abuse issues—and noted that "[t]he things that I did not being in my right mind has hurt [sic]." The trial court stepped

in shortly thereafter:

> THE COURT: Mr. Long, I've been sitting here and listening to you talk about your life's experiences. And the bottom line of the question is this, considering the issues that may be involved in this case, involving an allegation of murder by torture, a case in which there may be some evidence of child abuse and evidence of drug use, do you believe that your own life's experiences would affect your own ability to be a completely objective and fair and impartial juror to both sides?
>
> MR. LONG: I believe that I would struggle.
>
> THE COURT: Struggle with being fair?
>
> MR. LONG: Yeah, my—
>
> THE COURT: Struggle with—let me put—do you think you would struggle with being objective and impartial?
>
> MR. LONG: Like I said, I don't know the whole case or anything like that. I know what drugs can do to people, and I just—I've got a soft spot in my heart for people who get addicted.

Long was excused from the courtroom briefly during which time the defense stated it would not consent to Long being excused for cause at that point. Long was returned to the courtroom for further voir dire. During further questioning by the State, Long stated that he had a "soft spot" for people who are using illegal drugs because when a person is on drugs:

> You're not in your right mind. You're really not who you were born to be, and it changes you, and, you know, you're breaking the law by doing it, so everything that goes with it is breaking the law, and unless you've been there, you won't ever understand what it's like to be on the other side.

-173-

When the State asked directly whether Long's life experiences would "impair your ability to be objective in this particular case," Long answered, "Yes." Long answered affirmatively three more times to variations of the same inquiry by the State. The State moved to excuse Long for cause but the defense objected again. Long was again asked to step out of the courtroom.

The trial court noted the life experiences of Long and his explicit answer that those would substantially impair his ability to be a juror in a case that involved substance abuse. The State agreed, while defendant contended that Long had only suggested he would be more compassionate to defendants who had experienced substance abuse. Ultimately, after hearing arguments from each side, the trial court announced that

> upon consideration of the totality of Mr. Long's responses to questions asked by the prosecutor and by the [c]ourt, including but not limited to his description of his extensive history of substance abuse, his admission of sympathy for persons suffering [from] substance abuse; and representations of [c]ounsel for the State and [d]efendant that there may be evidence of substance abuse by [d]efendant introduced during the trial of this case, especially if this case reaches a sentencing phase; the Court also noting that when describing his history of drug abuse, that this prospective juror became visibly upset and began softly weeping, the [c]ourt does find that this prospective juror's ability to be completely objective, fair, and impartial to both the State, as well as [d]efendant, would be substantially impaired, and accordingly, the State's challenge for cause is sustained.

On appeal, defendant, quoting *Wainwright*, 469 U.S. at 424, contends that the

trial court abused its discretion in allowing the State's motion to excuse Long for cause, asserting that "the State did not establish that . . . Long's 'concerns' would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " We cannot agree. While, as defendant notes, the alleged substance use and abuse forecast to be presented in defendant's case was not identical to Long's experiences, Long stated several times that his experiences would impair his ability to be impartial in a case that involved substance abuse. Given that the excusal of cause is left to the trial court's discretion, we must "defer to the trial court's judgment concerning whether the prospective juror would be able to follow the law impartially." *Brogden*, 334 N.C. at 43 (quoting *Davis*, 325 N.C. at 624).

Regarding defendant's argument that the trial court erred in declining to offer defense counsel the opportunity to question Long, "[w]hether to allow defendant[ ] an opportunity to rehabilitate a prospective juror challenged for cause also lies within the trial court's discretion." *Stephens*, 347 N.C. at 366. Here, "the record shows the [State's] challenge is supported by the prospective juror's answers to the prosecutor's and court's questions," and there has been no "showing that further questioning would have elicited different answers" by Long. *See Gibbs*, 335 N.C. at 35. Accordingly, "the [trial] court [did] not err by refusing to permit the defendant to propound questions about the same matter." *Gibbs*, 335 N.C. at 35; *see also Warren*, 347 N.C. at 326 ("A defendant has no absolute right to question or to rehabilitate prospective jurors before or after the trial court excuses such jurors for cause."). This

argument is overruled.

## J.  In camera review of Reyes's mental health records

Defendant next represents that on his motion,[39] the trial court entered an order

for disclosure of mental health records of Reyes and a subsequent order explaining

the trial court had reviewed records in camera and would order some of Reyes's

records disclosed to the defense, while the remainder of the records in question would

be placed under seal in the superior court file. In that order, the trial court stated:

> The court has carefully reviewed these records and found
> that, with the exception of the attached letters, all of them
> pertain to grief counseling Ms. Reyes received following the
> death of her minor child. The mental health records of Ms.
> Reyes contain no information that would tend to exculpate
> defendant or to mitigate his punishment if he is found
> guilty of any crime charged. The attached letters,
> contained in Ms. Reyes'[s] mental health records, appear to
> be from . . . defendant to Ms. Reyes.

Defendant asks this Court to review the records that were sealed in the superior court

file "for any inconsistent statements or other impeachment evidence, and to remand

the case for a new trial if it determines that [defendant] was denied access to evidence

or information that was material and favorable to his defense," citing "the importance

---

[39] At the hearing on defendant's motion for disclosure of Reyes's medical records, which is not included on the record on appeal, the State represented that it was not aware of and did not possess any such evidence. Counsel for Reyes, who had been charged with felony child abuse in connection with Taylor's death, was also present and objected on her behalf. Reyes's counsel contended that the discovery of Reyes's medical records would violate her rights under the Fifth Amendment and her right to privacy and physician/patient privilege, although her counsel acknowledged that the trial court could compel disclosure of this information if it was necessary to a proper administration of justice under N.C.G.S. § 8-53.

of Taylor's mother to the credibility of the State's case."

Where the trial court conducts an in camera inspection of certain evidence and denies the defendant's request for its production, the evidence should be sealed and "placed in the record for appellate review." *State v. Hardy*, 293 N.C. 105, 128 (1977). Having examined these records to determine whether they contain any evidence that is "both favorable to the accused and material to guilt or punishment," *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987), we agree with the trial court's assessment that Reyes's medical records under seal contain no information—either exculpatory or impeaching—that is pertinent, much less material, to defendant's guilt or sentence. *See id.* ("[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.").

**K. Arbitrary capital sentencing system**

Defendant further argues that he received a capital sentence as part of "an arbitrary system that fails to rationally distinguish between the many potentially-capital cases that do not receive the death penalty, and the very few that do." In support of his position, defendant cites numerous murder cases, including those in which "[d]efendants killed young children in appalling circumstances," *see State v. Stacks*, No. COA21-167, 2022 WL 2204788 (N.C. Ct. App. June 21, 2022) (unpublished); *State v. Stepp*, 232 N.C. App. 132 (2014); *State v. Hampton*, No.

COA14-394, 2014 WL 7149212 (N.C. Ct. App. Dec. 16, 2014) (unpublished); *State v. Keels*, No. COA11-350, 2011 WL 6046177 (N.C. Ct. App. Dec. 6, 2011) (unpublished); were "engaged in mass killing, or murdered serially," *see State v. Bradley*, No. COA17-1391, 2018 WL 5796233 (N.C. Ct. App. Nov. 6, 2018) (unpublished); *State v. Thomas*, 268 N.C. App. 121 (2019); *State v. Hurd*, 246 N.C. App. 281 (2016); *State v. Stewart*, 231 N.C. App. 134 (2013); *State v. Cooper*, 219 N.C. App. 390 (2012); or "committed planned-out murders for money," *see State v. Dixon*, No. COA15-350, 2016 WL 4608185 (N.C. Ct. App. Sept. 6, 2016) (unpublished); *State v. Chaplin*, No. COA13-393, 2013 WL 5947754 (N.C. Ct. App. Nov. 5, 2013) (unpublished); *State v. Britt*, 217 N.C. App. 309 (2011); where juries nonetheless rejected the opportunity to recommend the imposition of a death sentence following their return of guilty verdicts. Defendant also cites recent murder cases where "prosecutors have chosen to try defendants non-capitally even though they subjected children to horrendous and protracted abuse." *See State v. McCullen*, No. COA19-319, 2020 WL 2126784 (N.C. Ct. App. May 5, 2020) (unpublished); *State v. Lail*, No. COA19-468, 2020 WL 774106 (N.C. Ct. App. Feb. 18, 2020) (unpublished); *State v. Cheeks*, 267 N.C. App. 579 (2019); *State v. Paddock*, 204 N.C. App. 280 (2010). Finally, defendant cites media accounts of "potentially-capital cases involving heinous and shocking facts that nonetheless were not even taken to trial, but were resolved with non-capital plea agreements."

Defendant asserts that these examples demonstrate that "the overwhelming majority of potentially capital cases" are resolved without the imposition of a death

sentence, such that those defendants who "receive the death penalty are not chosen rationally, for reasons unique to those cases[, but r]ather, they are a random and infinitesimal subset of defendants whose cases are not meaningfully distinguishable from the scores of other aggravated murder defendants who receive life sentences or less." Defendant then suggests that this impermissible arbitrariness could be rectified in either of two ways:

> One is to vacate [defendant's] death sentence pursuant to the statutory obligation to ensure proportionality, which provides relief from arbitrarily imposed death sentences. *See* N.C.G.S. § 15A-2000(d)(2) (requiring a death sentence to be overturned "upon a finding that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor").

> The alternative remedy is for the Court to declare the death penalty unconstitutional as applied to [defendant]. The federal and state constitutions prohibit cruel and/or unusual punishments. *See* U.S. Const. amend. VIII (banning "cruel and unusual punishments"); N.C. Const. art. I, § 27 (banning "cruel *or* unusual punishments") (emphasis added).

Engaging in proportionality review as directed by the General Assembly, we have considered whether (1) the record in this case supports the aggravating circumstances found by the jury, (2) defendant's capital sentence "was imposed under the influence of passion, prejudice, or any other arbitrary factor," and (3) the death sentence in defendant's case "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (2021); *see also State v. McNeill*, 371 N.C. 198, 264 (2018). As the Court

-179-

observed in *McNeill*, "[t]his Court has held the death penalty to be disproportionate in eight cases." *Id.* at 264–65 (citing *State v. Kemmerlin*, 356 N.C. 446, 487–89 (2002); *Benson*, 323 N.C. at 328–29; *State v. Stokes*, 319 N.C. 1, 19–27 (1987); *State v. Rogers*, 316 N.C. 203, 234–37 (1986); *State v. Young*, 312 N.C. 669, 686–91 (1985); *State v. Hill*, 311 N.C. 465, 475–79 (1984); *State v. Bondurant*, 309 N.C. 674, 692–94 (1983); *State v. Jackson*, 309 N.C. 26, 45–47 (1983)). We conclude that neither the facts of defendant's crimes against Taylor nor defendant's personal circumstances are substantially similar to the crimes or defendants in any of those eight cases. We also note that "this Court 'ha[s] never found a death sentence disproportionate in a case involving a victim of first-degree murder who also was sexually assaulted,'" as was the case with Taylor here. *Id.* at 265 (alteration in original) (quoting *State v. Kandies*, 342 N.C. 419, 455, *cert. denied*, 519 U.S. 894 (1996)).

We must also reject defendant's suggestion that our state's capital sentencing scheme is cruel and/or unusual in violation of the United States Constitution or North Carolina Constitution. "The rights guaranteed by N.C.G.S. § 15A-2000 are anchored in the eighth amendment prohibition against cruel and unusual punishment in that the statute 'requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.'" *State v. Wilson*, 322 N.C. 117, 144 (1988) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)). Accordingly, North Carolina's death sentence system has been upheld

repeatedly as constitutional. *See, e.g.*, *McNeill*, 371 N.C. at 262.

**L. Preservation issues**

Defendant raises five additional issues that he concedes have previously been decided by this Court contrary to his position. First, defendant contends that the trial court erred by overruling his objection to the imposition of the death penalty in the absence of a jury finding that defendant had acted with a specific intent to kill Taylor. The jury here found defendant guilty of first-degree murder only on theories of murder by torture and felony murder. Second, defendant argues that the trial court erred in denying his pretrial motion to prevent the State from seeking the death penalty, alleging that the murder indictment against defendant failed to raise any element which elevates the crime of murder from second-degree to first-degree and failed to allege any aggravating circumstances. Third, defendant asserts that the trial court erred in denying his motions objecting to the submission to the jury of the aggravating factors, namely a motion objecting to the submission of the aggravating circumstance found in N.C.G.S. § 15A-2000(e)(5) (capital felony was committed while the defendant was engaged in other specified felonies) on the ground that it subjected him to double jeopardy and multiple punishments and to the submission of the aggravating circumstance found in N.C.G.S. § 15A-2000(e)(9) (capital felony was especially heinous, atrocious, or cruel) on the ground that it is vague and overly broad. Fourth, defendant contends that the trial court erred in overruling his "objection to the death penalty due to the failure, in practice, of existing procedures to meet

minimum constitutional requirements." Fifth, defendant argues that the trial court erred when it overruled his objection to the death penalty under international law.

While he acknowledges the existing law is contrary to his position, defendant asks the Court to revisit these issues. *See State v. Leary*, 344 N.C. 109, 119 (1996) (addressing culpability and specific intent to kill in determining whether the defendant was eligible for the death penalty); *State v. Hunt*, 357 N.C. 257, 269 ("Since the genesis of the short-form murder indictment in 1887, its validity has continually been avowed by the General Assembly."), *cert. denied*, 539 U.S. 985 (2003); *State v. Gregory*, 340 N.C. 365, 412 (1995) (holding that the submission of the aggravating circumstance in N.C.G.S. § 15A-2000(e)(5) is proper when a murder occurred during the commission of one of the enumerated felonies but when the defendant was also convicted of first-degree murder on some other basis); *McNeill*, 371 N.C. at 262 (noting that North Carolina's capital sentencing scheme has repeatedly been upheld as constitutional under the United States Constitution and North Carolina Constitution); *State v. Thompson*, 359 N.C. 77, 126 (2004) (holding that North Carolina's death penalty does not violate international law), *cert. denied*, 546 U.S. 830 (2005). Having considered each of defendant's arguments on these points, we conclude that there is no reason to revisit or depart from our precedent, and accordingly, we overrule all of defendant's preservation arguments.

## III.    Conclusion

For the foregoing reasons, we conclude that defendant received a fair trial and

capital sentencing proceeding free of prejudicial error and that the death sentence recommended by the jury and imposed by the trial court is not excessive or disproportionate.

AFFIRMED.

Justice BERGER concurring.

I concur in Justice Morgan's opinion but write separately to address the conclusion that defendant's *Miranda* rights were violated during questioning by law enforcement.

"Both the United States Supreme Court and this Court have held that *Miranda* applies *only* in the situation where a defendant is subject to custodial interrogation." *State v. Barden*, 356 N.C. 316, 337 (2002) (emphasis added). "Custodial interrogation means 'questioning initiated by law enforcement officers after a person has been taken into custody . . . .' " *Illinois v. Perkins*, 496 U.S. 292, 296 (1990) (alteration in original) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "A person is in custody for purposes of *Miranda* when it is apparent from the totality of the circumstances that there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *State v. Garcia*, 358 N.C. 382, 396 (2004) (cleaned up).

Certainly, if *Miranda* applied to detention by private citizens, the lead opinion is correct in its reasoning. However, I believe centering our attention on the actions of a private citizen muddies the very clear waters of our *Miranda* jurisprudence in two important ways.

First, *Miranda*'s strictures developed so that "the constitutional rights of the individual could be enforced against overzealous *police practices*," *Miranda*, 384 U.S. at 444 (emphasis added), not against other private citizens. This is why "[o]ur

appellate court decisions are replete with examples of individuals who, though occupying some official capacity or ostensible position of authority, have been ruled unconnected to law enforcement for *Miranda* purposes." *State v. Etheridge*, 319 N.C. 34, 43 (1987). While the lead opinion correctly notes that these decisions primarily involve statements made to private citizens, the rationale for excluding them from the *Miranda* analysis is equally applicable to detention by private citizens who are unconnected to law enforcement. A private citizen acting on his or her own authority cannot take a person into "custody" for purposes of *Miranda*, and our inquiry here should focus on whether law enforcement took defendant into custody when they arrived at the hospital.

Second, our task is to review whether defendant was subjected to a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Garcia*, 358 N.C. at 396 (cleaned up). The "free to leave" standard is not the appropriate lens through which we view the conduct at issue here. *See State v. Buchanan*, 353 N.C. 332, 339–40 (2001) (The formal arrest inquiry and "free to leave" standard "are not synonymous[,]" and we have disavowed opinions that "stated or implied that the determination of whether a defendant is 'in custody' for *Miranda* purposes is based on a standard other than the 'ultimate inquiry' of whether there is a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' ").

Thus, "*Miranda* warnings are required only where there has been such a

restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Here, although defendant may "not have felt able to leave" prior to the arrival of law enforcement, the pertinent inquiry is whether law enforcement, once present, subjected defendant to a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Garcia*, 358 N.C. at 396 (cleaned up).

The trial court's unchallenged findings of fact demonstrate that when defendant made the challenged statements: (1) defendant was not placed under arrest; (2) the door to the exam room was open for portions of the interaction; (3) both officers had left the exam room for a time upon arrival, leaving defendant alone with the door open; (4) defendant was informed that he was not under arrest; (5) defendant was not accused of anything, promised anything, or threatened; and (6) defendant was not handcuffed "or restrain[ed] in any manner." These factual findings amply support the trial court's conclusion that defendant was not in custody for purposes of *Miranda*.

Chief Justice NEWBY, Justice BARRINGER, Justice DIETZ, and Justice ALLEN join in this concurring opinion.

*Earls, J., concurring in part and dissenting in part*

Justice EARLS concurring in part and dissenting in part.

The death penalty is an "unusually severe punishment, unusual in its pain, in its finality, and in its enormity. No other existing punishment is comparable to death in terms of physical and mental suffering." *Furman v. Georgia*, 408 U.S. 238, 287 (1972) (Brennan, J., concurring). In this way, a sentence of death "is the ultimate sanction." *Id.* at 286; *see also Gregg v. Georgia*, 428 U.S. 153, 188 (1976) ("[T]he penalty of death is different in kind from any other punishment imposed under our system of criminal justice."). And when a crime as heinous as that committed in this case occurs, there is an unsurprising and perhaps human urge to impose upon the perpetrator this most grievous consequence. In these circumstances, a trial court's responsibility to quell this impulse and ensure that justice is delivered dispassionately and evenhandedly is at its highest, meaning that a trial court has a heightened duty to "ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of . . . passion." *Eddings v. Oklahoma*, 455 U.S. 104, 117–18 (1982) (O'Connor, J., concurring).

As the majority recounts, Taylor, the four-year-old victim in this case, died after being subjected to unimaginable and appalling abuse. The State introduced overwhelming evidence at trial tending to prove that Mr. Richardson inflicted her injuries and was solely responsible for her death. Given the severity and brutality of

Taylor's injuries and the evidence of the abuse she suffered, it would be easy in this case to excuse any errors committed by the trial court by reasoning that Mr. Richardson's death sentence was inevitable, regardless of the trial court's conduct.

It is this line of reasoning that I believe underlies the majority's decision today, though it does not say so outright. Instead, the majority overlooks blatant errors committed by the trial court by employing shaky legal reasoning to affirm Mr. Richardson's conviction and death sentence. But as Mr. Richardson's appellate counsel eloquently explained during oral argument before this Court, "if the rule of law matters at all, it matters not just in the easy cases and the convenient cases; it matters most in the hard cases." This is, without question, an extraordinarily hard case. But the rule of law does not cease to exist in the face of any crime, no matter how extreme.

In this case, I concur in the majority's decision to affirm Mr. Richardson's conviction. But because I believe that the trial court committed both structural error and allowed the State to present unfairly prejudicial evidence, I would hold that a new sentencing hearing is required so that the punishment Mr. Richardson receives is the product of just process. I only address the issues as they relate to sentencing.

## I.    Discussion

### A.  Judge Lock's Failure to Recuse was Prejudicial Error

As the majority explains, when Mr. Richardson was about one year old, his father, Doug Richardson, was shot several times in his home. Mr. Richardson's

mother, Sandra Richardson, was charged and tried with conspiracy to murder Mr. Richardson's father. The State alleged that Sandra Richardson hired a hitman to kill Doug Richardson. She was acquitted after her criminal trial, but the judge who presided over child custody proceedings for the custody of Mr. Richardson later found that she bore responsibility for the incident.

Much of Mr. Richardson's defense during both the guilt and sentencing phases of his trial centered on the trauma he experienced being raised by Doug and Sandra Richardson in this dysfunctional atmosphere. This defense strategy required Mr. Richardson's trial counsel to investigate the circumstances of Doug Richardson's shooting to gain insight into the reverberating effects it may have had on Mr. Richardson. As Mr. Richardson explains in his brief to this Court:

> [D]efense counsel interviewed Doug, Sandy, and other Richardson family members about the event. Defense counsel spoke with one of Sandy's codefendants. They interviewed Sandy's defense attorney. They reviewed the superior court file of both the criminal trial and civil custody proceedings. Defense counsel also tried to obtain the District Attorney's file, but it had been destroyed. In addition, defense counsel determined that the chief police investigator in Sandy's case was deceased, and because Sandy was acquitted, the transcript from her trial was not available.

There was one other individual with inside information about the incident that the defense was unable to interview: Judge Thomas H. Lock himself.

Judge Lock, who presided over Mr. Richardson's trial, was one of the primary prosecutors who prosecuted the case against Sandra Richardson. Judge Lock's role in

prosecuting Sandra Richardson included acting as one of two counsel of record, signing indictments, participating in interviews of witnesses, and delivering the State's closing argument at trial. The record also reflects that at least one of Mr. Richardson's relatives remembered seeing Judge Lock at the subsequent custody hearing after Doug Richardson filed for divorce and sought custody of Mr. Richardson.

Based on Judge Lock's significant role as a prosecutor, the defense sought to meet with him to discuss his knowledge of the case and the Richardson family. Judge Lock addressed the defense's request in open court, explaining that the executive director of the North Carolina Judicial Standards Commission advised him that he need not recuse himself from Mr. Richardson's trial and emphasizing that although he remembered the case against Sandra Richardson, it had occurred twenty years earlier and he did not recall it involving any evidence that would bear on Mr. Richardson's case. Judge Lock declined to answer any questions the defense had about the prosecution.

In response to Judge Lock's refusal to discuss Sandra Richardson's case, the defense moved to disqualify him from presiding over Mr. Richardson's trial and filed a discovery motion seeking the disclosure of any information Judge Lock had about the earlier case. The motion for disqualification explained that "[t]he fact that Defendant's father was shot three times by a[n unknown] person purportedly acting at the bequest of Defendant's mother [was] . . . likely to be a major focus of Defendant's case should it reach a capital penalty phase," and "[t]he defense [could

not] fully investigate or develop a critical and material piece of mitigation as long as Judge Lock [was] presiding over [the] case."

The motion specifically explained that it was important that the defense interview Judge Lock because:

> 1) he potentially has a lot of knowledge about the case against Sandra Richardson and can fill the defense in about details that are not readily understood through the discovery; 2) Judge Lock presumably interacted a fair amount with the victim in that case, Doug Richardson, and therefore can discuss his observations about how the shooting may have effected Doug Richardson physically, mentally and emotionally; and 3) Judge Lock can describe his observations of Sandra Richardson throughout the trial. Judge Lock's observations about Mr. Richardson are relevant to her stability and character.

In short, the defense hoped to use Judge Lock's knowledge as mitigation evidence regarding the shooting itself and Judge Lock's observations of Mr. Richardson's parents in light of the incident. The motions were considered by Judge James Floyd Ammons Jr., who denied them both.

N.C.G.S. § 15A-1223(e) provides that "[a] judge *must* disqualify himself from presiding over a criminal trial or proceeding if he is a witness for or against one of the parties in the case." N.C.G.S. § 15A-1223(e) (2021) (emphasis added). Our Court has yet to interpret the text of § 15A-1223(e), but the text of the statute is simple: If Judge Lock was a witness for or against Mr. Richardson, disqualification was required. *See* N.C.G.S. § 15A-1223(e).

A witness is "[s]omeone who sees, knows, or vouches for something." *See*

*Witness*, Black's Law Dictionary (11th ed. 2019). The defense had good reason to believe that Judge Lock may have been a witness for Mr. Richardson. In his order on Mr. Richardson's motion to disqualify Judge Lock, Judge Ammons found that "Judge Lock played a major role in the prosecution of Sandra Richardson," including serving as counsel of record and interviewing witnesses. Based on this role, it is entirely plausible that Judge Lock developed his own personal impressions of Mr. Richardson's parents and had the opportunity to gain insight into their relationship and the circumstances surrounding the shooting through his witness interviews and the additional efforts he devoted to developing the case.

There is also the chance that Judge Lock did not develop the kind of impressions that would have been useful or relevant to Mr. Richardson as mitigation evidence. The error that was invited here, however, is that Judge Lock never disclosed *anything* that he knew to the defense or a neutral arbiter like Judge Ammons who could have reviewed the content of his recollections to determine whether the information constituted relevant mitigating evidence. Instead, Judge Lock simply made that decision for Mr. Richardson, declaring that he "did not recall [Sandra Richardson's] case containing any evidence which would be pertinent to the defendant's capital case." This was not Judge Lock's decision to make unilaterally, especially given his admission that he recalled the prosecution. At minimum, Judge Lock's recollections of the prosecution and any opinions he developed should have been provided to Judge Ammons prior to Judge Ammons' consideration of Mr.

Richardson's motion to disqualify Judge Lock and motion seeking discovery. Because no one except for Judge Lock himself knows what information he retained about the trial and the impressions he developed about the members of the Richardson family, it is impossible to determine whether he was a witness for Mr. Richardson under § 15A-1223(e) such that recusal was required.

The majority holds that the information the defense sought to elicit from Judge Lock was "speculative conjecture." And it faults Mr. Richardson for not identifying "any particular knowledge that Judge Lock could have that would be relevant to defendant or to the crimes for which defendant faced trial." This assertion ignores that the defense had no choice *but* to speculate about what information Judge Lock might be able to provide because Judge Lock refused to meet with or answer any of the defense's questions regarding Sandra Richardson's prosecution. The defense could therefore only identify the kind of information that Judge Lock might be able to shed light on, meaning its intention to obtain discovery from Judge Lock was necessarily based on its theory of what he might be able to discuss. The defense cannot now be penalized for Judge Lock's own failure to provide this information or recuse himself as he was required to do by statute.

Though we cannot say with certainty what information Judge Lock would have provided to the defense, it is undisputed that he played a substantial role in Sandra Richardson's prosecution and remembers the case, despite it happening over twenty years earlier. It therefore seems highly likely that Judge Lock developed the kinds of

insights that the defense sought to obtain, such as impressions about Doug Richardson's mental state following the shooting, information that Doug Richardson provided about Sandra Richardson's personality, and details about the state of their relationship and ability to care for Mr. Richardson.

To assert that Judge Lock was free of any of this kind of information is to ignore the indispensable role a prosecutor plays in trying a criminal defendant and the extreme attention to detail that the prosecutor is required to pay to develop his or her case. Any trial lawyer is familiar with the importance of developing a "theory of the case"—an important technique that "distills and organizes all the particular elements of the case, including those for which there may be no strong answer. It is the overall theme advanced by the attorney through different means in every part of his presentation of the case." Kenneth M. Mogill & Lia N. Ernst, *Examination of Witnesses* § 1:3 (2d ed. 2022). To develop this overarching theme in prosecuting Sandra Richardson, Judge Lock almost certainly would have delved into the dynamics of her relationship with Doug Richardson, her personality and stability in general, and Doug Richardson's own behaviors. Thus, despite uncertainty regarding the precise substance of Judge Lock's impressions, it is likely that he gained at least some insight in these areas.

But Judge Lock's unique relationship to the Richardson family is significant not just for purposes of § 15A-1223(e); it also implicates Mr. Richardson's rights under the U.S. Constitution. The U.S. Supreme Court has "firmly established that

sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *see also Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) ("[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." (citation omitted)). To wit, "the sentencer may not . . . be precluded from considering 'any relevant mitigating evidence.' " *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (quoting *Eddings*, 455 U.S. at 114). "Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation" and can be "particularly relevant." *Eddings*, 455 U.S. at 115.

The defense placed particular emphasis on obtaining such information from Judge Lock because "[t]estimony from a respected superior court judge that he observed, firsthand, serious dysfunction in the Richardson family would have been . . . powerful" mitigating evidence. And, as already discussed, it is not just plausible but likely that through his work on the case and his contact with Doug Richardson, Judge Lock gained an intimate look into Doug and Sandra Richardson's marriage, their points of tension, and the events that led to the alleged shooting. But by refusing

to disclose any information regarding his recollections of prosecuting Mr. Richardson's mother for allegedly conspiring to murder his father, Judge Lock deprived the jury of the opportunity to hear this testimony and Mr. Richardson of the chance to present all of the mitigating evidence that was reasonably available.

The majority downplays this deprivation, opining that any information Judge Lock may have been able to provide would have been immaterial, "speculative conjecture," and not "pertinent to defendant's case." As an initial matter, even if a materiality requirement existed, there would be no way to objectively assess whether Judge Lock was a material witness here because he did not reveal any of the knowledge he retained from prosecuting Sandra Richardson to either the defense or a neutral judge like Judge Ammons. What is more, neither the U.S. Constitution's guarantee that "criminal defendants be afforded a meaningful opportunity to present a complete defense," *California v. Trombetta*, 467 U.S. 479, 485 (1984), nor § 15A-1223(e) contain any form of a materiality requirement as contemplated by the majority.

Start with the Eighth Amendment to the U.S. Constitution. Though mitigation evidence must be relevant, this is a "low threshold" that includes "evidence which tends logically to prove or disprove some fact or circumstance which a factfinder could reasonably deem to have mitigating value." *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (cleaned up). And "[o]nce this low threshold for relevance is met, the 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital

defendant's mitigating evidence." *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 377–78 (1990)). Thus, in terms of the kind of evidence that Mr. Richardson was constitutionally entitled to introduce, the standard is based purely on relevance—not materiality.

For the reasons already described, though it is not certain, it is likely that Judge Lock could have provided at least some relevant mitigating evidence, meaning that had it been provided by Judge Lock during discovery, Mr. Richardson would have had a constitutional right to introduce it at trial. But again, the problem here is that Judge Lock refused to provide this information in the first place, and Judge Ammons denied Mr. Richardson's discovery motion which would have required Judge Lock to do so. But there is no constitutional basis for imposing a higher burden (i.e., a materiality requirement) on the compelled production of mitigation evidence than that imposed on its introduction to a jury. Under this approach, criminal defendants would be required to prove that potential witness testimony is material before that testimony is even provided. Instituting this onerous burden at the outset would be repugnant to a criminal defendant's "constitutionally protected right . . . to provide [a] jury with . . . mitigating evidence," *Williams v. Taylor*, 529 U.S. 362, 393 (2000), and impede defense counsel from "fulfill[ing] their obligation to conduct a thorough investigation of [a] defendant's background," *id.* at 396. But in characterizing the evidence that Mr. Richardson's defense sought from Judge Lock as immaterial, this is exactly the kind of burden the majority appears to believe was required here.

Subsection 15A-1223(e) also lacks a materiality requirement. Again, the plain text of the statute states that "[a] judge must disqualify himself from presiding over a criminal trial or proceeding if he is a witness for or against one of the parties in the case." N.C.G.S. § 15A-1223(e). This text does not contain any reference to the position that the judge must be a material witness, and "in effectuating legislative intent, it is [this Court's] duty to give effect to the words actually used in a statute and not to delete words used or to insert words not used." *Lunsford v. Mills*, 367 N.C. 618, 623 (2014).

The majority accepts the State's argument that the materiality requirement was "invited error" because Mr. Richardson "contended in his written motions and supporting oral arguments that Judge Lock could offer 'material mitigating evidence.' " Even if true, Judge Ammons had a duty to properly apply the law. As already described, § 15A-1223(e) does not contain any materiality requirement. When a trial court judge makes an error of law, it is the duty of an appellate court to correct that misapplication. It does not matter which party advocated for the misapplication because any legal error, regardless of its source, must be corrected. It is therefore Judge Ammons's misapplication of the law by inserting a materiality requirement that resulted in error here. There is no legal basis for binding the party that advocated for that misapplication to an incorrect legal standard.

Based on his unusual relationship with the Richardson family, Judge Lock should have been disqualified from presiding over Mr. Richardson's trial under § 15A-

1223(e), and he was required to disclose his knowledge of the prosecution and the Richardson family either to the parties in this case or a neutral arbiter under the Eighth Amendment to the U.S. Constitution. "[E]rror committed at trial which infringes upon [a] defendant's constitutional rights is presumed to be prejudicial and entitles him to a new trial unless the error in question is harmless beyond a reasonable doubt." *State v. Autry*, 321 N.C. 392, 399–400 (1988). Here, however, there is no way to assess whether the error was harmless beyond a reasonable doubt because Judge Lock's knowledge remains undisclosed.

At sentencing, the jury declined to find any of the seven mitigating factors that the defense introduced relating to Sandra Richardson's prosecution. It is impossible to determine whether the information Judge Lock possessed, if presented as mitigating evidence, would have changed the jury's decision to impose the death penalty in this case. As a result, the State cannot overcome the presumption of prejudice that exists here stemming from Judge Lock's refusal to provide potential mitigating evidence that Mr. Richardson had a constitutional right to introduce as part of his defense.

## B. The Trial Court's Evidentiary Errors Unfairly Prejudiced Mr. Richardson for Sentencing Purposes

### 1. *North Carolina's Arbitrary Death Penalty Sentencing Scheme Requires Trial Courts to Exercise the Utmost Care to Avoid Death Sentences Imposed Arbitrarily*

In *Furman*, the U.S. Supreme Court "held that the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the

punishment will be inflicted in an arbitrary and capricious manner." *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980). In other words, capital punishment schemes that provide "no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not" are unconstitutional. *Furman*, 408 U.S. at 313 (White, J., concurring). In a separate concurrence, Justice Stewart explained that the death sentences at issue were imposed arbitrarily, making them "cruel and unusual in the same way that being struck by lightning is cruel and unusual" in that "of all the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed." *Id.* at 309–10 (Stewart, J., concurring) (footnote omitted).

"[W]antonly and . . . freakishly imposed," *id.* at 310, death sentences persist in North Carolina's capital sentencing scheme. *See* Matthew Robinson, *The Death Penalty in North Carolina, 2021: A Summary of the Data and Scientific Studies* (2021); *see also* James G. Exum Jr., *Capital Punishment in North Carolina: A Justice's View On Why We Can 'No Longer Tinker With the Machinery of Death'*, 99 N.C. L. Rev. 101 (2020) (cataloguing arbitrariness in North Carolina death sentences).

Because randomly imposed death sentences are pervasive in North Carolina, it is incumbent upon trial court judges who preside over capital trials to exercise the utmost care to avoid erroneous rulings that could unfairly prejudice criminal

defendants. Given that this form of punishment is imposed so arbitrarily, a trial court's failure to exercise proper care, for example, by admitting improper evidence, could mean the difference between life and death for a defendant. With stakes so high and chances of a randomly imposed death sentence so great, trial courts have a duty to make sure that their own mistakes are not the reason an individual is sentenced to death. For the reasons discussed below, I do not believe that the trial court exercised this degree of care in Mr. Richardson's case.

## 2. *The Manner of the State's Display of Photographs was Excessive and Unfairly Prejudicial at Sentencing*

At trial, the State fixated on the nature and severity of the victim's injuries. To that end, it deluged the jury with gut-wrenching images of the victim's body and wounds. The defense objected to the introduction of the photographs, urging the trial court to exclude them under Rule 403 of the North Carolina Rules of Evidence. In the defense's view, the tsunami of gruesome images held minimal probative value and a monstrous prejudicial risk.

The trial court disagreed. It permitted the State to introduce the images, reasoning that the interest of convenience outweighed any prejudice. The State jumped on that offer. Of the State's fourteen witnesses, eight relied on those lurid images in their testimony, presenting a total of eighty-eight distinct pictures to the jury.[1] The State took a similar tack during closing arguments. In their final pitch to

---

[1] The State's witnesses offered eighty-eight distinct pictures throughout their testimony. But many witnesses returned to previously admitted images, generating 108

the jury, prosecutors exhibited a photographic slideshow of the victim's face and wounds. Those images were the last things jurors saw before they deliberated.

In my view, the trial court erred by permitting a trial-by-photograph. The graphic images carried little probative weight, especially because Mr. Richardson did not contest the cause or extent of the victim's injuries. Yet the State belabored the victim's wounds, plying jurors with picture after gruesome picture of the victim's body. The excessive use of the photographs and how the State presented them only ballooned their prejudicial impact. Rule 403 was designed to prevent the very tactics the State engaged in here: Attempting to coax a decision based on emotion, not evidence. The trial court erred by holding otherwise—the majority errs, too, by affirming that ruling.

Rule 403 of the North Carolina Rules of Evidence governs the admissibility of photographs. *State v. Mlo*, 335 N.C. 353, 374 (1994). In essence, Rule 403 is an evidentiary gatekeeper: It screens the information that reaches the jury, thereby fostering reasoned, dispassionate deliberation.

To do so, Rule 403 employs a balancing test. It tasks trial judges to exclude evidence if the probative value is "substantially outweighed" by the "danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403 (2021). That is, if the evidence carries an "undue

---

photographic exhibits admitted through testimony. On top of that, prosecutors displayed eight photos already admitted into evidence during closing argument. All told, the State showed an image to the jury 116 times over the course of the trial.

tendency" to elicit a "decision on an improper basis, . . . [usually] an emotional one." *State v. Mason*, 315 N.C. 724, 731 (1986) (cleaned up).

Photographs carry a unique risk of prejudice. *See State v. Hennis*, 323 N.C. 279, 284 (1988). After all, hearing testimony about something is quite different from seeing it yourself. Recognizing that danger—and its special risk in emotionally charged cases like Mr. Richardson's—this Court has taken special care to screen when and how the State may admit photographs. In analyzing prejudice, our cases focus on three factors: the purpose for which the State admits the pictures, whether their use is "excessive or repetitious," and how the State presents them. *See id.* at 283–86.

*First*, Rule 403 permits the State to offer photographs—even lurid ones—"so long as they are used for illustrative purposes." *Id.* at 284; *see also State v. Watson*, 310 N.C. 384, 397 (1984) ("Properly authenticated photographs of the body of a homicide victim may be introduced into evidence under instructions limiting their use to the purpose of illustrating the witness' testimony." (quoting *State v. Cutshall*, 278 N.C. 334, 347 (1971))). The State, for instance, may offer pictures to "illustrate testimony as to the cause of death." *Hennis*, 323 N.C. at 284. In the same vein, prosecutors may use photographs to "illustrate testimony regarding the manner of killing so as to prove circumstantially the elements of murder in the first degree." *Id.*

Or, when it is in dispute,[2] the State may admit pictures demonstrating "the character of the attack made by defendant upon the deceased." *State v. Gardner*, 228 N.C. 567, 573 (1948). In each of those cases, the photographs served a legitimate and limited purpose: Illustrating a witness's testimony to bolster the State's case. For that reason, their probative weight tipped Rule 403's scales.

*Second*, the "excessive" use of inflammatory photographs triggers Rule 403's bar. *See Hennis*, 323 N.C. at 283. Our cases have used a slew of descriptors— "redundant," "excessive," "repetitious," "unnecessary," "duplicative," "unduly reiterat[ive]." *See id.* at 284–87 (collecting cases). But the core insight is simple: When a "photograph adds nothing to the State's case, then its probative value is nil"— "nothing remains but its tendency to prejudice." *Id.* at 286 (cleaned up); *see also State v. Mercer*, 275 N.C. 108, 120 (1969) ("But where a prejudicial photograph is relevant, competent and therefore admissible, the admission of an excessive number of photographs depicting substantially the same scene may be sufficient ground for a new trial when the additional photographs add nothing in the way of probative value

---

[2] As our cases make clear, the State may not admit photographs to settle a nonexistent dispute. Where the parties do not contest a point, photographs illustrating that point lack probative value—their only conceivable purpose is to elicit prejudice. *See, e.g., State v. Mercer*, 275 N.C. 108, 121 (1969) (barring the State from admitting "poignant and inflammatory" pictures of the victim's body when the evidence as to the cause of death was uncontradicted), *overruled on other grounds by State v. Caddell*, 287 N.C. 266 (1975); *see also State v. Johnson*, 298 N.C. 355 (1979) (determining that where there was no evidence that the defendant had mutilated or dismembered the body of the deceased, photographs of the victim's body after its having been ravaged by animals not probative of any material fact at issue).

but tend solely to inflame the jurors."), *overruled on other grounds by State v. Caddell*, 287 N.C. 266 (1975).

*Third*, and finally, *how* the State presents photographs matters as much as the pictures themselves. In other words, context matters because it shapes the way jurors perceive, process, and weigh photographic evidence. For that reason, our Rule 403 analysis looks to factors like the "level of detail and scale," whether the pictures are colorized, and "where and how [they are] projected or presented." *See Hennis*, 323 N.C. at 285; *see also Mlo*, 335 N.C. at 374–75 (admonishing courts to consider "the circumstances surrounding the presentation of the photographs" when applying Rule 403). *Hennis* marks our clearest decision on that point. *See Hennis*, 323 N.C. at 285.

In that case—a grisly murder trial much like this one—the State offered thirty-five photographs of the crime scene and the victims' autopsies. *Id.* at 282. Of those photographs, nine depicted the victims' bodies at the scene. *Id.* at 282–83. The remaining twenty-six detailed the victims' injuries. *Id.* at 283. More specifically, the photographs zeroed in on the "head and chest areas of the victims," revealing "in potent detail the severity of their wounds" and the effects of decomposition. *Id.* To display the images, the State erected a screen on the courtroom wall opposite the jury. *Id.* at 282. The screen was large—large enough to "project two images 3 feet 10 inches by 5 feet 6 inches side-by-side." *Id.* On top of that, the State projected the photographs directly above the defendant's head. *Id.*

On review, this Court held that the number of photographs and the manner of their presentation flunked Rule 403's balancing test. *Id.* at 286–87. For one, the pictures were unduly "repetitious." *Id.* at 286. The State presented picture after picture "depicting substantially the same scene." *Id.* at 284–85 (quoting *Mercer*, 275 N.C. at 120). For example, the State offered "several color images of the same victim's neck wound." *Id.* at 286. But because the State presented other "color images of that same wound taken at the crime scene," the extra photographs "added nothing to the [S]tate's case." *Id.* And since the deluge of "grotesque and macabre" pictures lacked marginal probative value, they had "potential only for inflaming the jurors." *Id.*

The State's method of presenting the pictures compounded their prejudicial impact. *Id.* By projecting the lurid photos on an "unusually large screen," the State rendered them larger than life, inescapable even. *Id.* The jury had no choice but to stare at close-ups of the victims' wounds. And because the pictures appeared "directly over [the] defendant's head," the jury "continually [had] him in its vision as it viewed the slides." *Id.* All in all, the Court concluded, the photographs' "redundant content" undercut their probative value. *Id.* at 287. But they carried an extreme risk of prejudice—plying jurors with picture after blown-up picture of the victims' wounds created an "undue tendency" to elicit an improper verdict. *See id.* at 283 (reciting Rule 403's definition of "unfair prejudice"). Because the trial court thus erred by admitting the pictures, the defendant deserved a new trial.

*Hennis* demands the same result here. In Mr. Richardson's case—just as in *Hennis*—the State flunked each Rule 403's prejudice factors.

Begin with the purpose of the photographs. During Mr. Richardson's trial, the State offered eighty-eight pictures. It repeated many of them. So in total, the State showed jurors an image 116 times over the course of trial. And not just any images— gruesome, zoomed-in shots of the victim's injuries. Of the State's fourteen witnesses, eight used photographs during their testimony. Those witnesses decamped from the witness stand and stood in front of the jury box. They first narrated the victim's injuries—then they described the wounds again, this time with the aid of a picture displayed on a sixty-inch monitor. To underscore their testimony, they zoomed in on the pictures to magnify the wounds.

The State, of course, may offer photographs for a legitimate purpose like illustrating witness testimony. But the pictures shown here stray far beyond Rule 403's guardrails. Witness after witness used the same pictures to discuss the same injuries. In fact, at least four witnesses rehashed points made by others, relying on identical pictures used in prior testimony. Put simply, many of the State's witnesses had little to illustrate because their testimony traversed well-worn terrain. And for that reason, the State lacked a legitimate purpose in continuing to ply jurors with redundant, inflammatory images. Instead, the State's campaign of photographic warfare sought merely to "arouse the passions of the jury"—the very risk Rule 403 was created to forestall. *See State v. Murphy*, 321 N.C. 738, 741 (1988).

In the same vein, the State's "excessive or repetitious" use of photographs crossed the line from probative to prejudicial. As *Hennis* made clear, when the "use of photographs that have inflammatory potential is excessive or repetitious, the probative value of such evidence is eclipsed by its tendency to prejudice the jury." *Hennis*, 323 N.C. at 284. The pictures here were certainly inflammatory—larger-than-life images of a four-year-old's battered body could not be anything but. Any juror could grasp the horror of her wounds with a handful of photographs presented by a handful of proper witnesses. That is especially so because Mr. Richardson did not dispute the cause of the victim's injuries or their severity. Instead, at both the guilt and sentencing phases of trial, the defense focused on Mr. Richardson's state of mind.

Yet the State belabored the victim's wounds, inaugurating the gruesome details of the crime as the centerpiece of its case. Just look at the numbers: eight witnesses presented 108 pictures to the jury. That is over three times the number in *Hennis*—and in that case, three victims suffered multiple injuries. *See id.* at 281–86. Put another way, the prosecutor in *Hennis* had more ground to cover than the State did here. And still, this Court concluded that the repetitious and redundant use of grotesque photographs tipped Rule 403's scales. *Id.* at 286. If that was true in *Hennis*, it is doubly—no, *triply*—true here.

Another data point: In this case, the testimony of witnesses who relied on photographs spilled into 158 pages of transcripts. By Mr. Richardson's estimate, the

State sunk nearly four hours of witness testimony flashing lurid photos to the jury. And as in *Hennis,* many of those images depicted "substantially the same scene." *See Hennis,* 323 N.C. at 284 (quoting *Mercer,* 275 N.C. at 120). In fact, the State displayed five photographs three times, showing jurors again and again (and again) images of the victim's head, torso, back, arms, legs, and genitalia. Even the trial judge chided the State's tactics, warning the prosecutors that he harbored "some of the same concerns" as the defense about "unfair prejudice and needless presentation of cumulative evidence."

All told, the State's use of photographs meets any definition of "excessive." Even more because Mr. Richardson did not contest the cause or extent of the victim's injuries. By rehashing inflammatory images to prove an undisputed point, the State exceeded the limits set by Rule 403.

If any doubt about prejudice remains, the State's method of presentation extinguishes it. Start with the screen. As in *Hennis*, the State displayed the pictures on an "unusually large screen," here a sixty-inch monitor. *Cf. Hennis,* 323 N.C. at 286. That means that each image was two and one-half feet wide and four and one-half feet tall. To jurors, the pictures may have appeared even larger—prosecutors parked the screen just seven feet in front of the jury box. While testifying, the State's witnesses stood beside the screen, manipulating the photographs to punctuate their descriptions of the victim's injuries. The images were in color. *Cf. id.* at 285 (noting that "whether [a photograph] is color or black and white" bears on its potential for

prejudice). And unlike in 1988—when this Court decided *Hennis*—the pictures were high definition. So high definition, in fact, that the State's witnesses could magnify the grittiest of details for the jury. The images were, in a word, inescapable. The jury could not help but see each of the horrific pictures presented over four hours of testimony.

What's more, the State leveraged the most gruesome of the pictures in its closing argument to stoke the jury's anger. In urging jurors to return a guilty verdict, the State showed a photograph of the victim's battered face. Then again. And then again. Sandwiched between that face picture were graphic images of the victim's body, including five close-up shots of her genitalia. At one point, the prosecutor zoomed into a particularly gruesome image, remarking, "Now, that's an interesting bite." The timing, too, compounded the prejudicial impact. By focusing its closing argument on rehashing lurid, agonizing pictures, the State saturated the jury with emotion right before it retired to deliberate. The jurors left the courtroom with those gut-wrenching, ghastly images etched into their memories. How could they not? And for that reason, the State's resort to trial-by-photograph created an "undue tendency to suggest a decision on an improper [emotional] basis." *See Hennis*, 323 N.C. at 283.

All told, the State flounders on each Rule 403 factor. It lacked a legitimate purpose in admitting the photographs, instead relying on their shock value to sway jurors. The use of the pictures was also excessive. By any principled metric, the prejudice engendered by continually plying the jury with lurid images eclipsed any

probative value, especially for an undisputed point. How the State presented the images clinches the case. Regardless of the content, a juror could scarce look away from larger-than-life, colorized, high-definition pictures on a monitor mere feet from her face. But where that screen shows horrific images of a four-year-old's body—images magnified by witnesses and shown again and again—the effect is inescapable. Because the "danger of unfair prejudice" substantially outweighed any probative value, Rule 403—properly interpreted—barred the State from the "excessive or repetitious" use of the pictures. *See Hennis*, 323 N.C. at 284. The trial court clearly erred by holding otherwise.

The trial court's reasoning for allowing the State's preferred display was particularly misguided. Instead of implementing measures to ensure that the State's presentation of evidence did not veer into prejudicial territory given the nature of Taylor's injuries and the court's awareness that jurors would see a significant number of photographs often repeatedly, the trial court acquiesced to the State's preferred means of presenting the photos—on a large screen, just feet from the jury—because doing so was convenient for various reasons. Specifically, the trial court explained that the monitor's location was "plainly visible to all jurors including the alternate jurors at one time without having to relocate it" and without other individuals in the audience being able to see it and that its placement made it "visible to all jurors . . . without having [an] exhibit shown at multiple locations along the jury box as would be required if a smaller monitor was being used or smaller photographs were being

used." The court went on to conclude that "in considering the balancing test required by Rule 403, . . . the value of displaying the photographs and exhibits in [the proposed] fashion [was] not substantially outweighed by the danger of unfair prejudice to the defendant."

The trial court's explanation focused exclusively on the reasons why the State's preferred display was the most convenient option. It did not reject other possibilities as logistically impossible, nor did it appear to consider the risks of the State's display in the context of this particular case and the evidence likely to be introduced during the trial. Thus, despite its invocation of Rule 403's balancing test, the record suggests that the trial court did not actually weigh the risk of unfair prejudice to Mr. Richardson against the probative value of presenting the evidence in the manner proposed by the State. Instead, the trial court chose expediency over its duty to prevent unfair prejudice. There is no basis for making this trade off in the absence of proper balancing under Rule 403, no matter how convenient the State's display may have been. Moreover, the State has no right to present its photographic evidence in the most convenient way that it can conceive of.

All that the trial court was required to do here was implement a different, perhaps moderately less convenient, manner of displaying the State's photographic evidence. With this in mind, it is hard to imagine that there are any circumstances in which the risk of unfair prejudice to a criminal defendant who is facing death does not substantially outweigh the mere expediency of the State's preferred manner of

presenting evidence; a criminal defendant's life must always trump convenience. In employing an illusory balancing test under Rule 403 that failed to consider the gravity of what was at stake in this trial, the trial court's decision to allow the State's preferred photographic display was arbitrary and unsupported by reason, which amounted to an abuse of discretion. *See Hennis*, 323 N.C. at 285 ("Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.").

It is not enough that the trial court erred in permitting the State's introduction of photographic evidence, it must also be shown that this error caused actual prejudice. *Hennis*, 323 N.C. at 287 ("Only upon a showing that the trial court erred and that defendant has been prejudiced thereby will defendant be granted a new trial."). Though I do not believe that the trial court's error prejudiced Mr. Richardson at the guilt phase of trial, I would hold that it caused prejudice at the sentencing phase. As Mr. Richardson's brief to this Court points out, "[T]he jury's sound rejection of 43/46 mitigating factors (of which 32 were uncontroverted) is strong evidence of [its] lack of impartiality" because "[i]t is one thing to conclude that mitigating factors are outweighed by aggravating factors; it is another to deny they have any mitigating value at all." For example, "[n]ot one juror found that Mr. Richardson taking [Taylor] to the hospital was mitigating," and "[n]ot one juror found Mr. Richardson was under the influence of a mental or emotional disturbance, nor that his age of 21 was mitigating." This suggests that the jury was bent on sentencing Mr. Richardson with

the harshest penalty possible, regardless of what the mitigating evidence showed. But, as discussed, a jury's anger is not a proper basis for sentencing a criminal defendant to death. *See Hennis*, 323 N.C. at 283.

### 3. Dr. Barbaro's Testimony was Unreliable, Needlessly Cumulative, and Unfairly Prejudicial

Appellate review of expert testimony in Mr. Richardson's case is based on an earlier version of North Carolina Rule of Evidence 702(a) that has since been amended. *See* N.C.G.S. § 8C-1, Rule 702(a) (2003). The previous version of the rule stated that when "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion." *Id.* In *Howerton v. Arai Helmet, Ltd.*, this Court explained that the rule required a "three-step inquiry for evaluating the admissibility of expert testimony: (1) Is the expert's proffered method of proof sufficiently reliable as an area for expert testimony? (2) Is the witness testifying at trial qualified as an expert in that area of testimony? (3) Is the expert's testimony relevant?" 358 N.C. 440, 458 (2004) (citations omitted), *superseded on other grounds by statute as stated in SciGrip, Inc. v. Osae*, 373 N.C. 409 (2020). Dr. Barbaro's testimony failed the first requirement.

When assessing reliability under the former version of Rule 702(a), it is true that this Court has instructed that trial courts "should look to precedent for guidance in determining whether the theoretical or technical methodology underlying an

expert's opinion is reliable." *Howerton*, 358 N.C. at 459. At the time of Mr. Richardson's trial, this Court had approved the use of bite mark testimony in two cases. First, in *State v. Temple*, which was decided in 1981, this Court held that expert witnesses who provided bite mark testimony "applied scientifically established techniques of dentistry and photography to the solution of a particular novel problem," leading it to conclude that the testimony "was based upon established scientific methods[ ] and is admissible as an instrumentality which aids justice in the ascertainment of the truth." 302 N.C. 1, 12–13 (1981). A year later, this Court approved *Temple* in *State v. Green*, 305 N.C. 463 (1982). There, the Court declined to reverse *Temple*'s acceptance of bite mark testimony as a form of reliable evidence seemingly because the methodology "ha[d] been approved in other jurisdictions." *Id.* at 471.

Since *Temple* and *Green* were decided, however, there has been increasing skepticism as to the reliability of bite mark testimony. *See, e.g.*, David L. Faigman et al., *The Judicial Response to Expert Testimony on Bitemark Identification—Cases after Daubert*, 4 Mod. Sci. Evidence § 35:6 (2022) ("[B]etween the mid[-]1970s and today, a paucity of research [regarding bite mark evidence] has been replaced by a more substantial, though still limited body of research and earlier assumptions of accuracy have been replaced by data suggesting that moderate to high error rates are typical."). In light of this evolving understanding of bite mark evidence, there is no reason that "non-novelty, by itself, [should] shelter from reexamination erroneous

scientific claims that have lost the support of the field or fields from whence they came." *Id.* Such reexamination is necessary here.

In 2009, the first independent report examining the reliability of bite mark evidence was published by a committee of neutral scientists. *See* Comm. on Identifying the Needs of the Forensic Scis. Cmty., Nat'l Rsch. Council, *Strengthening Forensic Science in the United States: A Path Forward* (2009) (NAS Report). "In [the NAS Report], The National Academy of Sciences' Committee on Identifying the Needs of the Forensic Science Community fulfill[ed] the congressional charge of providing recommendations on policy initiatives that must be adopted in any plan to improve the forensic science disciplines." *Strengthening Forensic Science in the United States: A Path Forward*, U.S. Dep't of Just., Off. of Just. Programs, https://www.ojp.gov/ncjrs/virtual-library/abstracts/strengthening-forensic-science-united-states-path-forward (last visited Aug. 2, 2023). The NAS Report outlined some of the "problems inherent in bite mark analysis and interpretation," including that "[t]he uniqueness of the human dentition has not been scientifically established" and that "[t]he ability of the dentition, if unique, to transfer a unique pattern to human skin and the ability of the skin to maintain that uniqueness has not been scientifically established." NAS Report, at 175. The NAS Report therefore explained that "no scientific studies support" the position that "bite marks can demonstrate sufficient detail for positive identification." *Id.* at 176. The NAS Report found that bite mark evidence is unreliable in other ways as well. For example, it "suffers from the

potential for large bias among bite mark experts in evaluating a specific bite mark." *Id.* at 174.

Since the NAS Report was published, several other expert commissions have reached similar, and even more forceful, conclusions regarding the unreliability of bite mark evidence. For example, the Texas Forensic Science Commission, a body statutorily-created by the Texas legislature,[3] issued a report concluding that courts should not admit bite mark evidence in criminal cases and explaining that "1) there is no scientific basis for stating that a particular patterned injury can be associated to an individual's dentition; and 2) there is no scientific basis for assigning probability or statistical weight to an association, regardless of whether such probability is expressed numerically." Tex. Forensic Sci. Comm'n, *Forensic Bitemark Comparison Complaint Filed by National Innocence Project on Behalf of Steven Mark-Chaney—Final Report* (2016) (TFSC Report). The report further stated that "[t]hough these claims were once thought to be acceptable and have been admitted into evidence in criminal cases" around the country, "it is now clear they lack any credible supporting data." *Id.* at 15; *see also* President's Council of Advisors on Sci. & Tech., *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* 9 (2016) (PCAST Report) (explaining that the "available scientific evidence strongly suggests that examiners . . . cannot even consistently agree on whether an

---

[3] Among other things, the commission is charged with investigating the misuse of forensic evidence. *See About Us*, Tex. Forensic Sci. Comm'n, Tex. Jud. Branch, https://www.txcourts.gov/fsc/about-us/ (last visited Aug. 2, 2023).

injury *is* a human bite mark" and that "the prospects of developing bitemark analysis into a scientifically valid method [are] low").[4]

Though courts have historically been willing to admit bite mark evidence, in response to this growing body of research refuting the reliability of bite marks as a valid or reliable form of forensic evidence, in recent years many courts have questioned whether its admission is appropriate. *See, e.g.*, *Ege v. Yukins,* 485 F.3d 364, 376 (6th Cir. 2007) (opining that "[b]ite mark evidence may by its very nature be overly prejudicial and unreliable"); *Starks v. City of Waukegan*, 123 F. Supp. 3d 1036, 1052 (N.D. Ill. 2015) (explaining that "[i]t is . . . doubtful that 'expert' bite mark analysis would pass muster under Federal Rule of Evidence 702 in a case tried in federal court"); *State v. Lopez-Martinez*, No. 100,643, 2010 WL 2545626, at *4 (Kan. Ct. App. June 11, 2010) (Leben, J., concurring) (agreeing with the majority that "this case d[id] not present [the court] with an opportunity to consider whether [the Kansas Supreme Court's] holding that bite-mark testimony is admissible remains good law" but opining that, based on modern scientific developments, "[r]econsideration of the admissibility of bite-mark testimony seems appropriate").

Rather than engaging with the modern scientific developments that have led to a growing consensus that bite mark testimony is unreliable, the majority relies on

---

[4] "The President's Council of Advisors on Science and Technology (PCAST) is an advisory group of the Nation's leading scientists and engineers, appointed by the President to augment the science and technology advice available to him from inside the White House and from cabinet departments and other Federal agencies." PCAST Report.

this Court's holdings from over forty years ago that condoned the admission of such testimony. But as scientific understandings of various forms of forensic evidence evolve, courts have an obligation to respond to those advancements accordingly. By failing to re-examine the admissibility of a certain form of evidence in light of new science and relying solely on historical acceptance to justify its continued use, this Court allows junk science to serve an improper role in the criminal justice system. Because the emerging scientific consensus suggests that bite mark testimony is inherently unreliable, I dissent from the majority's view that it is admissible evidence and would take this opportunity to revisit this Court's previous decisions that conclude otherwise.

Aside from failing to pass muster under the former version of Rule 702(a), the probative value of Dr. Barbaro's testimony was substantially outweighed by the risk that his testimony would unfairly prejudice Mr. Richardson, and it was needlessly cumulative. *See* N.C.G.S. § 8C-1, Rule 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence."). The probative value of Dr. Barbaro's testimony in this case was minimal. First, Dr. Barbaro's testimony was not necessary for the State to show that Taylor sustained a significant number of bites. The State had at least three witnesses who treated or inspected Taylor, identified several of the wounds on her body as bite marks, and

estimated the age of those wounds. The State's own description of the bite marks demonstrates that there was no need for a forensic odontologist to identify the wounds as bite marks on top of the testimony from the other medical professionals in this case. For example, the State points out that there were a considerable number of bite marks on her body, and the marks were so detailed that "some of the[m] . . . included impressions from eight upper and lower teeth." Further, the defense did not dispute the testimony of the three other medical professionals that the marks were indeed bite marks.

Aside from establishing that the wounds were bite marks through the testimony of several other medical professionals, the State also introduced overwhelming evidence that Mr. Richardson was the only person who had access to Taylor and could have caused her injuries, meaning that Dr. Barbaro's testimony was not necessary for identification purposes. For example, a police officer who interviewed Mr. Richardson after he brought Taylor to the hospital testified for the State that Mr. Richardson admitted both "[t]hat he had been watching [Taylor] for the past two weeks while her mother . . . was in military training" and that "he was the only person that had been watching her." Mr. Richardson did not contest the veracity of this admission. In sum, Dr. Barbaro's testimony did not serve any independent purpose, and in light of all other evidence introduced in this case, was needlessly cumulative.

While Dr. Barbaro's testimony was not particularly helpful in proving any

element of the State's case either at the guilt phase or the sentencing phase, it was massively inflammatory. For example, when asked to describe his reaction when he saw Taylor and her injuries, Dr. Barbaro testified that he "immediately said a prayer that she would die." He testified over the defense's objection about Mr. Richardson's intent in biting Taylor by discussing the purpose of animal bites, opining that "[b]ears and dogs are trying, for the most part, to kill their victim. So, they're tearing and using their teeth as their tool or weapon to tear or maim their victim" and that "bite mark evidence in adolescents and above . . . is used strictly for punishment."[5] All the while, Dr. Barbaro relied on photographs to illustrate his testimony, utilizing the prejudicial monitor display previously discussed. Dr. Barbaro zoomed in on photographs of Taylor's wounds, hyper-magnifying their appearance to the jury.

The trial court sustained the defense's objections to these inflammatory statements, as well as many others, and instructed the jury to disregard them. "It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information." *Bruton v. United States*, 391 U.S. 123, 135 (1968). But "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* Dr. Barbaro's emotionally charged and highly prejudicial statements

---

[5] These are a few of the many instances in which Dr. Barbaro's testimony crossed the line, serving no other purpose but to inflame the passions of the jury.

present one such context.

Despite the trial court's instructions that the jury ignore certain improper testimony, the content of Dr. Barbaro's statements was such that it would be unrealistic to believe that, when it came time for sentencing, the jurors could simply forget what they had heard. Though jurors may frequently be able to follow instructions to disregard evidence, jurors are human, and whether subconsciously or not, there are bound to be times when they are unable to do so. Where, as here, the testimony to be disregarded is both inappropriate expert testimony and intensely graphic and chilling, it is to be expected that those statements will reverberate in the minds of the jurors, infecting their capacity to render a dispassionate sentence. The exceedingly human tendency of failing to disregard this type of evidence has consequences, and in capital cases, those consequences are particularly extreme. Because the nature of Dr. Barbaro's testimony was such that a jury was likely incapable of properly disregarding it, his statements played into the difference between life and death for Mr. Richardson. In this way, the trial court's instructions were insufficient to cure the highly prejudicial effect of his testimony.

Because the State already presented substantial evidence of Mr. Richardson's guilt and his methods of abusing Taylor, it appears that the State introduced Dr. Barbaro's testimony merely to inflame the passions of the jurors such that any punishment imposed would not be based on a neutral, dispassionate application of the law but on the jury's own anger. In short, Dr. Barbaro's testimony served no other

purpose than to enrage the jury. In this respect, his testimony was unnecessarily cumulative of testimony provided by other witnesses, and its content created a substantial risk of unfair prejudice to Mr. Richardson. Because it lacked probative value, it was error to admit it under Rule 403.

Taken together, the trial court's errors prejudiced Mr. Richardson at sentencing. Even if individual missteps may not establish prejudice "when considered in isolation," the "cumulative effect of the errors" may undermine a proceeding's reliability and fairness. *See State v. Canady,* 355 N.C. 242, 246 (2002) (aggregating trial court's multiple errors and concluding that cumulative effect of errors prejudiced defendant); *see also State v. Allen,* 378 N.C. 286, 304 (2021) (holding that courts must "consider the cumulative effect of alleged errors by counsel" in analyzing whether a defendant alleging ineffective assistance of counsel has shown prejudice).

In capital cases, there is a heightened risk of cumulative error during sentencing—the phase when jurors decide whether to impose the death penalty. *See, e.g., Moore v. Johnson,* 194 F.3d 586 (5th Cir. 1999) (holding that cumulative errors prejudiced defendant at sentencing phase of capital trial, but not during guilt phase).[6]

---

[6] Courts have recognized that the question of prejudice may apply differently at the guilt and sentencing phases of a capital trial. In other words, even if a legal error would not change a jury's finding of guilt, it could alter the sentence it would impose. *See, e.g., Smith v. Wainwright*, 741 F.2d 1248, 1255 (11th Cir. 1984) (ordering hearing on trial ineffectiveness claim in capital case because counsel's failure to impeach witness during guilt phase "may not only have affected the outcome of the guilt/innocence phase, it may have changed the outcome of the penalty trial"); *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) (recognizing in capital case that prejudice analysis varies depending on whether legal errors occurred during the guilt or sentencing phases of trial, and analyzing defendant's claims accordingly).

That is because the choice to exact "our state's most extreme punishment," *State v. Robinson,* 375 N.C. 173, 175 (2020), is morally infused and deeply personal. *See Woodson,* 428 U.S. at 303-04. For that reason, emotional appeals carry unique sway in capital cases, as they color jurors' moral calculus and their assessment of a defendant's culpability. And for the same reason, courts shoulder a special duty to ensure that a jury's decision to impose a death sentence flows from reason, not rage. *See Eddings,* 455 U.S. at 117–18; *California v. Ramos*, 463 U.S. 992, 998–99 (1983).

In my view, the fairness and reliability of Mr. Richardson's sentencing was undercut by the cumulative error of Judge Lock's failure to recuse, thereby depriving Mr. Richardson of potentially mitigating evidence; the relentless deluge of multiple gruesome photographs the State repeatedly presented to the jury; and Dr. Barbaro's inflammatory testimony comparing Mr. Richardson to an animal. Without those errors and their aggregated effect, there is a "reasonable probability that at least one juror would have struck a different balance" in deciding whether to sentence Mr. Richardson to death. *Wiggins v. Smith*, 539 U.S. 510, 535 (2003); *Porter v. McCollum*, 558 U.S. 30, 40–42 (2009) (per curiam). And because the death penalty requires jurors' unanimous agreement, N.C.G.S. § 15A-2000(b)(3), there is an unacceptable risk that Mr. Richardson's sentence was the fruit of flawed legal process. To ensure that the "most serious and irrevocable of our state's criminal punishments" is imposed through fair and just proceedings, *see State v. Ramseur,* 374 N.C. 658, 686 (2020), I would remand for a new sentencing hearing.

## II.    Conclusion

I concur with the results of the majority affirming the jury's verdict that Mr. Richardson was guilty of the first-degree murder of Taylor, as well as guilty of first-degree kidnapping, sexual offense with a child, and felony child abuse inflicting serious injury. However, I believe that the errors identified above require a new sentencing hearing.